JOSEPH T. MCNALLY
Acting United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
KEVIN B. REIDY (Cal. Bar No. 320583)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-8536
    Facsimile: (213) 894-6269
    E-mail:   kevin.reidy@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ANDREW A. WIEDERHORN<br>WILLIAM J. AMON,<br>REBECCA D. HERSHINGER, and<br>FAT BRANDS INC.,<br><br>    Defendants. | No. 2:24-cr-295-RGK<br><br>GOVERNMENT'S REPLY IN SUPPORT OF ITS MOTION FOR ORDER PERMITTING REVIEW OF NONPRIVILEGED DOCUMENTS OR FOR ORDER DIRECTING ATTORNEY COMMUNICATIONS BE SUBMITTED FOR *IN CAMERA* REVIEW; DECLARATION OF KEVIN B. REIDY; EXHIBITS |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Kevin B. Reidy, hereby files its Reply in Support of its Motion for an Order Permitting Review of Nonprivileged Documents or, alternatively, for an Order Directing In Camera Review of Certain Communications Made by Counsel to Defendant Fat Brands Inc.

    This reply is based upon the attached memorandum of points and authorities, the attached Declaration of Kevin B. Reidy and the

exhibits thereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 28, 2025                Respectfully submitted,

                                        JOSEPH T. MCNALLY
Acting United States Attorney

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division

      /s/
KEVIN B. REIDY
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

For three years, defendant FAT Brands, Inc. ("FAT") asserted work-product protection over an email sent by its counsel to its outside auditors on March 12, 2020 (the "Sussman Email"). In its opposition, FAT abruptly reversed course, "withdrawing its work product claim" over the Sussman Email, (Dkt. 104 at 5), while insisting that other equally critical crime-fraud communications should be kept from this Court's "preliminary in camera review . . . to determine whether the crime-fraud exception applies" under Zolin's first step. Dollar Tree Stores, Inc. v. Toyama Partners LLC, 2011 WL 5117565, at *2 (N.D. Cal. Oct. 28, 2011) (collecting authorities and ordering Zolin review).

The standard for in-camera review under Zolin's first step is "relatively minimal," and the government easily satisfied that burden even without considering Sussman's Email. E.g., id. Sussman's Email only strengthens the government's "preliminary showing based on evidence other than the potentially privileged materials themselves" that there exists a "good faith belief by a reasonable person that in camera review" of the communications between defendant Wiederhorn, Sussman, and others that preceded, predicated, and followed those misrepresentations[1] "may reveal evidence to establish the claim that the crime-fraud exception applies." United States v. Christensen, 828 F.3d 763, 799 (9th Cir. 2015). As detailed below, Sussman's Email contains material misrepresentations central to defendants' schemes to defraud, which only underscores the need for Zolin review.

---

[1] For example, the communications the government exhibited at Dkt. 101-1 at 9, 13.

Id. at 800-02; In re Grand Jury Investigation, 445 F.3d 266, 279 n.4 (3rd Cir. 2006); In re Grand Jury Proceedings, 87 F.3d 377, 382 (9th Cir. 1996); In Re Grand Jury Proceedings, 867 F.2d 539, 541 (9th Cir. 1989). Accordingly, the first step of the Zolin two-step procedure has been met, see Zolin, 491 U.S. at 572, and the prosecution team requests that the Court agree to review the communications identified in the Conclusion below to determine whether the crime-fraud exception is applicable.

The government's motion should therefore be granted.

**II. RESPONSIVE STATEMENT OF RELEVANT FACTS**

**A. FAT's Prior Claims of Privilege**

FAT frivolously suggests that "the dispute over [Sussman's Email] would not have been raised to the Court" if only the government had met and conferred with FAT concerning the same. (Dkt. 104 at 5-6.) That suggestion is belied by FAT's many assertions over the course of three or more years that Sussman's Email was protected under the work-product doctrine and would not be disclosed to the government. (E.g., Reidy Decl. Exs. A, B.)

**B. Sussman's Email Disclaims Any "Opinion" or "Conclusion"**

Before summarizing what Sussman's Email represented or misrepresented, it should be emphasized that Sussman's Email did not purport to render a legal opinion or conclusion regarding the legality of the conduct at issue. To the contrary, as Sussman emphasized, "it is not possible to provide a definitive conclusion or legal opinion on" the question of "whether personal loans that were made to Andy Wiederhorn . . . caused FAT Brands Inc. to violate Section 402 of the Sarbanes-Oxley Act (SOX 402)." (Reidy Decl. Ex. C. at 3, 4.)

### C. Misrepresentations in Sussman's Email

Sussman's email to FAT's auditors contains critical misstatements that enabled the crimes charged in this case.

First, in support of the suggestion that the money FAT was sending to its affiliate, Fog Cutter ("FOG"), was not primarily flowing from FOG and then to Wiederhorn, Sussman stated that FOG's "legacy expenses far outweigh in scope and amount the personal loans that were made by [FOG] to Mr. Wiederhorn." (Id. at 4.) FOG's own financial statements show that this statement is false. In reality, the opposite was true—FOG's loans to Wiederhorn far outstripped its other expenditures.[2] As FOG's own financials state, it "loan[ed] to [its] shareholder," defendant Wiederhorn, $9,155,000 in 2018 and $16,803,000 in 2019, whereas its "[t]otal general and administrative expenses," or the "legacy expenses" Sussman mentioned, were only about $3 million in both years. (Reidy Decl. Ex. D. at 5–6.)[3] FOG's financial statements for Q3 2020 further demonstrate the falsity of Sussman's statements. Those statements indicate that FOG took a "[l]oss on forgiveness of loan to stockholder," i.e., that it "forgave" the sham "loans" it gave to Wiederhorn, to the tune of $16,948,000, while its "[t]otal . . . expense[s]" were "$19,339,000." (Reidy Decl. Ex. D at 26.)

Second, Sussman's email also misrepresented that "[FOG] independently arranged for and approved Mr. Wiederhorn's personal

---

[2] This makes sense, because FOG existed largely to hold FAT stock and funnel FAT's cash to Wiederhorn in furtherance of the criminal schemes charged in this case.

[3] Defendants may protest that FOG listed "Total current liabilities" of roughly $25 million in both 2018 and 2019, but FOG did not use the majority of its cash to pay down its liabilities; instead it used its cash to compensate Wiederhorn. (See Reidy Decl. Ex. D at 5.)

3

loans" and that the "Fog Cutter Board . . . retained independent counsel[4] to document the loans." (Reidy Decl. Ex. C at 4.) In reality, the FOG Board had no knowledge of the personal loans to Wiederhorn. Although it appears Wiederhorn himself may have scrambled to clothe his scheme under the aegis of legal advice the day after FAT's outside auditors raised their concerns, (Reidy Decl. Ex. E (log of March 7, 2020, withheld "[c]ommunication[s] requesting the legal advice of counsel regarding shareholder loan"))[5], FOG director witnesses, including FOG director Don Coleman, have stated that, not only did they not "independently arrange for and approve[] Mr. Wiederhorn's personal 'loans,'" they were <u>not even</u> "<u>aware</u> of approximately $50 million in shareholder loans to WIEDERHORN from FOG between 2010 and 2020," and emphasized that they "would have remembered if WIEDERHORN had come to the FOG board for approval of shareholder loans." (Reidy Decl. Ex. F. at 3 (emphasis added).)

<u>Finally</u>, Sussman's Email represented, "Wiederhorn has substantial, independent duties as CEO of Fog Cutter . . . which make it rational for Fog Cutter to extend credit to Mr. Wiederhorn without any instruction or arrangement by FAT Brands." (Reidy Decl. Ex. C at 4.) Two years earlier, however, Wiederhorn himself told FOG's board <u>and</u> Allen Sussman that FOG "is just a stock holding company (owns FAT) nothing else." (Reidy Decl. Ex. G at 1.)

---

[4] Sussman <u>correctly</u> represented that "Wiederhorn's" "loans" were "primarily for compensatory purposes," which supports the government's allegations that Wiederhorn willfully violated the tax laws as alleged throughout the Indictment in this case.

[5] In light of Sussman's Email, the government would now request that all highlighted documents in Exhibit E of the Reidy Declaration submitted in connection with this Reply be ordered produced to the Court for <u>in-camera</u> review under <u>Zolin</u>'s first step.

4

### D. Sussman's April 24, 2020 Memo to FAT's Board[6]

As FAT described in its Opposition to the government's motion, "on April 24, 2020, Mr. Sussman provided a memo addressing" the questions FAT's board members had raised about "the money FAT sent Fog Cutter," (Dkt. 104 at 10) i.e., the millions of dollars of compensation Wiederhorn had siphoned from FAT, through FOG, to himself in the form of loans from FAT to FOG and then in the form of sham "loans" to himself. (E.g. Dkt. 1 ¶¶ 52-80.) Describing as "pure guesswork," (Dkt. 104 at 14), the government's good-faith belief that review of Sussman's Memo may reveal further evidence that the crime-fraud exception applies, defendant FAT misses the ball by emphasizing what Sussman's Memo to FAT's board contained. But the government's crime-fraud analysis focuses on evidence showing critical information that Sussman's Memo does not contain—any notice to FAT's directors that the funds Wiederhorn asked FAT to extend to FOG were going primarily into his own pocket. The government's belief in this regard is hardly "pure guesswork;" among multiple other witnesses who have provided non-privileged evidence in this regard, former FAT director James Neuhauser has stated that he was "unaware of the shareholder loan between [FOG] and WIEDERHORN" "[p]rior to September 2020," and "would have expected SUSSMAN to tell [him] WIEDERHORN was taking money out of the company via a shareholder loan if SUSSMAN knew that." (Reidy Decl. Ex. H. at 14-15.)

---

[6] Sussman's Memo can be found at Exhibit C to the Schleifer Declaration, Dkt. 101-1 at 11-14.

5

**E.  Continuity of Wiederhorn's Fraudulent Schemes**

For his part, defendant Wiederhorn asserts that his "prior shareholder loans and prior convictions have nothing to do with the conduct charged in this case." (Dkt. 105 at 2.) As the government reports he included with his filings establish, however, his prior convictions were the culmination of investigations into his "taking cash out of the companies with an intent to repay it later," his "focus [in] orchestrating financial transactions to access . . . cash without paying taxes on it," and the "misappli[cation of] personal expenses [that were] booked . . . under the shareholder loans," loans that "totaled roughly $65 million for WIEDERHORN" and which were not reported on "personal tax returns." (Dkt. 105-2 at 3; 105-3 at 3.) "Fog Cutter," now absorbed into defendant FAT, was an affiliate of and successor to the companies defendant Wiederhorn previously stripped, and, indeed, was delisted from the public markets in part because it paid Wiederhorn a $2 million bonus while he was incarcerated even though "Fog Cutter knew Wiederhorn would use the $2 million payment to pay the restitution his plea agreement." Fog Cutter Cap. Grp. Inc. v. S.E.C., 474 F.3d 822, 824 (D.C. Cir. 2007).

**F.  Wiederhorn Did Not Disclose That the FOG Funds Would Be Mostly Sent to Him in Compensation Disguised as Loans**

Defendant FAT misleadingly argues that Wiederhorn fully informed the FAT Board that the majority of funds sent from FAT to FOG would be sent to Wiederhorn personally as compensation disguised as personal loans. (Dkt. 104 at 9-10.) In support of that remarkable contention, defendant FAT cites an email in which Wiederhorn provided a list of liability payments FOG made on a monthly basis. (Id. at 10.) Most of the liabilities on the list specifically identify the

6

payor and, more critically, the amount FOG would pay to each payor each month. (Id.)  Yet the line item that supposedly informed the Board that FOG issued hundreds of thousands of dollars a month in personal loans to Wiederhorn does not identify Wiederhorn by name or specify the amount paid to him--it merely states "SG&A, including compensation at F[O]G."  (Id.)  The notion that this intentionally vague entry at the end of a list of detailed entries "accurately disclosed" the nature and extent of FOG's loan payments to Wiederhorn borders on the absurd.

### G. The $47 Million in Compensation to Wiederhorn Came from FAT and FAT Predecessors and Affiliates

Defendant Wiederhorn also protests, "Fat Brands did not even come into being until 2017 . . . and therefore could not possibly have extended the $47 million to Wiederhorn."  (Dkt. 105 at 3.)  This reference to the corporate combinations, initial public offerings, and mergers of FAT and its predecessors and affiliates is a non-sequitur; the $47 million in unreported compensation originated from the revenues of those now-combined entities, as the above-described facts make clear.  To take just one example, former FAT director James Neuhauser stated that he "would not have approved the funds lent from FAT BRANDS to F[O]G if [he] knew the money was going to WIEDERHORN.  In 2018, if FAT BRANDS had revenue of $18 million and $9 million went to WIEDERHORN via the shareholder loan, an investor's decision to invest might have been impacted."  (Reidy Decl. Ex. H. at 15.)  More directly, defendant Wiederhorn does not and cannot dispute that the funds at issue——while booked as "loans" from FOG, in fact flowed from FAT, often directly to him in payment of his personal expenses.  (See, e.g., Dkt. 1 ¶¶ 52-80.)

7

**III. ARGUMENT**

   **A.   The Government Has Satisfied Zolin's First Step**

The non-privileged evidence available easily clears the low bar set by the Zolin first step--"a good faith belief by a reasonable person that in camera review of the [privileged] materials may reveal evidence to establish the claim that the crime-fraud exception applies." Zolin, 491 U.S. at 572. That evidence includes:

- The misrepresentations in Sussman's Email (supra);
- Wiederhorn's communication with Sussman multiple times after the auditors raised concerns and before Sussman responded to them in Sussman's Email (e.g., Dkt. No. 101-1 at 9; Reidy Decl. Ex. E at 1);
- The apparent absence from Sussman's Memo to the FAT Board on April 24 (and in any communications or meetings, including board meetings, prior to Q3 2020 or later) of any disclosure by Sussman that Wiederhorn was taking the majority of the funds FAT loaned to FOG as compensation to himself (E.g., Reidy Decl. Ex. H. at 14-15);
- Statements from former FAT directors that they would not have approved further transfers from FAT to FOG had they known the money was going to Wiederhorn personally (E.g., Reidy Decl. Ex. H at 15).

In those ways, and others, the advice sought and given by Sussman in March and April 2020 lies at the center of defendants' frauds. Sussman's advice (and the misrepresentations upon which they were based) provided to FAT's outside auditors and its Board with assurances that unquestionably facilitated Wiederhorn's obtaining an additional $8 million from FAT in the second, third, and fourth

8

quarters of 2020.  Put another way, without Sussman's communications the fraud would likely not have continued.  Sussman's communications to the auditors and to the FAT Board furthered the alleged fraud by concealing its nature and extent from those who had the ability to stop it.  See, e.g., United States v. Schussel, 291 F. App'x 336, 345-46 (1st Cir. 2008) (affirming application of crime-fraud exception because "in each of the three documents [the defendant] was providing incorrect information to [his attorney] to be used in responses to . . . exchanges with the IRS in an effort to deceive the IRS about the true nature" of defendant's tax fraud); United States v. Beckman, 787 F.3d 466, 482-83 (8th Cir. 2015) (crime-fraud applied to communications between defendant and attorney used to submit "false and misleading information" to NHL in connection with effort to fraudulently purchase ownership interest).  At the very least, there is a reasonable, good-faith basis to believe this, which suffices to trigger in-camera review under Zolin's first step.

     Defendant mischaracterizes the government's Zolin motion as an attempt to "impugn" Sussman in order to "chill [his] testimony." (Dkt. 104 at 12.)  The government is not necessarily impugning Sussman's integrity, nor does it need to in order to meet its burden.  Perhaps Sussman, for example, passed along the various misrepresentations in the Sussman Email without knowledge as to their falsity or their helpfulness in concealing fraud.  But even if that were true, it would not matter--the crime-fraud exception "applies even when an attorney is unaware that the client is engaged in or planning a crime."  In re Grand Jury Investigation, 445 F.3d 266, 279 n.4 (3rd Cir. 2006); see also In re Grand Jury Proceedings, 87 F.3d 377, 382 (9th Cir. 1996) ("It is therefore irrelevant, for purposes

of determining whether the communications here were made 'in furtherance of' Corporation's criminal activity, that [counsel] may have been in the dark about the details of that activity."). The evidence of Sussman's enlistment in perpetrating the fraud, whether knowing or unknowing, more than meets the government's low burden at Zolin's first step.

### B. FAT's Authorities Are Inapposite

FAT's attempt to liken this situation to In re Grand Jury Investigation, 974 F.2d 1068 (9th Cir. 1992), falls short. The two cases are nothing alike in the timing of the communications sought or the degree to which the lawyers involved facilitated the fraud. In re Grand Jury held that the mere fact that a company had sought legal advice before commencing a Medicare fraud scheme was not sufficient to justify in camera review of pre-fraud privileged documents based on the temporal improbability that they promoted a criminal activity that had not yet begun. See id. at 1073. Here, however, the record shows that Wiederhorn's fraudulent scheme had been operating for many years when he enlisted Sussman's help in providing legal comfort to skeptical auditors and board members questioning the ever-increasing transfers of money from a publicly traded company to Wiederhorn's private holding company. That history, combined with the facts bulleted above, provides the good-faith belief necessary to trigger in camera review. The government has made a far stronger showing that FAT and Wiederhorn used Sussman to promote and continue their

fraud scheme and obtain additional funds from FAT to provide to Wiederhorn in the form of personal loans.[7]

Similarly, this Court should reject defendant's attempt to preclude the government from introducing evidence to respond to contentions defendant first raised in its opposition--including a key document that defendant only produced the day after filing--in the government's reply. Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1134 (7th Cir. 1996) ("Where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for [relief], reply papers--both briefs and affidavits--may properly address those issues.").

**IV.   CONCLUSION**

The government requests that the Court grant its motion and direct defendant FAT to furnish the Court with unredacted versions of: (i) Exhibits B and C to the March 7, 2025 Declaration of Adam P. Schleifer, (Dkt. 101-1 at 9-14); and (ii) unredacted versions of all highlighted documents in Exhibit E of the Reidy Declaration, so that the Court may conduct an in camera review to determine whether the crime-fraud exception to the attorney-client privilege applies.

---

[7] Similarly, United States v. de la Jara, 973 F.2d 746 (9th Cir. 1992), involved a district court who ruled that a document fell within the crime-fraud exception without first conducting a first-step Zolin analysis, id. at 748-49, a procedure that the government is not asking for here.

11