## DECLARATION OF KEVIN B. REIDY

I, Kevin B. Reidy, hereby declare and state:

1.    I am an Assistant United States Attorney assigned by the United States Attorney's Office for the Central District of California to the criminal prosecution in this case.

2.    Attached as Exhibit A to this Declaration is a true and correct copy of a November 21, 2022, letter from FAT's counsel to AUSA Adam P. Schleifer asserting and maintaining a claim of work-product protection over documents including Sussman's Email.

3.    Attached as Exhibit B to this Declaration is a true and correct copy of an August 26, 2024, email from FAT's counsel to AUSA Adam P. Schleifer confirming that "FAT Brands is asserting privilege and/or work product protections over" documents, including Sussman's Email, that it had produced to the government.

4.    Attached as Exhibit C to this Declaration is a true and correct copy of Sussman's Email, which was provided to the government by defendant FAT on Saturday, March 22, 2025.

5.    Attached as Exhibit D to this Declaration are true and correct copies of Exhibits 99.1 and 99.2 to FAT's March 12, 2021, SEC Form 8-K/A.

6.    Attached as Exhibit E to this Declaration is a true and correct copy excerpts from FAT's March 1, 2023 privilege log.

7.    Attached as Exhibit F to this Declaration is a true and correct copy of an FBI report of a May 26, 2023, interview of FOG board member Don Coleman, produced to defendants at Bates USAO_PROD-_00026989.

1

8.    Attached as Exhibit G to this Declaration is a true and correct copy of an email dated August 14, 2018, from Andy Wiederhorn to Allen Sussman and others, which the government produced to defendants at USAO_PROD_00082736.

9.    Attached as Exhibit H to this Declaration is a true and correct copy of an FBI report of a March 10, 2023, interview of former FAT Board member James Neuhauser, produced to the defendants at Bates USAO_PROD_00018888.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: March 28, 2025

/s/ Kevin B. Reidy
KEVIN B. REIDY

**<u>EXHIBIT A</u>**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144

———

TEL: (213) 687-5000

FAX: (213) 687-5600

**www.skadden.com**

DIRECT DIAL
(213) 687-5108
DIRECT FAX
(213) 621-5108
EMAIL ADDRESS
MATTHEW.TAKO@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

November 21, 2022

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**VIA EMAIL**

Adam P. Schleifer                    Special Agent Nathan Cherney
Assistant United States Attorney     Federal Bureau of Investigation
United States Attorney's Office      11000 Wilshire Blvd., Suite 1700
312 N. Spring St., Suite 1100        Los Angeles, CA 90024
Los Angeles, CA 90012

RE:     FAT Brands, Inc.

Dear Messrs. Schleifer and Cherney:

On behalf of our clients, Fat Brands, Inc. ("FAT") and Fog Cutter Acquisition LLC ("Fog Cutter") (collectively, the "Companies"), we write this letter to provide a response to an oral request you made for the Companies to identify any documents previously produced by Baker Tilly US, LLP ("Baker Tilly") over which the Companies assert attorney-client privilege, attorney work product protections, or any other related protections and/or privileges.

Earlier this year, we learned that there may have been certain materials produced by Baker Tilly which may contain materials covered by the attorney-client privilege or constitute protected attorney work product. It is our understanding that, upon this realization, you sequestered Baker Tilly's production from further review. The Companies requested that you furnish them with Baker Tilly's production so that the Companies could conduct a review. You declined to do so, and, instead, the Companies proceeded to work diligently with counsel for Baker Tilly to obtain the requested materials. Ultimately, on August 8, 2022, Baker Tilly provided the

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 2

Companies with a subset of its production to the Government, which the Companies
understand contains the documents which hit on a list of counsel provided to Baker
Tilly by the Companies.  Upon reviewing these documents, the Companies believed
that it was not a complete set and that several documents which should have hit on
the Companies' search terms were not included.  After further discussion with Baker
Tilly, the Companies were provided with a supplemental set of documents on
October 20, 2022.

The Companies have since reviewed all documents provided to them by
Baker Tilly, which we understand to be a subset of Baker Tilly's production to the
Government, which was culled using attorney name search terms.  As previously
articulated to you, the Companies believe that there is no waiver of attorney work
product when provided to an external auditor.  *See United States v. Sanmina Corp.*,
968 F.3d 1107, 1121 (9th Cir. 2020) ("disclosure of work product to a third party
does not waive the protection unless such disclosure is made to an adversary in
litigation or 'has substantially increased the opportunities for potential adversaries to
obtain the information.'").  Below is a list of all documents from the subset provided
to the Companies by Baker Tilly over which the Companies assert attorney-client
privilege or attorney work product protection.  The Companies reserve all rights to
further supplement this list.  The Companies further do not waive attorney work
product, attorney-client privilege, or any other applicable privileges or protections
over any documents produced by Baker Tilly which were not made available for the
Companies' review.

| Document | Basis | Description |
|---|---|---|
| BTUS083191 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS106662 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS176244 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS176251 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS157415 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS156694 | Attorney Work Product | Communication prepared in |

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 3

| Document | Basis | Description |
| --- | --- | --- |
| | | anticipation of regulatory action and/or litigation. |
| BTUS190853 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS232332 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS267692 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS267823 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS267899 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS222036 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS222195 | Attorney Work Product | Communication prepared in anticipation of regulatory action and/or litigation. |
| BTUS014010 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS015454 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS015462 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 4

| Document | Basis | Description |
|---|---|---|
| BTUS017803 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS018738 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS019966 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS026772 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS030189 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS036016 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS038697 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 5

| Document | Basis | Description |
|---|---|---|
| BTUS038715 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS042150 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS042608 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS000751 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS000759 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS121624 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS165028 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 6

| Document | Basis | Description |
|---|---|---|
| BTUS162839 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS258639 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS211891 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS199677 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS288636 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS291703 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS292188 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 7

| Document | Basis | Description |
|---|---|---|
| BTUS014283 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS015412 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS015458 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS016623 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS016660 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS017599 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS019464 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 8

| Document | Basis | Description |
|----------|-------|-------------|
| BTUS019492 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS019500 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS019504 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS019507 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS019510 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS019514 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS019525 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 9

| Document | Basis | Description |
|---|---|---|
| BTUS019533 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS024904 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS024921 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS024925 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS025176 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS038707 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS042154 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 10

| Document | Basis | Description |
| --- | --- | --- |
| BTUS171883 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS173855 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS190099 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS211876 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS211887 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS199606 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS279075 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 11

| Document | Basis | Description |
|---|---|---|
| BTUS296705 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS269569 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS269240 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS269245 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS296799 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS294779 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS295650 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 12

| Document | Basis | Description |
|---|---|---|
| BTUS295091 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS292239 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS296017 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS221891 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS295089 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS198197 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |
| BTUS158303 | Attorney Work Product | Document from counsel containing descriptions of work and mental impressions prepared in anticipation of potential and/or ongoing litigation. |

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 13

| Document | Basis | Description |
|---|---|---|
| BTUS132088 | Attorney Work Product | Communication with outside counsel prepared in anticipation of litigation. |
| BTUS132792 | Attorney Work Product | Communication with outside counsel prepared in anticipation of litigation. |
| BTUS133271 | Attorney Work Product | Document prepared by counsel in connection with ongoing litigation. |
| BTUS133271 | Attorney Work Product | Document prepared by counsel in connection with ongoing litigation. |

FOIA Confidential Treatment Requested.  The Companies hereby request that the FBI and the DOJ afford non-public, confidential treatment under the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA"), to this letter, the information contained herein, and all documents and the information contained therein produced in response to the Subpoena (the "Confidential Material").  The Confidential Material contains both confidential business and/or financial information concerning the Companies.

If any person (including any government employee who is not an employee of the FBI or the DOJ) requests the opportunity to inspect or copy the Confidential Material, the Companies respectfully requests that the undersigned immediately: (i) be notified of such request; (ii) be furnished with a copy of all written materials pertaining to such request (including, but not limited to, the request and any agency determination with respect to such request); and (iii) be given advance notice of any intended disclosure of the Confidential Material so that the Companies may, if deemed necessary and appropriate, pursue any available remedies.  Additionally, the Companies respectfully request that the Confidential Material, as well as any copies made thereof, be returned to the undersigned upon conclusion of the review of this matter.

Please be advised that we have sent the FOIA Compliance Officer a letter containing a request for confidential treatment under FOIA of the Confidential Material.

If you have any questions or would like to discuss this matter further, please do not hesitate to contact me.  Thank you for your continuing courtesy and cooperation in this matter.

Adam P. Schleifer
Nathan Cherney
November 21, 2022
Page 14

                              Sincerely,

                              Matthew J. Tako

Enclosures

cc:     Matthew E. Sloan, Esq.
        Allen Lanstra, Esq.

**EXHIBIT B**

| **From:** | Vicki Chou |
| **To:** | Schleifer, Adam (USACAC); Rotstein, Jimmy; Reidy, Kevin (USACAC) |
| **Cc:** | Fuchs, Douglas; Hanna, Nicola T.; Sandra R. Brown; Greenberg, Gordon; Roker, Brandon; Michael Proctor; ▮▮▮▮@mintz.com |
| **Subject:** | [EXTERNAL] RE: US v. Wiederhorn et al - Discovery |
| **Date:** | Monday, August 26, 2024 2:32:44 PM |

Counsel:

An issue has arisen with respect to the auditor documents the government plans to produce.  The short version is that there appear to be some documents in the auditor documents that FAT Brands is asserting privilege and/or work product protections over.  While we work out those issues with the government, and to avoid any delays in production, we are asking that all parties agree that the government's production will not be construed as a waiver of any of FAT Brands' applicable privileges or protections – i.e., that no one will argue that the government's production of documents supports a finding that FAT Brands waived any applicable privilege or protection.

Please respond with your assent if this is agreeable to you.

Thank you,
Vicki

**Vicki Chou**

**HUESTON HENNIGAN** LLP



Biography

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

**EXHIBIT C**

**From:** Gregory Zelenay ▮
**Sent:** 3/19/2020 1:02:20 AM
**To:** Rebecca Hershinger ▮
**Subject:** FW: SOX 402 question

## Gregory Zelenay
Partner

squarmilner

▮

**From:** Gregory Zelenay
**Sent:** Friday, March 13, 2020 4:56 PM
**To:** 'Allen Sussman' ▮
**Cc:** Andy Wiederhorn ▮                                    Ernest Miranda
▮

**Subject:** RE: SOX 402 question

Allen,

Thank you for this, this is helpful in relation to Fog Cutter loans.

We also have an issue with ongoing "Due from affiliates" on Fat Brands books that is a balance which continues to increase since the IPO date. Essentially, these are amounts coming out of Fat Brands to Fog Cutter, flowing through the Fat Brands balance sheet. The "Due from affiliates" account has increased steadily since the IPO and the original promissory notes.

I may be oversimplifying, but I basically see three types of funds going from Fat Brands to Fog Cutter:

1.      Amounts per the tax sharing arrangement
2.      Amounts related to the Home Style Dining investment
3.      Other amounts

It is the third category of "other amounts" that we think we need to document better. There are a variety of different types of Fog Cutter expenses that Fat Brands has funded (compensation, FCCG operating expenses, etc.). In talking with Andy last night, I understand the genesis of the arrangement and see where it will end up once Fog Cutter and Fat Brands merge (NOL will wipe out the due from account). I also understand that the funding in 2018 required the $30M note to Fog Cutter get converted into equity at the time, which was really amounts due to Fog Cutter for contributing Fatburger and Buffalo into FAT Brands. **That said, I think it would be prudent to have a new promissory note (similar to the $11M one at the IPO date), that covers the increases in the "due from" account related to "other amounts".** I think the Company has been operating under the assumption that these increases are basically a continuation of the original $11M note, same terms, etc., but it's not clear to me that the original note would cover amounts over the original $11M.

I'm envisioning our related party note to basically be made up of the three components, and for us to have a promissory note from Fog Cutter that supports the amounts that have been transferred to Fog Cutter from Fat Brands or paid by Fat Brands on Fog Cutter's behalf.

I'm copying my concurring partner, Ernest Miranda, so we are all on the same page.

Please let us know if you agree with this recommendation, and if so, if we can get the note that supports these amounts due from Fog Cutter.

Thanks.



**From:** Allen Sussman
**Sent:** Thursday, March 12, 2020 6:53 PM
**To:** Gregory Zelenay <
**Cc:** Andy Wiederhorn
**Subject:** SOX 402 question

EXTERNAL EMAIL - PLEASE EXERCISE CAUTION.
Greg, in the email below, you asked me to comment on whether personal loans that were made to Andy Wiederhorn by Fog Cutter Capital Group Inc. may have caused FAT Brands Inc. to violate Section 402 of the Sarbanes-Oxley Act (SOX 402). SOX 402 provides as follows:

**"It shall be unlawful for any issuer . . ., directly or indirectly, including through any subsidiary, to extend or maintain credit, to arrange for the extension of credit, or to renew an extension of credit, in the form of a personal loan to or for any director or executive officer (or equivalent thereof) of that issuer."**

For purposes of SOX 402, FAT Brands would be considered the "issuer", but Fog Cutter would not be considered an "issuer" since it does not have securities that are required to be registered with the SEC.

As you know, Fog Cutter is the financial sponsor of FAT Brands and there have been a number of contractual arrangements between the companies, including an intercompany loan made by FAT Brands to Fog Cutter, and another intercompany loan made by Fog Cutter to FAT Brands. My understanding is that these ongoing contractual relationships between Fog Cutter and FAT Brands have raised the question during your audit process of whether FAT Brands has, through these relationships, indirectly "arranged" for an extension of credit by Fog Cutter to Mr. Wiederhorn.

Unfortunately, there is very little guidance or official interpretations of SOX 402 published by the SEC, and the guidance that is available does not shed light on the meaning of the term "arrange for the extension of credit". (A number of exceptions to SOX 402 have been recognized, such as loans by banks or brokers, travel and indemnification advances, etc., but none of these exceptions is directly applicable here.)

The primary guidance that is available and relevant to this issue consists of a position paper published in October 2002 by 25 law firms, which set forth the consensus of these law firms regarding various interpretations of SOX 402. Here is a link to the 25 law firm memo: https://www.lw.com/upload/pubcontent/_pdf/pub1796_1.pdf

Regarding the issues raised above, the law firm memo states the following:

"The concept of "arranging" necessarily requires some level of issuer involvement in the loan [that is made] by a third party. While certain limited facilitation of a "personal loan," such as providing information or confirming that

the issuer will comply (as well as the method by which the issuer will comply) with its existing obligations, should not constitute "arranging," more substantial levels of facilitation or participation by the issuer may be deemed to be "arranging." Given the conflict of interest-oriented policy of § 402, the use of company assets or facilitation by the issuer of an arrangement that would affect the behavior of directors or executive officers is more likely to involve an "arranging." There also may be circumstances in which an issuer is "arranging" but in which the issuer should not be viewed as "arranging" a "personal loan." For example, an issuer could develop a broadly based employee benefit program involving incidental loans that are available on the same terms to all participants. While the issuer may have arranged the benefit program, it should not be viewed as having arranged "personal loans" because of the incidental nature of the loan feature. An example of this would be loans from 401(k) plans discussed below."

The law firm memo also provides the following example:

**"Parent/shareholder loans to executive officer of "issuer" subsidiary (who is not also executive officer or director of parent):**

i.   *Traditional loan.* Depends on whether subsidiary has "arranged."

•   **Permissible** – If there is clear evidence the loan is made by reason of service to the parent, not the subsidiary. It is helpful if similar loans are also offered to similarly situated employees of the lender who are not directors or executive officers of the subsidiary.

•   **Permissible** – If it can otherwise be clearly shown that the subsidiary has not "arranged."

In both cases, factors to be considered include director and executive officer interlocks and the relative size of the parent and the subsidiary."

In applying these concepts, there are a number of important facts to be considered:

•   Fog Cutter maintains an independent Board of Directors with no interlocks with the FAT Brands Board, other than Mr. Wiederhorn. (Don Berchtold is a Board member of Fog Cutter and a marketing executive of FAT Brands, but has no role in the financial or compensation function of FAT Brands.)

•   There are important, independent business reasons for the intercompany loan made by FAT Brands to Fog Cutter, including to finance Fog Cutter's legacy expenses incurred during the IPO and restructuring of FAT Brands and its subsidiaries. These legacy expenses far outweigh in scope and amount the personal loans that were made by Fog Cutter to Mr. Wiederhorn.

•   Fog Cutter independently arranged for and approved Mr. Wiederhorn's personal loans primarily for compensatory purposes for his services to Fog Cutter. The payments were structured as loans for bona fide business reasons of Fog Cutter. In addition, the Fog Cutter Board did not consult with or seek permission from FAT Brands' management or Board concerning the loans to Mr. Wiederhorn, and retained independent counsel to document the loans.

•   Mr. Wiederhorn has substantial, independent duties as CEO of Fog Cutter which predate the formation of FAT Brands, which make it rational for Fog Cutter to extend credit to Mr. Wiederhorn without any instruction or arrangement by FAT Brands.

Although it is not possible to provide a definitive conclusion or legal opinion on these issues in the absence of direct guidance or interpretation by the SEC or Congress, it seems that the facts outlined above would provide a strong basis for the position that the current arrangements do not violate SOX 402.

I'm happy to discuss these issues or address any follow up questions at your convenience. Thanks.

**Allen Z. Sussman**
*Partner*
***Loeb & Loeb LLP***

Los Angeles | New York | Chicago | Nashville | San Francisco | Washington, DC | Beijing | Hong Kong | www.loeb.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

**From:** Gregory Zelenay                              >
**Sent:** Friday, March 6, 2020 12:09 PM
**To:** Andy Wiederhorn
**Subject:** Follow Up

Hi Andy,

Hopefully, today is the securitization is closing...I know it's been a ton of work for you and your team.

I wanted to follow up with you on our conversation from the other day. I discussed the issues with Ernest Miranda (concurring partner) as he will also need to have comfort around the issue. Here is where we landed:

• We think your interpretation is correct in that the loans are allowable if they are to FCCG and not you, personally. That said, anything we can get from Allen Sussman in writing to support that would be helpful. We are not asking for a formal legal opinion to be written up, but we would like some additional comfort on the interpretation and position being taken. This could perhaps be a one liner email from him that basically says he's reviewed the issue and it appears to be allowable within the rules.

• We would like to add some additional clarity in the related party disclosures. Related party disclosures are a hot button focus issue for the SEC and the PCAOB currently, and we think that footnote needs to provide a few more details than what has been done to date. Once we get the draft of the 10-K, we can provide some proposed language on this front that you can review.

• Jade will be providing you with a related party questionnaire that we will need filled out. Since much of our reliance on these transactions is based on the representations of management, we will need this as the document showing we received this info from you. Once you see the questionnaire, please let me or Jade know if you have any questions on it.

Thanks.

Greg

# Gregory J. Zelenay
Office Managing Partner, Los Angeles


squarmilner

gzelenay@squarmilner.com

## www.squarmilner.com


Squar Milner is a member of Allinial Global, an association of legally independent accounting firms.

**EXHIBIT D**

3/27/25, 4:25 PM    Case 2:24-cr-00295-RGK    Document 109-1    Filed 03/28/25    Page 26 of 95    Page ID
sec.gov/Archives/edgar/data/1705012/000149315221005900/ex99-1.htm
#:903

EX-99.1 3 ex99-1.htm

<b>Exhibit 99.1</b>



Certified Public Accountants
and Financial Advisors

**The Fog Cutter Group
(a carveout of Fog Cutter Capital
Group Inc.)**
Combined Financial Statements
Years Ended December 29, 2019 and
December 30, 2018



## FINANCIAL STATEMENT SCHEDULES

**The Fog Cutter Group (a carveout of Fog Cutter Capital Group Inc.)**

**Audited Financial Statements**

Independent Auditor's Report                                                                                                F-1-F-2
Combined Balance Sheets as of December 29, 2019 and December 30, 2018                                                       F-3
Combined Statements of Operations for the years ended December 29, 2019 and December 30, 2018                              F-4
Combined Statements of Equity (Deficit) for the years ended December 29, 2019 and December 30, 2018                        F-5
Combined Statements of Cash Flows for the years ended December 29, 2019 and December 30, 2018                              F-6-F-7
Notes to Combined Financial Statements                                                                                      F-8



Squar Milner LLP

Certified Public Accountants
and Financial Advisors

## INDEPENDENT AUDITOR'S REPORT

Stockholders and Board of Directors
Fog Cutter Capital Group Inc. and Subsidiaries
Beverly Hills, California

**Report on the Financial Statements**

We have audited the accompanying combined financial statements of the Fog Cutter Group, which comprise the combined balance sheets as of December 29, 2019 and December 30, 2018, the related combined statements of operations, changes in equity and cash flows for the years then ended, and the related notes to the combined financial statements (collectively, the "financial statements"). The Fog Cutter Group consists of Fog Cutter Capital Group Inc. and all of its subsidiaries and affiliated entities (excluding FAT Brands Inc, "FAT").

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

11150 Santa Monica Boulevard, Suite 600 • Los Angeles, CA 90025                main 310.826.4474

Located throughout California                                                                     web squarmilner.com

F-1



We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Fog Cutter Group as of December 29, 2019 and December 30, 2018, and the results of their operations and cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

**Emphasis of Matters**

As discussed in Note 2, Fog Cutter Capital Group Inc. ("FCCG") and FAT are contemplating a forward triangular merger in 2020 pursuant to which FCCG will merge with and into a newly formed subsidiary of FAT, leaving FAT as the surviving corporation. The accompanying combined financial statements reflect the accounts of the Group referred to above on a stand-alone basis, excluding the activity and ownership of FAT. Accordingly, these special purpose financial statements are not intended to be a complete presentation of the financial position or results of operations of FCCG and its subsidiaries taken as a whole. Our opinion is not modified with respect to this matter.

As discussed in Note 1, the Group is liable for debt obligations maturing in 2020 and has limited liquidity resources other than advances it receives from FAT. Therefore, the Group's ability to meet its future liquidity requirements is dependent upon the operating and capital activities of FAT and the planned completion of its planned merger into FAT during the fourth quarter of 2020. The accompanying financial statements do not reflect the impact of this uncertainty. Our opinion is not modified with respect to this matter.

Very truly yours,

*/s/ Squar Milner LLP*

Los Angeles, CA
October 13, 2020

F-2

FOG CUTTER GROUP
(A carveout of FOG CUTTER CAPITAL GROUP, INC.)
COMBINED BALANCE SHEETS
*(dollars in thousands, except share data)*

| | December 29, 2019 | December 30, 2018 |
|---|---|---|
| **Assets** | | |
| Current assets | | |
| Cash | $ 29 | $ 29 |
| Dividends receivable from FAT Brands Inc. | 209 | - |
| Other current assets | 127 | 104 |
| Total current assets | 365 | 133 |
| | | |
| Property, plant and equipment, net of accumulated depreciation of $286 and $289, respectively | 63 | 72 |
| Investment in FAT Brands, Inc. Series A   preferred stock | 1,500 | 1,500 |
| Loan to shareholder | 16,803 | 9,155 |
| Other assets | 56 | - |
| Total assets | $ 18,787 | $ 10,860 |
| | | |
| **Liabilities and Stockholders' Deficit** | | |
| Liabilities | | |
| Accounts payable | $ 4,554 | $ 3,587 |
| Accrued expenses | 11,264 | 11,116 |
| Current portion of long-term debt | 6,359 | 5,860 |
| Litigation reserve | 3,500 | 3,500 |
| Other | 65 | 64 |
| Total current liabilities | 25,742 | 24,127 |
| | | |
| Due to Fat Brands Inc. | 25,967 | 15,514 |
| Other | 56 | 58 |
| Total liabilities | 51,765 | 39,699 |
| | | |
| Commitments and contingencies (Note 11) | | |
| | | |
| Stockholders' deficit | | |
| Common stock, $.0001 par value; 200,000,000 shares authorized; 13,882,044 and 11,757,044 shares issued; 10,082,399 and 7,957,399 shares outstanding as of as of December 29, 2019 and December 30, 2018, respectively | 1 | 1 |
| Additional paid-in capital | 174,756 | 172,631 |
| Accumulated deficit | (195,724) | (189,460) |
| Treasury stock, 3,799,645 common shares as of December 29, 2019 and December 30, 2018, at cost | (12,011) | (12,011) |
| Total stockholders' deficit | (32,978) | (28,839) |
| Total liabilities and stockholders' deficit | $ 18,787 | $ 10,860 |

The accompanying notes are an integral part of these combined financial statements.

F-3

FOG CUTTER GROUP
(A carveout of FOG CUTTER CAPITAL GROUP, INC.)
COMBINED STATEMENTS OF OPERATIONS
(dollars in thousands, except share data)

For the Years Ended December 29, 2019 and December 30, 2018

|  | 2019 | 2018 |
|---|---|---|
| **Revenue** | | |
| Restaurant sales | $ - | $ 828 |
| Total revenue | - | 828 |
| | | |
| **General and administrative expenses** | | |
| Compensation expense | 1,825 | 223 |
| Restaurant operating expense | - | 889 |
| Other general and administrative expenses | 1,791 | 1,897 |
| Total general and administrative expenses | 3,616 | 3,009 |
| | | |
| Loss from operations | (3,616) | (2,181) |
| | | |
| **Other (expense) income** | | |
| Interest expense | (3,025) | (2,123) |
| Interest income | 827 | 1,245 |
| Reserve for litigation settlement | - | (1,750) |
| Other expense | (448) | (134) |
| Total other expense, net | (2,646) | (2,762) |
| | | |
| Loss before income tax expense | (6,262) | (4,943) |
| | | |
| Income tax expense | 2 | 3 |
| | | |
| Net loss | $ (6,264) | $ (4,946) |

The accompanying notes are an integral part of these combined financial statements

F-4

FOG CUTTER GROUP
(A carveout of FOG CUTTER CAPITAL GROUP, INC.)
COMBINED STATEMENTS OF EQUITY (DEFICIT)
*(dollars in thousands, except share data)*

| | Shares [1] | Common Stock | | | | | Accumulated Deficit | Total |
| | | Par value | Additional paid-in capital | Treasury Stock | Total | | | |
|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2017 | 7,957,399 | $ 1 | $ 172,631 | $ (12,011) | $160,621 | | $ (184,514) | $ (23,893) |
| Net loss | - | - | - | - | - | | (4,946) | (4,946) |
| Balance at December 30, 2018 | 7,957,399 | 1 | 172,631 | (12,011) | 160,621 | | (189,460) | (28,839) |
| Net loss | - | - | - | - | - | | (6,264) | (6,264) |
| Issuance of common stock in lieu of cash compensation payable | 1,825,000 | - | 1,825 | - | 1,825 | | - | 1,825 |
| Issuance of common stock in lieu of cash directors' fees payable | 300,000 | - | 300 | - | 300 | | - | 300 |
| Balance at December 29, 2019 | 10,082,399 | $ 1 | $ 174,756 | $ (12,011) | $162,746 | | $ (195,724) | $ (32,978) |

(1) Issued and outstanding, net of 3,799,645 shares of treasury stock.

The accompanying notes are an integral part of these combined financial statements.

F-5

FOG CUTTER GROUP
(A carveout of FOG CUTTER CAPITAL GROUP, INC.)
COMBINED STATEMENTS OF CASH FLOWS
*(dollars in thousands)*

For the Years Ended December 29, 2019 and December 30, 2018

|  | 2019 | 2018 |
|---|---:|---:|
| Cash flows from operating activities |  |  |
| Net loss | $ (6,264) | $ (4,946) |
| Adjustments to reconcile net loss to net cash used in operations: |  |  |
| Deferred income taxes | - | 1,240 |
| Depreciation and amortization | 9 | 22 |
| Share based compensation and expenses | 2,125 | - |
| Capitalized interest | 212 | 35 |
| Loss on sale of FAT Series A Preferred | - | 100 |
| Impairment of goodwill | - | 125 |
| Change in: |  |  |
| Dividends receivable from FAT Brands Inc. | (209) | 36 |
| Other current assets | (23) | 4 |
| Litigation reserve | - | 1,750 |
| Other assets | (56) | 137 |
| Accounts payable and accrued expenses | 1,115 | (3,904) |
| Deferred income | - | (6) |
| Total adjustments | 3,173 | (461) |
| Net cash used in operating activities | (3,091) | (5,407) |
|  |  |  |
| Cash flows from investing activities |  |  |
| Payments received on related party debt | - | 8,853 |
| Proceeds from resale of FAT Series A Preferred | - | 400 |
| Cash dividends received from FAT Brands Inc. | - | 147 |
| Loan to shareholder | (7,648) | (9,155) |
| Net cash (used in) provided by investing activities | (7,648) | 245 |
|  |  |  |
| Cash flows from financing activities |  |  |
| Proceeds from borrowings | 300 | - |
| Repayments of borrowings | (14) | (3,012) |
| Change in due to affiliates | 10,453 | 8,158 |
| Net cash provided by financing activities | 10,739 | 5,146 |
|  |  |  |
| Net decrease in cash | - | (16) |
| Cash at beginning of period | 29 | 45 |
| Cash at end of period | $ 29 | $ 29 |
|  |  |  |
| Supplemental disclosures of cash flow information: |  |  |
| Cash paid for interest | $ 509 | $ 357 |
| Cash paid for income taxes | $ 6 | $ 161 |

(continued)

The accompanying notes are an integral part of these combined financial statements.

F-6

FOG CUTTER GROUP
(A carveout of FOG CUTTER CAPITAL GROUP, INC.)
COMBINED STATEMENTS OF CASH FLOWS
*(dollars in thousands)*

For the Years Ended December 29, 2019 and December 30, 2018

|  | 2019 | 2018 |
|---|---|---|
| Supplemental disclosure of non-cash financing and investing activities: |  |  |
| Note receivable from FAT Brands Inc. exchanged for common and preferred stock of FAT Brands Inc. | $              - | $          9,272 |
| Common stock issued in payment of compensation and fees | $          2,125 | $              - |
| Income taxes (receivable) payable adjusting amounts due to FAT Brands Inc. | $            (51) | $            195 |

The accompanying notes are an integral part of these combined financial statements.

F-7

**NOTES TO COMBINED FINANCIAL STATEMENTS**

**NOTE 1. ORGANIZATION AND RELATIONSHIPS**

Fog Cutter Capital Group, Inc., (the "Company" or "FCCG") was originally incorporated as Wilshire Real Estate Investment Trust Inc. in the State of Maryland on October 24, 1997. However, the Company has never elected to be treated as a Real Estate Investment Trust ("REIT") for tax purposes. Effective January 25, 2001, the Company changed its name to Fog Cutter Capital Group Inc. to better reflect the diversified nature of its business and investments. Initially, the Company made opportunistic equity and financial investments in a variety of industries. However, beginning in August 2003 with its acquisition of controlling interests in Fatburger North America, Inc, ("Fatburger"), the Company began to focus its business in the restaurant franchising sector. The Company is currently the controlling shareholder of FAT Brands, Inc. ("FAT").

FAT Brands Inc. was formed on March 21, 2017 as a wholly owned subsidiary of FCCG. On October 20, 2017, FAT completed an initial public offering and issued additional shares of common stock representing 20 percent of its ownership (the "Offering"). The net proceeds of the Offering were approximately $20,930,000 after deducting the selling agent fees and offering expenses. FAT's common stock trades on the Nasdaq Capital Market under the symbol "FAT."

Concurrent with the Offering, two subsidiaries of FCCG (the "Predecessor Companies"), Fatburger North America, Inc. ("Fatburger") and Buffalo's Franchise Concepts, Inc. ("Buffalo's") were contributed to FAT in exchange for a $30,000,000 note payable (the "Related Party Debt"). Concurrent with and subsequent to the Offering, FAT has acquired and is franchising additional restaurant brands.

The accompanying combined financial statements have been prepared to facilitate the proposed merger of FAT and FCCG. For this purpose, the accompanying financial statements include the accounts of the FCCG and all of its subsidiaries and affiliated entities (excluding FAT), which together are herein collectively referred to as the Fog Cutter Group or the Group. As of December 29, 2019 and December 30, 2018, the Group included the following entities:

- <u>Fog Cap Acceptance Inc.</u> – Fog Cap Acceptance Inc. was originally formed to make opportunistic equity and financing investments, all of which have been previously divested. In recent years, the only activity of Fog Cap Acceptance Inc. has involved legacy debt related to these prior investments.

- <u>Fog Cap Development LLC.</u> – Fog Cap Development LLC was originally formed to acquire, develop and sell a portfolio of retail real estate properties. Following the completion of the sale of the portfolio in 2007, the operations of Fog Cap Development have been limited to the provision of centralized corporate overhead management for all of the Company's subsidiaries, with overhead expenses being allocated to the various subsidiaries. Following the Offering, FAT assumed overhead responsibility for itself and its subsidiaries.

- <u>Homestyle Dining LLC</u> – In March 2017, the Company agreed to acquire Homestyle Dining LLC ("HSD") from Metromedia Company and its affiliate ("Metromedia") pursuant to a Membership Interest Purchase Agreement, as amended, which provided for a cash purchase price of $10,550,000 to be paid at closing. Effective October 20, 2017, FAT provided $10,550,000 of the net proceeds from the Offering to the Company to consummate the acquisition of HSD. In exchange, FAT received full ownership in the HSD operating subsidiaries: Ponderosa Franchising Company, Bonanza Restaurant Company, Ponderosa International Development, Inc. and Puerto Rico Ponderosa, Inc. (collectively, "Ponderosa"). These subsidiaries conduct the worldwide franchising of the Ponderosa Steakhouse Restaurants and the Bonanza Steakhouse Restaurants. The Company retained the HSD holding company and its remaining subsidiaries: Pon Realty and Coles, LLC. HSD owned one Cole's Backyard Grill restaurant, located in Lindale, Texas. That restaurant closed in 2018. HSD and its remaining subsidiaries were otherwise inactive and primarily held only legacy liabilities relating to its prior operations.

- <u>BFCI Palmdale</u> – BFCI Palmdale previously owned one Buffalo's Café restaurant located in Palmdale, California. The restaurant was sold to a franchisee in early 2016.

**NOTE 1. ORGANIZATION AND RELATIONSHIPS** (continued)

- <u>BFCI Palm Desert</u> – BFCI Palm Desert owned one Buffalo's Café restaurant located in Palm Desert, California. The restaurant was closed in 2017.

- <u>BC Canyon</u> – BC Canyon owned one Buffalo's Café restaurant in Canyon, Texas. The restaurant was closed in 2018.

- <u>Fatburger Restaurants of New Jersey</u> – Fatburger Restaurants of New Jersey owned a Fatburger restaurant in Atlantic City, New Jersey. The restaurant was closed in 2016.

- <u>Fatburger Restaurants China, LLC</u> – Fatburger Restaurants China, LLC ("FB China"), together with its subsidiaries, Fatburger International and Fatburger Hong Kong, were organized to invest in Company owned Fatburger restaurants in greater China. By the end of 2016, all restaurants previously developed by FB China had all either been closed or transferred to franchise ownership.

At December 29, 2019 and December 30, 2018, certain Group officers and directors controlled, directly or indirectly, significant voting influence of the Group. At December 29, 2019, the Group continued to control a significant voting majority of FAT.

*Liquidity*

Pursuant to ASU 2014-15, the Group evaluated its ability to continue as a going concern. The Group's operations resulted in a net use of cash in the amounts of $3,091,000 and $5,407,000 for the years ended December 29, 2019 and December 30, 2018, respectively. These amounts were primarily funded by advances from FAT, and future liquidity resources will likely continue to be dependent upon the operating and capital activities of FAT. Additionally, as of December 29, 2019, the Company was subject to debt obligations maturing in 2020 in the amount of $6,359,000.

On April 24, 2020, the Company entered into an Intercompany Revolving Credit Agreement with FAT ("Intercompany Agreement"). FAT had previously extended credit to the Company pursuant to a certain Intercompany Promissory Note (the "Original Note"), dated October 20, 2017, with an initial principal balance of $11,906,000. Subsequent to the issuance of the Original Note, FAT and certain of its direct or indirect subsidiaries made additional intercompany advances. Pursuant to the Intercompany Agreement, the revolving credit facility bears interest at a rate of 10% per annum, has a five-year term with no prepayment penalties, and has a maximum capacity of $35,000,000. All additional borrowings under the Intercompany Agreement are subject to the approval of the FAT Board of Directors, in advance, on a quarterly basis and may be subject to other conditions as set forth by FAT. The initial balance under the Intercompany Agreement totaled $21,067,000 including the balance of the Original Note, borrowings subsequent to the Original Note, accrued and unpaid interest income, and other adjustments through December 29, 2019. (See Notes 11 and 12)

During the fourth quarter of 2020, the Company expects to complete a forward triangular merger (the "Merger") pursuant to which FCCG would merge with and into a wholly-owned subsidiary of FAT, with the subsidiary of FAT becoming the parent. The Company anticipates that this structure will provide capital opportunities which will be sufficient to meet the Group's financial obligations.

While the Company expects the COVID-19 pandemic to negatively impact its business, results of operations, and financial position, the related financial impact cannot be reasonably estimated at this time. However, the Company believes that the working capital available to it from FAT, both before and after the Merger, together with disciplined management of the Company's operating expenses, will be sufficient for the twelve months of operations following the issuance of these combined financial statements. (See Note 12)

**NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Nature of operations* – The Group, together with its controlled subsidiary, FAT Brands Inc., is a multi-brand franchising company specializing in fast casual and casual dining restaurant concepts around the world. FAT operates through its subsidiaries: Fatburger, Buffalo's Cafe, Buffalo's Express, Hurricane Grill & Wings, Ponderosa Steakhouses, Bonanza Steakhouses, Yalla Mediterranean and Elevation Burger. Each subsidiary licenses the right to use its brand name and provides franchisees with operating procedures and methods of merchandising. Upon signing a franchise agreement, the franchisor is committed to provide training, some supervision and assistance, and access to operations manuals. As needed, the franchisor will also provide advice and written materials concerning techniques of managing and operating the restaurants.

**NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (continued)

The Group operates on a 52-week calendar and its fiscal year ends on the last Sunday of the calendar year. Consistent with the industry practice, FAT measures its stores' performance based upon 7-day work weeks. Using the 52-week cycle ensures consistent comparable weekly reporting for operations and ensures that each week has the same days, since certain days are more profitable than others. The use of this method means a 53rd week is added to the fiscal year every 5 or 6 years. In a 52-week year, all four quarters are comprised of 13 weeks. In a 53-week year, one extra week is added to the fourth quarter. Both 2019 and 2018 were both 52-week years.

*Basis of Presentation* – The accompanying combined financial statements are being produced to facilitate the merger of FAT and the Company. For this purpose, the accompanying financial statements include the accounts of the Group which includes the Company and all subsidiaries and affiliated entities (excluding FAT). Intercompany accounts have been eliminated in combination.

*Use of estimates in the preparation of the combined financial statements* – The preparation of the combined financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the combined financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates include the determination of fair values of certain financial instruments for which there is no active market, the allocation of basis between assets acquired, sold or retained, and valuation allowances for notes receivable and accounts receivable. Estimates and assumptions also affect the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Goodwill* – Goodwill and other intangible assets with indefinite lives, such as trademarks, are not amortized but are reviewed for impairment annually or more frequently if indicators arise. Management assesses potential impairments to intangible assets at least annually, or when there is evidence that events or changes in circumstances indicate that the carrying amount of an asset may not be recovered. Judgments regarding the existence of impairment indicators and future cash flows related to intangible assets are based on operational performance of the acquired businesses, market conditions and other factors. The Group's remaining balance of goodwill of $125,000 was fully impaired in 2018 when the restaurant generating the goodwill was closed. (See Note 1)

*Income taxes* – Effective October 20, 2017, the Company entered into a Tax Sharing Agreement with FAT that provides that the Company will, to the extent permitted by applicable law, file combined federal, California and Oregon (and possibly other jurisdictions where revenue is generated, at FCCG's election) income tax returns with FAT and its subsidiaries. FAT will pay the Company the amount that its tax liability would have been had it filed a separate combined return.

The Group accounts for income taxes under the asset and liability method. Under this method, deferred tax assets and liabilities are determined based on the differences between financial reporting and tax reporting bases of assets and liabilities and are measured using enacted tax rates and laws that are expected to be in effect when the differences are expected to reverse. Realization of deferred tax assets is dependent upon future earnings, the timing and amount of which are uncertain.

A two-step approach is utilized to recognize and measure uncertain tax positions. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained upon tax authority examination, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon the ultimate settlement.

F-10

**NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (continued)

*Recently Adopted Accounting Standards*

In May 2014, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) 2014-09, Revenue from Contracts With Customers (Topic 606), requiring an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods and services to customers. The updated standard replaces most existing revenue recognition guidance in U.S. GAAP.

These standards require that the transaction price received from customers be allocated to each separate and distinct performance obligation. The transaction price attributable to each separate and distinct performance obligation is then recognized as the performance obligations are satisfied as specified in the contract. The Company adopted ASU 2014-09 on January 1, 2018. The adoption of this standard did not have a material impact on the Group's combined financial statements.

In August 2016, the FASB issued ASU 2016-15, Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments. The new guidance is intended to reduce diversity in practice in how transactions are classified in the statement of cash flows. This ASU is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2017. The adoption of this standard did not have a material impact on the Group's combined financial statements.

The FASB issued ASU 2019-12, *Simplifying the Accounting for Income Taxes:* This standard removes certain exceptions for recognizing deferred taxes for investments, performing intraperiod allocation and calculating income taxes in interim periods. It also adds guidance in certain areas, including the recognition of franchise taxes, recognition of deferred taxes for tax goodwill, allocation of taxes to members of a consolidated group, computation of annual effective tax rates related to enacted changes in tax laws, and minor improvements related to employee stock ownership plans and investments in qualified affordable housing projects accounted for using the equity method. The Company adopted this ASU on December 30, 2019. The adoption of this standard did not have a material effect on the Group's combined financial position, results of operations or cash flows.

*Recently Issued Accounting Standards*

In July 2018, the FASB issued ASU 2018-09, Codification Improvements. This ASU makes amendments to multiple codification Topics. The transition and effective date guidance is based on the facts and circumstances of each amendment. Some of the amendments in this ASU do not require transition guidance and will be effective upon issuance of this ASU. However, many of the amendments in this ASU do have transition guidance with effective dates for annual periods beginning after December 15, 2018. The Group is currently assessing the effect that this ASU will have on its financial position, results of operations, and disclosures.

In August 2018, the FASB issued ASU 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurement." This ASU adds, modifies and removes several disclosure requirements relative to the three levels of inputs used to measure fair value in accordance with Topic 820, "Fair Value Measurement." This guidance is effective for fiscal years beginning after December 15, 2019, including interim periods within that fiscal year. Early adoption is permitted. The Group is currently assessing the effect that this ASU will have on its financial position, results of operations, and disclosures.

**NOTE 3. NOTE RECEIVABLE FROM FAT**

Effective with the Offering on October 20, 2017, FCCG contributed two of its operating subsidiaries, Fatburger and Buffalo's, to FAT in exchange for an unsecured promissory note with a principal balance of $30,000,000, bearing interest at a rate of 10.0% per annum, and maturing in five years (the "Related Party Debt"). The contribution was consummated pursuant to a Contribution Agreement between FAT and FCCG. Approximately $19,778,000 of the note payable to FCCG was subsequently repaid, reducing the balance to $10,222,000 at June 26, 2018. On June 27, 2018, FAT entered into the Note Exchange Agreement, as amended, under which it agreed with FCCG to exchange $9,272,053 of the remaining balance of FAT's outstanding Related Party Debt for shares of capital stock of FAT in the following amounts:

F-11

**NOTE 3. NOTE RECEIVABLE FROM FAT** (continued)

- $2,000,000 of the Related Party Debt balance was exchanged for 20,000 shares of Series A Fixed Rate Cumulative Preferred Stock of FAT at $100 per share and warrants to purchase 25,000 of FAT's common stock with an exercise price of $8.00 per share; and
- A portion of the remaining Related Party Debt balance of $7,272,053 was exchanged for 989,395 shares of Common Stock of FAT, representing an exchange price of $7.35 per share, which was the closing trading price of the Common Stock on June 26, 2018.

Following the exchange, the remaining balance of the Related Party Debt was $950,000. As of December 30, 2018, the Related Party Debt was fully paid off.

The transactions described above were exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") pursuant to the exemption for transactions by an issuer not involving any public offering under Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D of the Securities Act and in reliance on similar exemptions under applicable state laws.

Interest income related to the Related Party Debt of $888,000 was recognized for the year ended December 30, 2018.

**NOTE 4. INVESTMENT IN FAT BRANDS SERIES A PREFERRED STOCK**

On June 27, 2018, FCCG acquired 20,000 shares of Series A Fixed Rate Cumulative Preferred Stock of FAT at $100 per share and warrants to purchase 25,000 of FAT's common stock with an exercise price of $8.00 per share in exchange for $2,000,000 of the Related Party Debt balance (See Note 3).

The Series A Preferred Stock contains the following terms:

Dividends - Holders of Series A Preferred Stock will be entitled to receive cumulative dividends on the $100.00 per share stated liquidation preference of the Series A Preferred Stock, in the amount of (i) cash dividends at a rate of 9.9% per year, plus (ii) deferred dividends equal to 4.0% per year, payable on the Mandatory Redemption Date (defined below).

Liquidation and Redemption - Upon (i) the five-year anniversary of the initial issuance date (June 8, 2023), or (ii) the earlier liquidation, dissolution or winding-up of FAT (the "Series A Mandatory Redemption Date"), the holders of Series A Preferred Stock will be entitled to cash redemption of their shares in an amount equal to $100.00 per share plus any accrued and unpaid dividends.

In addition, prior to the Series A Mandatory Redemption Date, FAT may optionally redeem the Series A Preferred Stock, in whole or in part, at the following redemption prices per share, plus any accrued and unpaid dividends:

(i)   On or prior to June 30, 2021: $115.00 per share.

(ii)   After June 30, 2021 and on or prior to June 30, 2022: $110.00 per share.

(iii)   After June 30, 2022: $100.00 per share.

Holders of Series A Preferred Stock may also optionally cause FAT to redeem all or any portion of their shares of Series A Preferred Stock beginning any time after the two-year anniversary of the initial issuance date for an amount equal to $100.00 per share plus any accrued and unpaid dividends.

During the year ended December 30, 2018, FCCG sold 5,000 shares of the Series A Fixed Rate Cumulative Preferred Stock of FAT, and the related warrants to purchase 6,250 of FAT's common stock with an exercise price of $8.00 per share, to an unrelated investor for $400,000 and recognized a $100,000 loss on the sale.

As of December 29, 2019, FCCG owns 15,000 shares of the Series A Fixed Rate Cumulative Preferred Stock of FAT and warrants to purchase 18,750 of FAT's common stock with an exercise price of $8.00 per share. As of December 29, 2019 and December 30, 2018, the carrying value of this investment on the balance sheet was $1,500,000. FCCG

F-12

**NOTE 4. INVESTMENT IN FAT BRANDS SERIES A PREFERRED STOCK** (continued)

recognized dividend income relating to the Series A Preferred during the years ended December 29, 2019 and December 30, 2018 in the amount of $208,000 and $134,000, respectively.

**NOTE 5. LOAN TO SHAREHOLDER**

FCCG has made advances to Andrew A. Wiederhorn, the Company's CEO and significant shareholder (the "Shareholder Loan"). As of December 29, 2019 and December 30, 2018, the balance outstanding on the Shareholder Loan was $16,803,000 and $9,155,000, respectively. The Shareholder Loan bears interest at 5% per annum on outstanding balances. The Group recognized interest income on the Shareholder Loan in the amount of $619,000 and $222,675 for the years ended December 29, 2019 and December 30, 2018, respectively.

**NOTE 6. ACCRUED EXPENSES**

Accrued expenses consist of the following (in thousands):

|  | December 29, 2019 | December 30, 2018 |
|---|---|---|
| Payroll taxes | $ 6,621 | $ 6,589 |
| Professional fees | 1,680 | 1,390 |
| Vendor liabilities | 1,521 | 1,895 |
| Gift card balances | 135 | 156 |
| Credit card balance | 185 | 185 |
| Closed restaurant accruals | 728 | 728 |
| Other | 394 | 173 |
| Total | $ 11,264 | $ 11,116 |

**NOTE 7. INCOME TAXES**

The Group's deferred taxes reflect the net effect of temporary differences between the carrying amount of assets and liabilities for financial reporting purposes and the amounts used for calculating taxes payable on a stand-alone basis. Significant components of the Company's deferred tax assets and liabilities are as follows (in thousands):

|  | December 29, 2019 | December 30, 2018 |
|---|---|---|
| Deferred tax assets (liabilities) |  |  |
| Net operating loss carryforwards | $ 18,513 | $ 19,902 |
| Other | 546 | (220) |
| Valuation allowance | (19,059) | (19,682) |
| Total | $ - | $ - |

Components of the income tax expense are as follows (in thousands):

|  | Fiscal Year Ended December 29, 2019 | Fiscal Year Ended December 30, 2018 |
|---|---|---|
| Current |  |  |
| Federal | $ - | $ - |
| State | 2 | 3 |
| Foreign | - | - |
|  | 2 | 3 |

F-13

**NOTE 7. INCOME TAXES** (continued)

| | Fiscal Year Ended December 29, 2019 | Fiscal Year Ended December 30, 2018 |
|---|---|---|
| Deferred | | |
| Federal | $ - | $ - |
| State | - | - |
| Total income tax expense | $ 2 | $ 3 |

At December 29, 2019 and December 30, 2018, the differences between income taxes expected at the U.S. Federal statutory income tax rate of 21% and the reported income tax expense are primarily related to state taxes, net of federal benefit, various permanent items; and, change in federal, and state valuation allowances.

As of December 29, 2019, FCCG's annual tax filings for the prior three years are open for audit by Federal tax agencies and for the prior four years for state tax agencies. Management evaluated the overall tax positions and has determined that no provision for uncertain income tax positions is necessary as of December 29, 2019.

**NOTE 8. DEBT**

The Group's combined debt is summarized as follows (in thousands):

| | December 29, 2019 | December 30, 2018 |
|---|---|---|
| **Debt recorded at Fog Cutter Capital Group:** | | |
| Note payable to a private lender. The note bears interest at a fixed rate of 12% and is unsecured. Interest is due monthly in arrears. The note matures on December 31, 2020. | $ 2,026 | $ 1,970 |
| Note payable to a private lender. The note bears interest at a fixed rate of 12% and is unsecured. Interest is due monthly in arrears. The note matures on December 31, 2020. | 2,989 | 2,907 |
| Note payable to a private lender, secured by the FCCG's interest in certain shares of FAT Common Stock. The note bears interest at a fixed rate of 15%. The note matures December 1, 2020. | 311 | - |
| Note payable to a private lender, secured by the FCCG's interest in certain shares of FAT Common Stock. The note bears interest at a fixed rate of 12%. Interest is due monthly in arrears. The maturity date of the note is December 31, 2020. | 688 | 624 |
| **Debt recorded at Fog Cap Development, LLC:** | | |
| Note payable to a private lender secured by the FCCG's interest in shares of FAT Common Stock. The note bears interest at a fixed rate of 15%. Interest is due at maturity. The note is due December 1, 2020. | 345 | 359 |
| Total debt | $ 6,359 | $ 5,860 |

F-14

https://www.sec.gov/Archives/edgar/data/1705012/000149315221005900/ex99-1.htm

**NOTE 8. DEBT** (continued)

The amounts due at December 30, 2018 were classified as current liabilities because of the maturity dates that were in effect at that time. The maturities were subsequently extended to the dates shown above.

**NOTE 9. RELATED PARTY TRANSACTIONS**

The Group is obligated to FAT in the amount of $25,967,000 as of December 29, 2019 compared to $15,514,000 as of December 30, 2018. The payable to FAT bears interest at a rate of 10% per annum. During the fiscal years ended December 29, 2019 and December 30, 2018, the Group recorded accrued interest expense on the balance of the payable to FAT of $1,528,000 and $825,000, respectively.

The Group obligation to FAT includes a preferred capital investment made by FAT in Homestyle Dining LLC, a Delaware limited liability corporation ("HSD") in the amount of $4.0 million made effective July 5, 2018 (the "Preferred Interest"). FCCG owns all of the common interests in HSD. The holder of the Preferred Interest is entitled to a 15% priority return on the outstanding balance of the investment (the "Preferred Return"). During the fiscal years ended December 29, 2019 and December 30, 2018, the Company recorded accrued interest expense of $600,000 and $300,000, respectively. Any available cash flows from HSD on a quarterly basis are to be distributed to pay the accrued Preferred Return and repay the Preferred Interest until fully retired. On or before the five-year anniversary of the investment, the Preferred Interest is to be fully repaid, together with all previously accrued but unpaid Preferred Return. The Company has unconditionally guaranteed repayment of the Preferred Interest in the event HSD fails to do so.

During the fiscal year ended December 29, 2019, FCCG recorded a receivable from FAT in the amount of $51,000 under the Tax Sharing Agreement, which was offset against the intercompany payable. During the fiscal year ended December 30, 2018, the Company recorded a payable to FAT in the amount of $195,000 relating to the Tax Sharing Agreement.

Prior to the Offering, FAT's operations were insignificant other than structuring the Offering. During this time, the Company provided executive administration and accounting services for FAT. FAT reimbursed the Company for out-of-pocket costs associated with these services, but there was no allocation of FCCG's overhead costs. Effective with the Offering, FAT assumed all direct and indirect administrative functions relating to its business.

**NOTE 10. EQUITY**

As of December 29, 2019 and December 30, 2018, the total number of authorized shares of common stock was 200,000,000. There were 13,882,044 and 11,757,044 shares issued and 10,082,399 and 7,957,399 shares outstanding, respectively. FCCG holds 3,799,645 shares of common stock in treasury.

Below are the changes to FCCG's common stock during the fiscal year ended December 29, 2019:

- On August 28, 2019, the Company issued a total of 1,825,000 shares of common stock at a value of $1.00 per share as compensation.

- On August 28, 2019, the Company issued a total of 300,000 shares of common stock at a value of $1.00 per share to the non-employee members of the board of directors as consideration for directors' fees.

**NOTE 11. COMMITMENTS AND CONTINGENCIES**

*Litigation*

***Eric Rojany, et al. v. FAT Brands Inc., et al.***, Superior Court of California for the County of Los Angeles, Case No. BC708539, **and** *Daniel Alden, et al. v. FAT Brands Inc., et al.*, **Superior Court of California for the County of Los Angeles, Case No. BC716017.**

F-15

**NOTE 11. COMMITMENTS AND CONTINGENCIES** (continued)

On June 7, 2018, FAT Brands, Inc., Andrew Wiederhorn, Ron Roe, James Neuhauser, Edward H. Rensi, Marc L. Holtzman, Squire Junger, Silvia Kessel, Jeff Lotman, Fog Cutter Capital Group Inc., and Tripoint Global Equities, LLC (collectively, the "Original Defendants") were named as defendants in a putative securities class action lawsuit entitled *Rojany v. FAT Brands, Inc.*, Case No. BC708539 (the "*Rojany* Case"), in the Superior Court of the State of California, County of Los Angeles. On July 31, 2018, the *Rojany* Case was designated as complex, pursuant to Rule 3.400 of the California Rules of Court and assigned the matter to the Complex Litigation Program. On August 2, 2018, the Original Defendants were named defendants in a second putative class action lawsuit, *Alden v. FAT Brands*, Case No. BC716017 (the "*Alden* Case"), filed in the same court. On September 17, 2018, the *Rojany* and *Alden* Cases were consolidated under the *Rojany* Case number. On October 10, 2018, plaintiffs Eric Rojany, Daniel Alden, Christopher Hazelton-Harrington and Byron Marin ("Plaintiffs") filed a First Amended Consolidated Complaint against FAT Brands, Inc., Andrew Wiederhorn, Ron Roe, James Neuhauser, Edward H. Rensi, Fog Cutter Capital Group Inc., and Tripoint Global Equities, LLC (collectively, "Defendants"), thereby removing Marc L. Holtzman, Squire Junger, Silvia Kessel and Jeff Lotman as defendants. On November 13, 2018, Defendants filed a Demurrer to First Amended Consolidated Complaint. On January 25, 2019, the Court sustained Defendants' Demurrer to First Amended Consolidated Complaint with Leave to Amend in Part. Plaintiffs filed a Second Amended Consolidated Complaint on February 25, 2019. On March 27, 2019, Defendants filed a Demurrer to the Second Amended Consolidated Complaint. On July 31, 2019, the Court sustained Defendants' Demurrer to the Second Amended Complaint in Part, narrowing the scope of the case. Defendants filed their Answer to the Second Amended Consolidated Complaint on November 12, 2019. On January 29, 2020, Plaintiffs filed a Motion for Class Certification. Plaintiffs' Motion for Class Certification is fully briefed, and the hearing on Plaintiffs' Motion for Class Certification is set for September 10, 2020. Defendants dispute Plaintiffs' allegations and will continue to vigorously defend themselves in this litigation.

***Adam Vignola, et al. v. FAT Brands Inc., et al.*, United States District Court for the Central District of California, Case No. 2:18-cv-07469.**

On August 24, 2018, the Original Defendants were named as defendants in a putative securities class action lawsuit entitled *Vignola v. FAT Brands, Inc.*, Case No. 2:18-cv-07469-PSG-PLA, in the United States District Court for the Central District of California. On October 23, 2018, Charles Jordan and David Kovacs (collectively, "Lead Plaintiffs") moved to be appointed lead plaintiffs, and the Court granted Lead Plaintiffs' motion on November 16, 2018. On January 15, 2019, Lead Plaintiffs filed a First Amended Class Action Complaint against the Original Defendants. The allegations and claims for relief asserted in *Vignola* are substantively identical to those asserted in the *Rojany* Case. Defendants filed a Motion to Dismiss First Amended Class Action Complaint, or, in the Alternative, to Stay the Action In Favor of a Prior Pending Action. On June 14, 2019, the Court denied Defendants' motion to stay but granted Defendants' motion to dismiss the First Amended Class Action Complaint, with Leave to Amend. Lead Plaintiffs filed a Second Amended Class Action Complaint on August 5, 2019. On September 9, 2019, Defendants' filed a Motion to Dismiss the Second Amended Class Action Complaint. On December 17, 2019, the Court granted Defendants' Motion to Dismiss the Second Amended Class Action Complaint in Part, Without Leave to Amend. The allegations remaining in *Vignola* are substantively identical to those remaining in the *Rojany* Case. Defendants filed their Answer to the Second Amended Class Action Complaint on January 14, 2020. On December 27, 2019, Lead Plaintiffs filed a Motion for Class Certification. By order entered March 16, 2020, the Court denied Lead Plaintiffs' Motion for Class Certification. By order entered April 1, 2020, the Court set various deadlines for the case, including a fact discovery cut-off of December 29, 2020, expert discovery cut-off of February 23, 2021 and trial date of March 30, 2021. On July 16, 2020, the parties reached an agreement in principle to settle this case, pursuant to which lead plaintiffs will dismiss their claims against defendants with prejudice in exchange for a payment by or on behalf of defendants of $75,000. The parties are in the process of documenting this settlement.

FCCG is obligated to indemnify its officers and directors to the extent permitted by applicable law in connection with the above actions, and has insurance for such individuals, to the extent the limits of the applicable insurance policies and subject to potential reservations of rights. FCCG is also obligated to indemnify Tripoint Global Equities, LLC under certain conditions relating to the *Rojany* and *Vignola* matters. These proceedings are ongoing and FCCG is unable to predict the ultimate outcome of these matters. There can be no assurance that the defendants will be successful in defending against these actions.

F-16

**NOTE 11. COMMITMENTS AND CONTINGENCIES** (continued)

*Stratford Holding LLC v. Foot Locker Retail Inc. (U.S. District Court for the Western District of Oklahoma, Case No. 5:12-cv-00772-HE)*

In 2012 and 2013, two property owners in Oklahoma City, Oklahoma sued numerous parties, including FCCG, for alleged environmental contamination on their properties, stemming from dry cleaning operations on one of the properties. The property owners seek damages in the range of $12 million to $22 million. From 2002 to 2008, a former

FCCG subsidiary managed a lease portfolio, which included the subject property. FCCG denies any liability, although it did not timely respond to one of the property owners' complaints and several of the defendants' cross-complaints and thus is in default. The parties are currently conducting discovery, and the matter is scheduled for trial for November 2021. The Company is unable to predict the ultimate outcome of this matter, however, reserves in the amount of $3,500,000 have been recorded on the balance sheet relating to this litigation. There can be no assurance that the defendants will be successful in defending against these actions.

*SBN FCCG LLC v FCCGI (Los Angeles Superior Court, Case No. BS172606)*
SBN FCCG LLC ("SBN") filed a complaint against Fog Cutter Capital Group, Inc. ("FCCG") in New York state court for an indemnification claim (the "NY case") stemming from an earlier lawsuit in Georgia regarding a certain lease portfolio formerly managed by a former FCCG subsidiary. In February 2018, SBN obtained a final judgment in the NY case for a total of $651,290, which included $225,030 in interest dating back to March 2012. SBN then obtained a sister state judgment in Los Angeles Superior Court, Case No. BS172606 (the "California case"), which included the $651,290 judgment from the NY case, plus additional statutory interest and fees, for a total judgment of $656,543. In May 2018, SBN filed a cost memo, requesting an additional $12,411 in interest to be added to the judgment in the California case, for a total of $668,954. In May 2019, the parties agreed to settle the matter for $580,000, which required the immediate payment of $100,000, and the balance to be paid in August 2019. Fog Cutter wired $100,000 to SBN in May 2019, but has not yet paid the remaining balance of $480,000. The parties have not entered into a formal settlement agreement, and they have not yet discussed the terms for the payment of the remaining balance.

The Group is involved in other claims and legal proceedings from time-to-time that arise in the ordinary course of business. The Company does not believe that the ultimate resolution of these actions will have a material adverse effect on its business, financial condition, results of operations, liquidity or capital resources.

*Guarantee of FAT — Loan and Security Agreement*

On January 29, 2019, the FAT as borrower, and its subsidiaries and affiliates as guarantors, entered into a Loan and Security Agreement (the "Loan and Security Agreement") with The Lion Fund, L.P. and The Lion Fund II, L.P. ("Lion"). Pursuant to the Loan and Security Agreement, the FAT borrowed $20.0 million from Lion, and utilized the proceeds to repay $16.0 million in existing borrowings, plus accrued interest and fees, and provide additional general working capital to FAT.

In connection with the Loan and Security Agreement, FAT issued to Lion a warrant to purchase up to 1,167,404 shares of FAT's common stock at $0.01 per share (the "Lion Warrant"), exercisable only if the amounts outstanding under the Loan and Security Agreement were not repaid in full by June 30, 2020, as extended. If the Loan and Security Agreement was repaid in full prior to June 30, 2020, the Lion Warrant would be terminated in its entirety.

The term loan under the Loan and Security Agreement was due to mature on June 30, 2020. Interest on the term loan accrued at an annual fixed rate of 20.0% and was payable quarterly. The FAT was allowed to prepay all or a portion of the outstanding principal and accrued and unpaid interest under the Loan and Security Agreement at any time upon prior notice to Lion without penalty, other than a make-whole provision providing for a minimum of six months' interest.

F-17

**NOTE 11. COMMITMENTS AND CONTINGENCIES** (continued)

As security for its obligations under the Loan Agreement, the FAT granted a lien on substantially all of its assets to Lion. In addition, certain of FAT's subsidiaries and affiliates entered into a Guaranty (the "Guaranty") in favor of Lion, pursuant to which they guaranteed the obligations of FAT under the Loan and Security Agreement and granted as security for their guaranty obligations a lien on substantially all of their assets.

The Loan and Security Agreement contained customary affirmative and negative covenants, including covenants that limited or restricted FAT's ability to, among other things, incur other indebtedness, grant liens, merge or consolidate, dispose of assets, pay dividends or make distributions, in each case subject to customary exceptions. The Loan and Security Agreement also included customary events of default that included, among other things, non-payment, inaccuracy of representations and warranties, covenant breaches, events that result in a material adverse effect (as defined in the Loan and Security Agreement), cross default to other material indebtedness, bankruptcy, insolvency and material judgments. The occurrence and continuance of an event of default could have resulted in the acceleration of FAT's obligations under the Loan and Security Agreement and an increase in the interest rate by 5.0% per annum.

The Loan and Security Agreement was subsequently amended several times which allowed FAT to increase its borrowing by $3,500,000 in connection with the acquisition of Elevation Burger; extended the exercise date of the Lion Warrant to June 30, 2020; extended the due date for certain quarterly payments and imposed associated extension and other loan fees.

On March 6, 2020, FAT repaid the Lion Loan and Security Agreement in full. As a result of the prepayment, the Lion Warrant was cancelled in its entirety and the guarantee by the Company was cancelled.

_Guarantee of FAT — Elevation Note_

On June 19, 2019, the FAT completed the acquisition of Elevation Burger. A portion of the purchase price included the issuance to the Seller of a convertible subordinated promissory note (the "Elevation Note") with a principal amount of $7,509,816, bearing interest at 6.0% per year and maturing in July 2026. The Elevation Note is convertible under certain circumstances into shares of the FAT's common stock at $12.00 per share. The Company has guaranteed payment of the Elevation Note.

FAT is required to make fully amortizing payments of $110,000 per month during the term of the Elevation Note. The Elevation Note is a general unsecured obligation of Company and is subordinated in right of payment to all indebtedness of the Company arising under any agreement or instrument to which FAT or any of its Affiliates is a party that evidences indebtedness for borrowed money that is senior in right of payment.

**NOTE 12. SUBSEQUENT EVENTS**

Pursuant to FASB ASC 855, Management has evaluated all events and transactions that occurred from December 29, 2019 through the date of issuance of these combined financial statements. During this period, the Company did not have any significant subsequent events, except as disclosed below:

_Guarantee of FAT — Loan and Security Agreement_

On March 6, 2020, FAT repaid the Lion Loan and Security Agreement in full. As a result of the prepayment, the Lion Warrant was cancelled in its entirety and the guarantee by FCCG was cancelled. (See Note 11).

_COVID-19_

In March 2020, the World Health Organization declared the outbreak of a novel coronavirus (COVID-19) as a pandemic, which continues to spread throughout the United States and other countries. As a result, FAT Brand's restaurant franchisees have temporarily closed some retail locations, modified store operating hours, adopted a "to-go" only operating model, or a combination of these actions. These actions have reduced consumer traffic, all resulting
in a negative impact to FAT Brands' revenues. While the business disruption from the COVID-19 pandemic is currently expected to be temporary, there is a great deal of uncertainty around the severity and duration of the

F-18

**NOTE 12. SUBSEQUENT EVENTS** (continued)

_COVID-19_ (continued)

disruption. The Group may experience longer-term effects on its business, economic growth and consumer demand in the U.S. and worldwide. The effects of COVID-19 may materially adversely affect our business, results of operations, liquidity and ability to service our existing debt, particularly if these effects continue in place for a significant amount of time. While the disruption is currently expected to be temporary, there is uncertainty around the duration. Therefore, while the Company expects this matter to negatively impact its business, results of operations, and financial position, the related financial impact cannot be reasonably estimated at this time.

_Intercompany Agreement_

On April 24, 2020, FCCG entered into an Intercompany Revolving Credit Agreement with FAT ("Intercompany Agreement"). FAT had previously extended credit to the Company pursuant to a certain Intercompany Promissory Note (the "Original Note"), dated October 20, 2017, with an initial principal balance of $11,906,000. Subsequent to the issuance of the Original Note, the Company and certain of its direct or indirect subsidiaries received additional intercompany advances in the aggregate amount of $10,523,000. Pursuant to the Intercompany Agreement, the revolving credit facility bears interest at a rate of 10% per annum, has a five-year term with no prepayment penalties, and has a maximum capacity of $35,000,000. All additional borrowings under the Intercompany Agreement are subject to the approval of the Board of Directors of FAT, in advance, on a quarterly basis and may be subject to other conditions as set forth by FAT. The initial balance under the Intercompany Agreement totaled $21,067,000 including the balance of the Original Note, borrowings subsequent to the Original Note, accrued and unpaid interest income, and other adjustments through December 29, 2019. (See Note 9).

_FAT Preferred Stock Exchange Agreement_

On July 13, 2020, FCCG entered into an agreement to exchange its 15,000 shares of FAT Brands' Series A Preferred Stock, plus accrued dividends thereon at face value, for shares of FAT Brands 8.25% Series B Cumulative Preferred Stock valued at $25.00 per share. (See Note 4).

Holders of FAT's Series B Preferred Stock will be entitled to receive, when declared by the FAT's Board of Directors, cumulative cash dividends payable monthly in an amount per share equal to $2.0625 each year, which is equivalent to 8.25% per annum of the $25.00 liquidation preference per share. Dividends on the Series B Preferred Stock will be payable monthly in arrears. If FAT fails to make a cash dividend payment with respect to 12 or more consecutive or non-consecutive monthly dividends, the dividend rate on the Series B Preferred Stock will increase to $2.50 per share each year, which is equivalent to 10% of the $25.00 liquidation preference per share until the Company has paid all accumulated accrued and unpaid dividends on the Series B Preferred Stock in full and has paid accrued dividends for all dividend periods during the two most recently completed dividend periods in full. In addition, if the Company fails to make a cash dividend payment with respect to 18 or more consecutive or non-consecutive monthly dividends, the holders of the Series B Preferred Stock, voting as a separate class, will be entitled to vote for the election of two additional directors to serve on the Company's Board of Directors until all dividends that are owed have been paid in full.

_Loan to Shareholder_

During the six months ended June 28, 2020, FCCG forgave the Shareholder Loan.

_Reverse Stock Split_

On September 2, 2020, FCCG's shares of common stock were the subject of a reverse stock split, reducing the number of issued shares in the ratio of 326,000 shares to one. Shareholders owning less than one share following the reverse split were issued notes in lieu of their fractional share in the amount of $2.75 per original share.

F-19

**NOTE 12. SUBSEQUENT EVENTS** (continued)

*Reverse Stock Split* (continued)

Immediately following these transactions, FCCG declared a stock split which was exactly the opposite of the previous reverse stock split (issuing 326,000 shares for each share of stock), thus eliminating the effects of the reverse stock split.

F-20

EX-99.2 8 ex99-2.htm

Exhibit 99.2

**Fog Cutter Group**
**(A carveout of Fog Cutter Capital Group, Inc.)**

**Combined Financial Statements**

**For the Thirty-Nine Weeks Ended September 27, 2020 and September 29, 2019**

**FINANCIAL STATEMENT SCHEDULES**

**The Fog Cutter Group (a carveout of Fog Cutter Capital Group, Inc.)**

**Unaudited Financial Statements**

| | |
|---|---|
| Combined Balance Sheets as of September 27, 2020 and December 29, 2019 | F-1 |
| Combined Statements of Operations for the thirty-nine weeks ended September 27, 2020 and September 29, 2019 | F-2 |
| Combined Statements of Changes in Stockholders' Deficit for the thirty-nine weeks ended September 27, 2020 and September 29, 2019 | F-3 |
| Combined Statements of Cash Flows for the thirty-nine weeks ended September 27, 2020 and September 29, 2019 | F-4 |
| Notes to Combined Financial Statements | F-5 |

FOG CUTTER GROUP
(A carveout of FOG CUTTER CAPITAL GROUP, INC.)
COMBINED BALANCE SHEETS
*(dollars in thousands, except share data)*

|  | September 27, 2020 | December 29, 2019 |
|---|---|---|
|  | (Unaudited) | (Audited) |
| **Assets** |  |  |
| Current assets |  |  |
| Cash | $ 30 | $ 29 |
| Dividends receivable from FAT Brands Inc. | - | 209 |
| Other current assets | 129 | 127 |
| Total current assets | 159 | 365 |
|  |  |  |
| Property, plant and equipment, net of accumulated depreciation of $287 and $286, respectively | 58 | 63 |
| Investment in FAT Brands Inc. preferred stock and warrants | 1,861 | 1,500 |
| Loan to stockholder | 5,606 | 16,803 |
| Other assets | 56 | 56 |
| Total assets | $ 7,740 | $ 18,787 |
|  |  |  |
| **Liabilities and Stockholders' Deficit** |  |  |
| Liabilities |  |  |
| Accounts payable | $ 3,101 | $ 4,554 |
| Accrued expenses | 10,293 | 11,264 |
| Current portion of long-term debt | 10,385 | 6,359 |
| Litigation reserve | 3,980 | 3,500 |
| Other | - | 65 |
| Total current liabilities | 27,759 | 25,742 |
|  |  |  |
| Due to FAT Brands Inc. | 38,732 | 25,967 |
| Other | 75 | 56 |
| Total liabilities | 66,566 | 51,765 |
|  |  |  |
| Commitments and contingencies (Note 10) |  |  |
|  |  |  |
| Stockholders' deficit |  |  |
| Common stock, $.0001 par value; 10,100,000 shares authorized; 8,428,692 shares issued and outstanding as of September 27, 2020; 200,000,000 shares authorized, 13,882,044 shares issued, and 10,082,399 outstanding as of December 29, 2019 | 1 | 1 |
| Additional paid-in capital | 158,197 | 174,756 |
| Accumulated deficit | (217,024) | (195,724) |
| Treasury stock, 3,799,645 common shares as of December 29, 2019 | - | (12,011) |
| Total stockholders' deficit | (58,826) | (32,978) |
| Total liabilities and stockholders' deficit | $ 7,740 | $ 18,787 |

The accompanying notes are an integral part of these combined financial statements.

F-1

FOG CUTTER GROUP
(A carveout of FOG CUTTER CAPITAL GROUP, INC.)
COMBINED STATEMENTS OF OPERATIONS
(dollars in thousands, except share data)

(Unaudited)

For the Thirty-nine Weeks Ended September 27, 2020 and September 29, 2019

|  | September 27, 2020 | September 29, 2019 |
|---|---|---|
| Revenue | $ - | $ - |
|  |  |  |
| Expenses |  |  |
| Compensation | 1,325 | 1,675 |
| General and administrative | 634 | 1,277 |
| Total expenses | 1,959 | 2,952 |
|  |  |  |
| Loss from operations | (1,959) | (2,952) |
|  |  |  |
| Other (expense) income |  |  |
| Interest expense | (3,199) | (1,884) |
| Interest income | 406 | 582 |
| Loss on forgiveness of loan to stockholder | (16,948) | - |
| Other income, net | 402 | (523) |
| Total other expense, net | (19,339) | (1,825) |
|  |  |  |
| Loss before income tax expense | (21,298) | (4,777) |
|  |  |  |
| Income tax expense | 2 | 1 |
|  |  |  |
| Net loss | $ (21,300) | $ (4,778) |

The accompanying notes are an integral part of these combined financial statements

F-2

FOG CUTTER GROUP
(A carveout of FOG CUTTER CAPITAL GROUP, INC.)
COMBINED STATEMENTS OF STOCKHOLDERS' DEFICIT
*(dollars in thousands, except share data)*

(Unaudited)

For the thirty-nine weeks ended September 27, 2020

|  | Common Stock | | | | | | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|---|
|  | Shares | Par Value | Additional Paid-in Capital | Treasury Stock | Total | | | |
| Balance at December 29, 2019 [1] | 10,082,399 | $ 1 | $ 174,756 | $ (12,011) | $162,746 | $ | (195,724) | $ (32,978) |
| Net loss | - | - | - | - | - | | (21,300) | (21,300) |
| Cancellation of treasury stock [2] | - | - | (12,011) | 12,011 | - | | - | - |
| Redemption of fractional shares | (1,653,707) | - | (4,548) | - | (4,548) | | - | (4,548) |
| Balance at September 27, 2020 | 8,428,692 | $ 1 | $ 158,197 | $ - | $158,198 | $ | (217,024) | $(58,826) |

(1) Issued and outstanding, net of 3,799,645 shares of treasury stock.
(2) All 3,799,645 shares of treasury stock were cancelled as of July 6, 2020.

For the thirty-nine weeks ended September 29, 2019

|  | Common Stock | | | | | | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|---|
|  | Shares [1] | Par value | Additional paid-in capital | Treasury Stock | Total | | | |
| Balance at December 30, 2018 | 7,957,399 | $ 1 | $ 172,631 | $ (12,011) | $160,621 | $ | (189,460) | $ (28,839) |
| Net loss | - | - | - | - | - | | (4,778) | (4,778) |
| Issuance of common stock in lieu of cash compensation payable | 1,825,000 | - | 1,825 | - | 1,825 | | - | 1,825 |
| Issuance of common stock in lieu of cash directors' fees payable | 300,000 | - | 300 | - | 300 | | - | 300 |
| Balance at September 29, 2019 | 10,082,399 | $ 1 | $ 174,756 | $ (12,011) | $162,746 | $ | (194,238) | $ (31,492) |

(1) Issued and outstanding, net of 3,799,645 shares of treasury stock.

The accompanying notes are an integral part of these combined financial statements.

F-3

FOG CUTTER GROUP
(A carveout of FOG CUTTER CAPITAL GROUP, INC.)
COMBINED STATEMENTS OF CASH FLOWS
*(dollars in thousands)*

(Unaudited)

For the thirty-nine weeks ended September 27, 2020 and September 29, 2019

|  | September 27, 2020 | September 29, 2019 |
|---|---|---|
| Cash flows from operating activities |  |  |
| Net loss | $ (21,300) | $ (4,778) |
| Adjustments to reconcile net loss to net cash used in operations: |  |  |
| Loss on forgiveness of loan to stockholder | 16,948 | - |
| Share based compensation and expenses | - | 2,125 |
| Depreciation and amortization | 1 | 14 |
| Accrued interest | 55 | 105 |
| Change in: |  |  |
| Accounts payable | (1,453) | 649 |
| Accrued expenses | (55) | (246) |
| Other liabilities | (478) | - |
| Other assets | (116) | (151) |
| Total adjustments | 14,902 | 2,496 |
| Net cash used in operating activities | (6,398) | (2,282) |
|  |  |  |
| Cash flows from investing activities |  |  |
| Loan advances to stockholder | (5,751) | (5,116) |
| Net cash used in investing activities | (5,751) | (5,116) |
|  |  |  |
| Cash flows from financing activities |  |  |
| Repayments of long-term debt | (576) | - |
| Change in due to FAT Brands Inc. | 12,726 | 7,372 |
| Net cash provided by financing activities | 12,150 | 7,372 |
|  |  |  |
| Net increase in cash | 1 | (26) |
| Cash at beginning of period | 29 | 29 |
| Cash at end of period | $ 30 | $ 3 |
|  |  |  |
| Supplemental disclosures of cash flow information: |  |  |
| Cash paid for interest | $ 509 | $ 429 |
| Cash paid for income taxes | $ 4 | $ 1 |
|  |  |  |
| Supplemental disclosure of non-cash financing and investing activities: |  |  |
| Income taxes payable added to amounts due to FAT Brands Inc. | $ 158 | $ 30 |
| Notes issued in exchange for fractional common shares | $ 4,548 | $ - |
| Dividends receivable exchanged for FAT Series B Preferred Stock | $ 361 | $ - |

The accompanying notes are an integral part of these combined financial statements.

F-4

**NOTES TO COMBINED FINANCIAL STATEMENTS**

**NOTE 1. ORGANIZATION AND RELATIONSHIPS**

Fog Cutter Capital Group, Inc., (the "Company" or "FCCG") was originally incorporated as Wilshire Real Estate Investment Trust Inc. in the State of Maryland on October 24, 1997. However, the Company has never elected to be treated as a Real Estate Investment Trust for tax purposes. Effective January 25, 2001, the Company changed its name to Fog Cutter Capital Group Inc. to better reflect the diversified nature of its business and investments. Initially, the Company made opportunistic equity and financial investments in a variety of industries. However, beginning in August 2003 with its acquisition of controlling interests in Fatburger North America, Inc, ("Fatburger"), the Company began to focus its business in the restaurant franchising sector. On July 29, 2020, the Company was reincorporated in the State of Delaware. At that time, the number of authorized shares decreased from 200,000,000 to 10,100,000.

As of September 27, 2020, the Company was the controlling shareholder of FAT Brands, Inc. ("FAT"). FAT was formed on March 21, 2017 as a wholly owned subsidiary of FCCG. On October 20, 2017, FAT completed an initial public offering and issued additional shares of common stock representing 20 percent of its ownership (the "Offering"). The net proceeds of the Offering were approximately $20,930,000 after deducting the selling agent fees and offering expenses. FAT's common stock trades on the Nasdaq Capital Market under the symbol "FAT."

Concurrent with the Offering, two subsidiaries of FCCG, Fatburger North America, Inc. ("Fatburger") and Buffalo's Franchise Concepts, Inc. ("Buffalo's"), (collectively the "Predecessor Companies"), were contributed to FAT in exchange for a $30,000,000 note payable (the "Related Party Debt"). Concurrent with and subsequent to the Offering, FAT has acquired and is franchising additional restaurant brands.

The accompanying combined financial statements have been prepared to facilitate the merger of FAT and FCCG. For this purpose, the accompanying financial statements include the accounts of FCCG and all of its subsidiaries and affiliated entities (excluding FAT), which together are herein collectively referred to as the Fog Cutter Group or the Group. As of, and for the thirty-nine weeks ended September 27, 2020 and September 29, 2019, the Group included the following entities:

- <u>Fog Cap Acceptance Inc.</u> – Fog Cap Acceptance Inc. was originally formed to make opportunistic equity and financing investments, all of which have been previously divested. In recent years, the only activity of Fog Cap Acceptance has involved legacy debt related to these prior investments.

- <u>Fog Cap Development LLC.</u> – Fog Cap Development LLC was originally formed to acquire, develop and sell a portfolio of retail real estate properties. Following the completion of the sale of the portfolio in 2007, the operations of Fog Cap Development LLC have been limited to the provision of centralized corporate overhead management for all of the Company's subsidiaries, with overhead expenses being allocated to the various subsidiaries. Following the Offering, FAT assumed overhead responsibility for itself and its subsidiaries.

- <u>Homestyle Dining LLC</u> – In March 2017, the Company agreed to acquire Homestyle Dining LLC ("HSD") from Metromedia Company and its affiliate ("Metromedia") pursuant to a Membership Interest Purchase Agreement, as amended, which provided for a cash purchase price of $10,550,000 to be paid at closing. Effective October 20, 2017, FAT provided $10,550,000 of the net proceeds from the Offering to the Company to consummate the acquisition of HSD. In exchange, FAT received full ownership in the HSD operating subsidiaries: Ponderosa Franchising Company, Bonanza Restaurant Company, Ponderosa International Development, Inc. and Puerto Rico Ponderosa, Inc. (collectively, "Ponderosa"). These subsidiaries conduct the worldwide franchising of the Ponderosa Steakhouse Restaurants and the Bonanza Steakhouse Restaurants. The Company retained the HSD holding company and its remaining subsidiaries. HSD owned one Cole's Backyard Grill restaurant, located in Lindale, Texas. That restaurant closed in 2018. HSD and its remaining subsidiaries were otherwise inactive and primarily held only legacy liabilities relating to its prior operations.

- <u>Buffalo's Café Palmdale LLC</u> – Buffalo's Café Palmdale previously owned one Buffalo's Café restaurant located in Palmdale, California. The restaurant was sold to a franchisee in early 2016.

- <u>BFCI Palm Desert LLC</u> – BFCI Palm Desert LLC owned one Buffalo's Café restaurant located in Palm Desert, California. The restaurant was closed in 2017.

- <u>BC Canyon</u> – BC Canyon owned one Buffalo's Café restaurant in Canyon, Texas. The restaurant was closed in 2018.

- <u>Fatburger Restaurants of New Jersey</u> – Fatburger Restaurants of New Jersey owned a Fatburger restaurant in Atlantic City, New Jersey. The restaurant was closed in 2016.

- <u>Fatburger Restaurants China, LLC</u> ("FB China"), together with its subsidiaries, Fatburger International, Inc. and Fatburger Hong Kong, were organized to invest in Company owned Fatburger restaurants in greater China. By the end of 2016, all restaurants previously developed by FB China had all either been closed or transferred to franchise ownership.

On September 27, 2020, certain Company officers and directors controlled, directly or indirectly, significant voting influence of the Group. On September 27, 2020, the Company continued to control a significant voting majority of FAT.

*Liquidity*

Pursuant to ASU 2014-15, the Group evaluated its ability to continue as a going concern. During the thirty-nine weeks ended September 27, 2020, the Group's operations resulted in a net use of cash in the amount of $6,398,000. These amounts were primarily funded by advances from FAT, and future liquidity resources will likely continue to be dependent upon the operating and capital activities of FAT. Additionally, as of September 27, 2020, the Group was subject to debt obligations maturing within twelve months in the amount of $10,385,000.

On April 24, 2020, the Company entered into an Intercompany Revolving Credit Agreement with FAT (the "Intercompany Agreement"). FAT had previously extended credit to the Company pursuant to a certain Intercompany Promissory Note (the "Original Note"), dated October 20, 2017, with an initial principal balance of $11,906,000. Subsequent to the issuance of the Original Note, FAT and certain of its direct or indirect subsidiaries made additional intercompany advances. Pursuant to the Intercompany Agreement, the revolving credit facility bears interest at a rate of 10% per annum, has a five-year term with no prepayment penalties, and has a maximum capacity of $35,000,000. All additional borrowings under the Intercompany Agreement are subject to the approval of the FAT Brands Board of Directors, in advance, on a quarterly basis and may be subject to other conditions as set forth by FAT. The initial balance under the Intercompany Agreement totaled $21,067,000, including the balance of the Original Note, borrowings subsequent to the Original Note, accrued and unpaid interest income, and other adjustments through December 29, 2019. As of September 27, 2020, the balance of the Intercompany Agreement totaled $33,382,000.

During the fourth quarter of 2020, the Company completed a forward triangular merger (the "Merger") pursuant to which FCCG merged with and into a wholly owned subsidiary of FAT, with the subsidiary of FAT becoming the parent of FCCG and certain of its subsidiaries. The Company anticipates that this structure will provide capital opportunities which will be sufficient to meet the Group's financial obligations.

*COVID-19*

In March 2020, the World Health Organization classified the outbreak of a novel coronavirus ("COVID-19") as a pandemic, which continues to spread throughout the United States and other countries. As a result, FAT Brand's restaurant franchisees have closed some retail locations, modified store operating hours, adopted a "to-go" only operating model, or a combination of these actions. These actions have reduced consumer traffic, all resulting in a negative impact to FAT Brands' revenues. While the business disruption from the COVID-19 pandemic is currently expected to be temporary, there is a great deal of uncertainty around the severity and duration of the disruption. The Group may experience longer-term effects on its business, economic growth and consumer demand in the U.S. and worldwide. The effects of COVID-19 may materially adversely affect our business, results of operations, liquidity and ability to service our existing debt, particularly if these effects continue in place for a significant amount of time. While the disruption is currently expected to be temporary, there is uncertainty around the duration. Therefore, while the Company expects this matter to negatively impact its business, results of operations, and financial position, the related financial impact cannot be reasonably estimated at this time.

F-6

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Nature of operations* – The Group, together with its controlled subsidiary, FAT Brands Inc., is a multi-brand franchising company specializing in fast casual and casual dining restaurant concepts around the world. FAT operates through its subsidiaries: Fatburger, Johnny Rockets, Buffalo's Cafe, Buffalo's Express, Hurricane Grill & Wings, Ponderosa Steakhouses, Bonanza Steakhouses, Yalla Mediterranean and Elevation Burger. Each subsidiary licenses the right to use its brand name and provides franchisees with operating procedures and methods of merchandising. Upon signing a franchise agreement, the franchisor is committed to provide training, some supervision and assistance, and access to operations manuals. As needed, the franchisor will also provide advice and written materials concerning techniques of managing and operating the restaurants.

To conform with FAT's operations, the Group utilizes a 52-week calendar with its fiscal year ending on the last Sunday of the calendar year. Consistent with restaurant industry practice, FAT measures its stores' performance based upon 7-day work weeks. Using the 52-week cycle ensures consistent comparable weekly reporting for operations and ensures that each week has the same days, since certain days are more profitable than others.

*Basis of Presentation* – The accompanying combined financial statements are being produced to facilitate the merger of FAT and the Company. For this purpose, the accompanying financial statements include the accounts of the Group which includes the Company and all subsidiaries and affiliated entities (excluding FAT and its subsidiaries). Intercompany accounts have been eliminated in combination.

*Use of estimates in the preparation of the combined financial statements* – The preparation of the combined financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the combined financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates include the determination of fair values of certain financial instruments for which there is no active market, the allocation of basis between assets acquired, sold or retained, and valuation allowances for notes receivable and accounts receivable. Estimates and assumptions also affect the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Income taxes* – Effective October 20, 2017, the Group became part of a Tax Sharing Agreement between the Company and FAT which provides that the Company will, to the extent permitted by applicable law, file combined federal, California and Oregon (and possibly other jurisdictions where revenue is generated, at FCCG's election) income tax returns with FAT and its subsidiaries. FAT will pay the Company the amount that its tax liability would have been had it filed a separate combined return.

The Group accounts for income taxes under the asset and liability method. Under this method, deferred tax assets and liabilities are determined based on the differences between financial reporting and tax reporting bases of assets and liabilities and are measured using enacted tax rates and laws that are expected to be in effect when the differences are expected to reverse. Realization of deferred tax assets is dependent upon future earnings, the timing and amount of which are uncertain.

A two-step approach is utilized to recognize and measure uncertain tax positions. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained upon tax authority examination, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon the ultimate settlement.

F-7

*Recently Adopted Accounting Standards*

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurement.*" This ASU adds, modifies and removes several disclosure requirements relative to the three levels of inputs used to measure fair value in accordance with Topic 820, "Fair Value Measurement." The Group adopted this ASU on December 30, 2019. The adoption of this standard did not have a material effect on the Group's financial position, results of operations or cash flows.

The FASB issued ASU No. 2018-15, *Intangibles-Goodwill and Other-Internal-Use Software (Subtopic 350-40).* The new guidance reduces complexity for the accounting for costs of implementing a cloud computing service arrangement and aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal use software license). The Group adopted this ASU on December 30, 2019. The adoption of this standard did not have a material effect on the Group's financial position, results of operations or cash flows.

The FASB issued ASU 2019-12, *Simplifying the Accounting for Income Taxes:* This standard removes certain exceptions for recognizing deferred taxes for investments, performing intraperiod allocation and calculating income taxes in interim periods. It also adds guidance in certain areas, including the recognition of franchise taxes, recognition of deferred taxes for tax goodwill, allocation of taxes to members of a consolidated group, computation of annual effective tax rates related to enacted changes in tax laws, and minor improvements related to employee stock ownership plans and investments in qualified affordable housing projects accounted for using the equity method. The Group adopted this ASU on December 30, 2019. The adoption of this standard did not have a material effect on the Group's financial position, results of operations or cash flows.

## NOTE 3. INVESTMENT IN FAT BRANDS PREFERRED STOCK

On June 27, 2018, FCCG acquired 20,000 shares of Series A Fixed Rate Cumulative Preferred Stock of FAT ("FAT Series A Preferred Stock") at $100 per share and warrants to purchase 25,531 shares of FAT's common stock with an exercise price of $7.83 per share (as adjusted for a common stock dividend declared by FAT in 2019) in exchange for $2,000,000 of a Related Party Debt balance.

The FAT Series A Preferred Stock contained the following terms:

Dividends - Holders of FAT Series A Preferred Stock were entitled to receive cumulative dividends on the $100.00 per share stated liquidation preference of the FAT Series A Preferred Stock, in the amount of (i) cash dividends at a rate of 9.9% per year, plus (ii) deferred dividends equal to 4.0% per year, payable on the Mandatory Redemption Date (defined below).

Liquidation and Redemption - Upon (i) the five-year anniversary of the initial issuance date (June 8, 2023), or (ii) the earlier liquidation, dissolution or winding-up of FAT (the "Series A Mandatory Redemption Date"), the holders of FAT Series A Preferred Stock would have been entitled to cash redemption of their shares in an amount equal to $100.00 per share plus any accrued and unpaid dividends.

In addition, prior to the Series A Mandatory Redemption Date, FAT could have optionally redeemed the FAT Series A Preferred Stock, in whole or in part, at scheduled redemption prices per share.

During the year ended December 30, 2018, FCCG sold 5,000 shares of the FAT Series A Preferred Stock, and the related warrants to purchase 6,383 of FAT's common stock at an exercise price of $7.83 per share, to an unrelated investor.

F-8

On July 13, 2020, FCCG entered into an agreement to exchange its 15,000 shares of FAT Brands' Series A Preferred Stock, plus accrued dividends thereon at face value, for 60,000 shares of FAT Brands 8.25% Series B Cumulative Preferred Stock valued at $25.00 per share ("FAT Series B Preferred Stock"). The Company also received an additional 14,449 shares of FAT Series B Preferred Stock as consideration for accrued dividends due to FCCG.

Holders of FAT Series B Preferred Stock will be entitled to receive, when declared by the FAT's Board of Directors, cumulative cash dividends payable monthly in an amount per share equal to $2.0625 each year, which is equivalent to 8.25% per annum of the $25.00 liquidation preference per share. Dividends on the Series B Preferred Stock will be payable monthly in arrears. If FAT fails to make a cash dividend payment with respect to 12 or more consecutive or non-consecutive monthly dividends, the dividend rate on the FAT Series B Preferred Stock will increase to $2.50 per share each year, which is equivalent to 10% of the $25.00 liquidation preference per share until FAT has paid all accumulated accrued and unpaid dividends on the FAT Series B Preferred Stock in full and has paid accrued dividends for all dividend periods during the two most recently completed dividend periods in full. In addition, if FAT fails to make a cash dividend payment with respect to 18 or more consecutive or non-consecutive monthly dividends, the holders of the FAT Series B Preferred Stock, voting as a separate class, will be entitled to vote for the election of two additional directors to serve on the FAT's Board of Directors until all dividends that are owed have been paid in full.

FCCG recognized dividend income relating to the Series A Preferred Stock during the thirty-nine weeks ended September 27, 2020 and September 29, 2019 in the amount of $129,000 and $156,000, respectively.

As of September 27, 2020, FCCG owns 74,449 shares of FAT Series B Preferred Stock and warrants to purchase 19,148 shares of FAT's common stock at an exercise price of $7.83 per share (as adjusted for a common stock dividend declared by FAT in 2019), with a combined carrying value of $1,861,000. FCCG recognized dividend income relating to the Series B Preferred Stock during the thirty-nine weeks ended September 27, 2020 in the amount of $31,000.

## NOTE 4. LOAN TO STOCKHOLDER

FCCG has made advances to Andrew A. Wiederhorn, the Company's CEO and significant stockholder (the "Stockholder Loan"). The Stockholder Loan bears interest at 5% per annum on outstanding balances. During the thirty-nine weeks ended September 27, 2020, FCCG forgave a portion of the Stockholder Loan and recorded a loss on forgiveness of loan to stockholder in the amount of $16,948,000. As of September 27, 2020, the balance outstanding on the Stockholder Loan was $5,606,000. FCCG recognized interest income on the Stockholder Loan in the amount of $277,000 and $426,000 for the thirty-nine weeks ended September 27, 2020 and September 29, 2019, respectively.

## NOTE 5. INCOME TAXES

The Group's deferred taxes reflect the net effect of temporary differences between the carrying amount of assets and liabilities for financial reporting purposes and the amounts used for calculating taxes payable on a stand-alone basis. Significant components of the Group's deferred tax assets and liabilities are as follows (in thousands):

|  | September 27, 2020 | | December 29, 2019 | |
|---|---|---|---|---|
| Deferred tax assets (liabilities) | | | | |
| Net operating loss carryforwards | $ | 17,552 | $ | 18,513 |
| Other | | 3,370 | | 546 |
| Valuation allowance | | (20,922) | | (19,059) |
| Total | $ | - | $ | - |

Components of the income tax expense are as follows (in thousands):

|  | Thirty-nine Weeks Ended September 27, 2020 | | Thirty-nine Weeks Ended September 29, 2019 | |
|---|---|---|---|---|
| Current | | | | |
| Federal | $ | - | $ | - |
| State | | 2 | | 1 |
| Foreign | | - | | - |

3/27/25, 4:24 PM
Case 2:24-cr-00295-RGK   Document 109-1   Filed 03/28/25   Page 59 of 95   Page ID
#:936
sec.gov/Archives/edgar/data/1705012/000149315221005900/ex99-2.htm

|  |  | 2 |  |  | 1 |
|---|---|---|---|---|---|
| Deferred |  |  |  |  |  |
| Federal |  | - |  |  | - |
| State |  | - |  |  | - |
|  |  | - |  |  | - |
| Total income tax expense | $ | 2 | $ |  | 1 |

F-9

The differences between income taxes expected at the U.S. Federal statutory income tax rate of 21% and the reported income tax expense are primarily related to state taxes, net of federal benefit, expiration of net operating loss carryforwards; and change in federal, and state valuation allowances.

As of September 27, 2020, FCCG's annual tax filings for the prior three years are open for audit by Federal and for the prior four years for state tax agencies. Management evaluated the Group's overall tax positions and has determined that no provision for uncertain income tax positions is necessary as of September 27, 2020.

**NOTE 6. ACCRUED EXPENSES**

Accrued expenses consist of the following (in thousands):

|  | September 27, 2020 | December 29, 2019 |
|---|---|---|
| Payroll taxes and related penalties | $ 6,529 | $ 6,621 |
| Professional fees | 1,460 | 1,680 |
| Vendor liabilities | 1,502 | 1,521 |
| Gift card balances | 135 | 135 |
| Credit card balance | 185 | 185 |
| Closed restaurant accruals | 303 | 728 |
| Other | 179 | 394 |
| Total | $ 10,293 | $ 11,264 |

**NOTE 7. DEBT**

The Group's combined debt is summarized as follows (in thousands):

|  | September 27, 2020 | December 29, 2019 |
|---|---|---|
| **Debt recorded at Fog Cutter Capital Group:** | | |
| Note payable to a private lender. The note bears interest at a fixed rate of 12% and is unsecured. Interest is due monthly in arrears. The note matures on December 31, 2020. | $ 1,976 | $ 2,026 |
| Note payable to a private lender. The note bears interest at a fixed rate of 12% and is unsecured. Interest is due monthly in arrears. The note matures on December 31, 2020. | 2,871 | 2,989 |
| Note payable to a private lender, secured by FCCG's interest in certain shares of FAT Common Stock. The note bears interest at a fixed rate of 15%. The note matures December 1, 2020. | 113 | 311 |
| Note payable to a private lender, secured by FCCG's interest in certain shares of FAT Common Stock. The note bears interest at a fixed rate of 12%. Interest is due monthly in arrears. The maturity date of the note was June 30, 2020 | 743 | 688 |
| Consideration payable to former shareholders issued in redemption of fractional shares of the FCCG's stock (Note 9). The consideration is unsecured and non-interest bearing and is due and payable on May 21, 2021. | 4,548 | - |
| **Debt recorded at Fog Cap Development, LLC:** | | |
| Note payable to a private lender secured by FCCG's interest in shares of FAT Common Stock. The note bears interest at a fixed rate of 15%. Interest is due at maturity. The note is due December 1, 2020. | 134 | 345 |

Case 2:24-cr-00295-RGK    Document 109-1    Filed 03/28/25    Page 61 of 95    Page ID #:938

| | | | | | |
|---|---|---|---|---|---|
| Total debt | | | $ | 10,385 | $ 6,359 |

Subsequent to September 27, 2020, the maturity date of each of the above loans was amended to be May 21, 2021.

F-10

3/27/25, 4:24 PM    Case 2:24-cr-00295-RGK    Document 109-1    Filed 03/28/25    Page 62 of 95    Page ID
#:939
SEC.gov/Archives/edgar/data/1705012/000149315221005900/ex99-2.htm

## NOTE 8. RELATED PARTY TRANSACTIONS

As described in Note 1 - *Liquidity,* on April 24, 2020, FCCG entered into an Intercompany Agreement with FAT. As of September 27, 2020, the balance payable under the Intercompany Agreement was $33,382,000. The Group recognized $2,163,000 and $1,350,000 in interest expense related to the intercompany advances during the thirty-nine weeks ended September 27, 2020 and September 29, 2019, respectively.

Effective July 5, 2018, FAT made a preferred capital investment in Homestyle Dining LLC, a Delaware limited liability corporation ("HSD") in the amount of $4.0 million (the "Preferred Interest"). FCCG owns all of the common interests in HSD. The holder of the Preferred Interest is entitled to a 15% priority return on the outstanding balance of the investment (the "Preferred Return"). During the thirty-nine weeks ended September 27, 2020, the Group recorded interest expense of $450,000. Any available cash flows from HSD on a quarterly basis are to be distributed to pay the accrued Preferred Return and repay the Preferred Interest until fully retired. On or before the five-year anniversary of the investment, the Preferred Interest is to be fully repaid, together with all previously accrued but unpaid Preferred Return. FCCG has unconditionally guaranteed repayment of the Preferred Interest in the event HSD fails to do so. As of September 27, 2020, the balance payable, including accrued and unpaid interest income, under the Preferred Interest was $5,350,000.

During the thirty-nine weeks ended September 27, 2020 and September 29, 2019, FCCG recorded a payable to FAT under the Tax Sharing Agreement in the amount of $158,000 and $30,000, respectively, which were included in the due to affiliate balance.

## NOTE 9. EQUITY

*Cancellation of Treasury Shares*

On July 6, 2020, FCCG cancelled 3,799,645 shares of common stock previously held in treasury, with a cost basis of $12,011,000.

*Reverse Stock Split*

In the third quarter of 2020, FCCG's shares of common stock were the subject of a reverse stock split, reducing the number of issued shares in the ratio of 326,000 shares to one. Shareholders owning less than one share following the reverse split were entitled to cash-in-lieu of their fractional shares in the amount of $2.75 per original share to be paid on or before May 21, 2021, without interest thereon. The amount of cash-in-lieu to be paid by the Company totals $4,548,000. Effective with the consummation of the Merger on December 24, 2020, the payment of the cash-in-lieu became the obligation of Fog Cutter Acquisition, LLC. (See Note 11)

Immediately following the reverse stock split, FCCG declared a forward stock split which was the exact inverse of the previous reverse stock split (issuing 326,000 shares for each remaining share of outstanding stock), thus eliminating the effects of the reverse stock split on the shares not receiving cash-in-lieu.

As of September 27, 2020, the total number of authorized shares of common stock was 10,100,000 and there were 8,428,692 shares issued and outstanding.

*Stock-based Compensation*

During the thirty-nine weeks ended September 29, 2019, FCCG completed the following stock-based transactions:

- On August 28, 2019, the Company issued a total of 1,825,000 shares of common stock at a value of $1.00 per share as compensation.

- On August 28, 2019, the Company issued a total of 300,000 shares of common stock at a value of $1.00 per share to the non-employee members of the board of directors as consideration for directors' fees.

F-11

**NOTE 10. COMMITMENTS AND CONTINGENCIES**

*Litigation*

***Eric Rojany, et al. v. FAT Brands Inc., et al.*, Superior Court of California for the County of Los Angeles, Case No. BC708539, and *Daniel Alden, et al. v. FAT Brands Inc., et al.*, Superior Court of California for the County of Los Angeles, Case No. BC716017.**

On June 7, 2018, FAT Brands, Inc., Andrew Wiederhorn, Ron Roe, James Neuhauser, Edward H. Rensi, Marc L. Holtzman, Squire Junger, Silvia Kessel, Jeff Lotman, Fog Cutter Capital Group Inc., and Tripoint Global Equities, LLC (collectively, the "Original Defendants") were named as defendants in a putative securities class action lawsuit entitled *Rojany v. FAT Brands, Inc.*, Case No. BC708539 (the "*Rojany* Case"), in the Superior Court of the State of California, County of Los Angeles. On July 31, 2018, the *Rojany* Case was designated as complex, pursuant to Rule 3.400 of the California Rules of Court and assigned the matter to the Complex Litigation Program. On August 2, 2018, the Original Defendants were named defendants in a second putative class action lawsuit, *Alden v. FAT Brands*, Case No. BC716017 (the "*Alden* Case"), filed in the same court. On September 17, 2018, the *Rojany* and *Alden* Cases were consolidated under the *Rojany* Case number. On October 10, 2018, plaintiffs Eric Rojany, Daniel Alden, Christopher Hazelton-Harrington and Byron Marin ("Plaintiffs") filed a First Amended Consolidated Complaint against FAT Brands, Inc., Andrew Wiederhorn, Ron Roe, James Neuhauser, Edward H. Rensi, Fog Cutter Capital Group Inc., and Tripoint Global Equities, LLC (collectively, "Defendants"), thereby removing Marc L. Holtzman, Squire Junger, Silvia Kessel and Jeff Lotman as defendants. On November 13, 2018, Defendants filed a Demurrer to First Amended Consolidated Complaint. On January 25, 2019, the Court sustained Defendants' Demurrer to First Amended Consolidated Complaint with Leave to Amend in Part. Plaintiffs filed a Second Amended Consolidated Complaint on February 25, 2019. On March 27, 2019, Defendants filed a Demurrer to the Second Amended Consolidated Complaint. On July 31, 2019, the Court sustained Defendants' Demurrer to the Second Amended Complaint in Part, narrowing the scope of the case. Defendants filed their Answer to the Second Amended Consolidated Complaint on November 12, 2019. Thereafter, plaintiffs Alden, Hazelton-Harrington and Marin, voluntarily dismissed their claims without prejudice, leaving only plaintiff Rojany as the putative class representative plaintiff ("Plaintiff"). On January 29, 2020, Plaintiff filed a Motion for Class Certification. On October 8, 2020, the Court denied Plaintiff's Motion for Class Certification. On January 6, 2021, the parties executed a Settlement Agreement and Mutual Release pursuant to which plaintiff agreed to dismiss his individual claims against defendants with prejudice in exchange for a payment by or on behalf of defendants of $50,000. On January 27, 2021, plaintiff filed a request for dismissal of this action, with prejudice, in its entirety.

***Adam Vignola, et al. v. FAT Brands Inc., et al.*, United States District Court for the Central District of California, Case No. 2:18-cv-07469.**

On August 24, 2018, the Original Defendants were named as defendants in a putative securities class action lawsuit entitled *Vignola v. FAT Brands, Inc.*, Case No. 2:18-cv-07469-PSG-PLA, in the United States District Court for the Central District of California. On October 23, 2018, Charles Jordan and David Kovacs (collectively, "Lead Plaintiffs") moved to be appointed lead plaintiffs, and the Court granted Lead Plaintiffs' motion on November 16, 2018. On January 15, 2019, Lead Plaintiffs filed a First Amended Class Action Complaint against the Original Defendants. The allegations and claims for relief asserted in *Vignola* are substantively identical to those asserted in the *Rojany* Case. Defendants filed a Motion to Dismiss First Amended Class Action Complaint, or, in the Alternative, to Stay the Action In Favor of a Prior Pending Action. On June 14, 2019, the Court denied Defendants' motion to stay but granted Defendants' motion to dismiss the First Amended Class Action Complaint, with Leave to Amend. Lead Plaintiffs filed a Second Amended Class Action Complaint on August 5, 2019. On September 9, 2019, Defendants' filed a Motion to Dismiss the Second Amended Class Action Complaint. On December 17, 2019, the Court granted Defendants' Motion to Dismiss the Second Amended Class Action Complaint in Part, Without Leave to Amend. The allegations remaining in *Vignola* are substantively identical to those remaining in the *Rojany* Case. Defendants filed their Answer to the Second Amended Class Action Complaint on January 14, 2020. On December 27, 2019, Lead Plaintiffs filed a Motion for Class Certification. By order entered March 16, 2020, the Court denied Lead Plaintiffs' Motion for Class Certification. By order entered April 1, 2020, the Court set various deadlines for the case, including a fact discovery cut-off of December 29, 2020, expert discovery cut-off of February 23, 2021 and trial date of March 30, 2021. On September 25, 2020, the parties executed a Settlement Agreement and Mutual Release pursuant to which lead plaintiffs agreed to dismiss their individual claims against defendants with prejudice in exchange for a payment by or on behalf of defendants of $75,000. On October 13, 2020, the Court ordered the stipulated dismissal of this action, with prejudice, in its entirety.

F-12

FCCG is obligated to indemnify its officers and directors to the extent permitted by applicable law in connection with the above actions, and has insurance for such individuals, to the extent of the limits of the applicable insurance policies and subject to potential reservations of rights. FCCG is also obligated to indemnify Tripoint Global Equities, LLC under certain conditions relating to the *Rojany* and *Vignola* matters. These two proceedings are now concluded.

### Stratford Holding LLC v. Foot Locker Retail Inc. (U.S. District Court for the Western District of Oklahoma, Case No. 5:12-cv-00772-HE)

In 2012 and 2013, two property owners in Oklahoma City, Oklahoma sued numerous parties, including Fog Cutter, for alleged environmental contamination on their properties, stemming from dry cleaning operations on one of the properties. The property owners seek damages in the range of $12 million to $22 million. From 2002 to 2008, a former Fog Cutter subsidiary managed a lease portfolio, which included the subject property. Fog Cutter denies any liability, although it did not timely respond to one of the property owners' complaints and several of the defendants' cross-complaints and thus is in default. The parties are currently conducting discovery, and the matter is scheduled for trial for November 2021. The Company is unable to predict the ultimate outcome of this matter, however, reserves in the amount of $3,500,000 have been recorded on the balance sheet relating to this litigation. There can be no assurance that the defendants will be successful in defending against these actions.

### SBN FCCG LLC v FCCGI (Los Angeles Superior Court, Case No. BS172606)

SBN FCCG LLC ("SBN") filed a complaint against Fog Cutter Capital Group, Inc. ("FCCG") in New York state court for an indemnification claim (the "NY case") stemming from an earlier lawsuit in Georgia regarding a certain lease portfolio formerly managed by a former FCCG subsidiary. In February 2018, SBN obtained a final judgment in the NY case for a total of $651,290, which included $225,030 in interest dating back to March 2012. SBN then obtained a sister state judgment in Los Angeles Superior Court, Case No. BS172606 (the "California case"), which included the $651,290 judgment from the NY case, plus additional statutory interest and fees, for a total judgment of $656,543. In May 2018, SBN filed a cost memo, requesting an additional $12,411 in interest to be added to the judgment in the California case, for a total of $668,954. In May 2019, the parties agreed to settle the matter for $580,000, which required the immediate payment of $100,000, and the balance to be paid in August 2019. FCCG wired $100,000 to SBN in May 2019, but has not yet paid the remaining balance of $480,000. The parties have not entered into a formal settlement agreement, and they have not yet discussed the terms for the payment of the remaining balance.

The Group is involved in other claims and legal proceedings from time-to-time that arise in the ordinary course of business. The Group does not believe that the ultimate resolution of these actions will have a material adverse effect on its business, financial condition, results of operations, liquidity or capital resources.

### *Guarantee of FAT — Elevation Note*

On June 19, 2019, the FAT completed the acquisition of Elevation Burger. A portion of the purchase price included the issuance to the Seller of a convertible subordinated promissory note (the "Elevation Note") with a principal amount of $7,509,816, bearing interest at 6.0% per year and maturing in July 2026. The Elevation Note is convertible under certain circumstances into shares of the FAT's common stock at $12.00 per share. The Company has guaranteed payment of the Elevation Note.

F-13

*Guarantee of FAT — Elevation Note* (continued)

FAT is required to make fully amortizing payments of $110,000 per month during the term of the Elevation Note. The Elevation Note is a general unsecured obligation of FAT and is subordinated in right of payment to all indebtedness of FAT arising under any agreement or instrument to which FAT or any of its affiliates is a party that evidences indebtedness for borrowed money that is senior in right of payment.

## NOTE 11. SUBSEQUENT EVENTS

Pursuant to FASB ASC 855, Management has evaluated all events and transactions that occurred from December 29, 2019 through the date of issuance of these combined financial statements. During this period, the Company did not have any significant subsequent events, except as described below:

*Loan to Stockholder*

During the fourth quarter of 2020, FCCG transferred 74,449 shares of FAT Series B Preferred Stock and warrants to purchase 19,148 shares of FAT's common stock at an exercise price of $7.83 per share, with a combined carrying value of $1,861,000 to Fog Cutter Holdings, LLC, a Delaware limited liability company ("Holdings") owned by certain previous Company stockholders that were not cashed out as a result of the reserve stock split, including Andrew Wiederhorn. The Company recorded an advance on the Stockholder Loan in the amount of $1,861,000 as a result of the transfer of preferred shares and warrants.

On December 24, 2020, the Company cancelled the Stockholder Loan arrangement with Mr. Wiederhorn and forgave the ending balance, recording a related loss on forgiveness of loan to stockholder in the amount of $8,489,000.

*Merger with FAT.*

On December 10, 2020, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with FAT, Fog Cutter Acquisition, LLC, a Delaware limited liability company and wholly owned subsidiary of FAT ("Merger Sub"), and Holdings.

Pursuant to the Merger Agreement, the Company agreed to merge with and into Merger Sub, with Merger Sub surviving as a wholly owned subsidiary of FAT (the "Merger"). Upon closing of the Merger, the former stockholders of the Company became direct stockholders of FAT, holding, in the aggregate, 9,679,288 shares of the FAT's common stock (the same number of shares of Common Stock held by the Company immediately prior to the Merger) and received certain limited registration rights with respect to the shares received in the Merger. As a result of the Merger, FCCG's wholly owned subsidiaries, Homestyle Dining, LLC, Fog Cap Development LLC, Fog Cap Acceptance Inc. and BC Canyon LLC, became indirect wholly owned subsidiaries of FAT.

Under the Merger Agreement, Holdings has agreed to indemnify FAT for any breaches of FCCG's representations and warranties, covenants and certain other matters specified in the Merger Agreement, subject to certain exceptions and qualifications. Holdings has also agreed to hold a minimum fair market value of shares of Common Stock of FAT to ensure that it has assets available to satisfy such indemnification obligations if necessary.

The Company undertook the Merger primarily to provide a structure to allow its shareholders to participate directly in the potential growth of FAT and to simplify its corporate structure.

F-14

**EXHIBIT E**

| Bates Start | Bates Stop | Custodian | Production Status | Author | Addressee(s) | Other Recipient(s) | Date | Privilege Type | Privilege RE: |
|---|---|---|---|---|---|---|---|---|---|
| FATBrands_00403508 | FATBrands_00403508 | Hershinger, Rebecca | Withheld | Rebecca Hershinger (rhershinger@fatbrands.com) | Allen Z. Sussman - Loeb & Loeb LLP (asussman@loeb.com) (asussman@loeb.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | 2/9/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding draft board minutes. |
| FATBrands_00403509 | FATBrands_00403509 | Hershinger, Rebecca | Withheld | | | | 2/9/2020 | Attorney Client | Document subject of requested legal advice regarding draft board minutes. |
| FATBrands_00403510 | FATBrands_00403510 | Hershinger, Rebecca | Withheld | | | | 2/9/2020 | Attorney Client | Document subject of requested legal advice regarding draft board minutes. |
| FATBrands_00403511 | FATBrands_00403511 | Hershinger, Rebecca | Withheld | | | | 2/9/2020 | Attorney Client | Document subject of requested legal advice regarding draft board minutes. |
| FATBrands_00403512 | FATBrands_00403512 | Hershinger, Rebecca | Withheld | | | | 2/9/2020 | Attorney Client | Document subject of requested legal advice regarding draft board minutes. |
| FATBrands_00459263 | FATBrands_00459263 | Wiederhorn, Andrew | Withheld | Rebecca Hershinger (rhershinger@fatbrands.com) | Allen Z. Sussman - Loeb & Loeb LLP (asussman@loeb.com) (asussman@loeb.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | 2/9/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding draft board minutes. |
| FATBrands_00459264 | FATBrands_00459264 | Wiederhorn, Andrew | Withheld | | | | 2/9/2020 | Attorney Client | Document subject of requested legal advice regarding draft board minutes. |
| FATBrands_00459265 | FATBrands_00459265 | Wiederhorn, Andrew | Withheld | | | | 2/9/2020 | Attorney Client | Document subject of requested legal advice regarding draft board minutes. |
| FATBrands_00459266 | FATBrands_00459266 | Wiederhorn, Andrew | Withheld | | | | 2/9/2020 | Attorney Client | Document subject of requested legal advice regarding draft board minutes. |
| FATBrands_00459267 | FATBrands_00459267 | Wiederhorn, Andrew | Withheld | | | | 2/9/2020 | Attorney Client | Document subject of requested legal advice regarding draft board minutes. |
| FATBrands_00459268 | FATBrands_00459268 | Wiederhorn, Andrew;Hershinger, Rebecca | Withheld | Allen Sussman (asussman@loeb.com) | Rebecca Hershinger (rhershinger@fatbrands.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | 2/10/2020 | Attorney Client | Communication reflecting the legal advice of counsel regarding draft board minutes. |
| FATBrands_00459269 | FATBrands_00459269 | Wiederhorn, Andrew;Hershinger, Rebecca | Withheld | | | | 2/10/2020 | Attorney Client | Document reflecting the legal advice of counsel regarding draft board minutes. |
| FATBrands_00403513 | FATBrands_00403513 | Hershinger, Rebecca | Withheld | Rebecca Hershinger (rhershinger@fatbrands.com) | Allen Sussman (asussman@loeb.com) | | 2/10/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding draft board minutes. |
| FATBrands_00459270 | FATBrands_00459271 | Wiederhorn, Andrew | Redacted | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | Gina Soto (gsoto@fatbrands.com) | | 2/18/2020 | Attorney Client | Communication reflecting the legal advice of counsel regarding shareholder loan. |
| FATBrands_00459272 | FATBrands_00459272 | Wiederhorn, Andrew | Withheld | | | | 2/18/2020 | Attorney Client | Document reflecting the legal advice of counsel regarding shareholder loan. |
| FATBrands_00459273 | FATBrands_00459273 | Wiederhorn, Andrew | Withheld | | | | 2/18/2020 | Attorney Client | Document reflecting the legal advice of counsel regarding shareholder loan. |
| FATBrands_00459274 | FATBrands_00459274 | Wiederhorn, Andrew | Withheld | | | | 2/18/2020 | Attorney Client | Document reflecting the legal advice of counsel regarding shareholder loan. |
| FATBrands_00459275 | FATBrands_00459275 | Wiederhorn, Andrew | Withheld | | | | 2/18/2020 | Attorney Client | Document reflecting the legal advice of counsel regarding shareholder loan. |
| FATBrands_00459276 | FATBrands_00459276 | Wiederhorn, Andrew | Withheld | (rtanden@foley.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | | 2/24/2020 | Attorney Client | Communication regarding the legal advice of counsel regarding potential or actual mergers of Fog Cutter and FAT Brands. |
| FATBrands_00459277 | FATBrands_00459277 | Wiederhorn, Andrew | Withheld | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | (rtanden@foley.com) | | 2/24/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding potential or actual mergers of Fog Cutter and FAT Brands. |
| FATBrands_00403514 | FATBrands_00403514 | Hershinger, Rebecca | Withheld | Rebecca Hershinger (rhershinger@fatbrands.com) | Allen Sussman (asussman@loeb.com) | | 3/5/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding draft board minutes. |
| FATBrands_00403515 | FATBrands_00403515 | Hershinger, Rebecca | Withheld | | | | 3/5/2020 | Attorney Client | Document subject of requested legal advice regarding draft board minutes. |
| FATBrands_00459278 | FATBrands_00459278 | Wiederhorn, Andrew | Withheld | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | BRikkers@foley.com (brikkers@foley.com) | Ron Roe (rroe@fatburger.com) | 3/7/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding shareholder loan. |
| FATBrands_00459279 | FATBrands_00459279 | Wiederhorn, Andrew | Withheld | | | | 3/7/2020 | Attorney Client | Document subject of requested legal advice regarding shareholder loan. |
| FATBrands_00459280 | FATBrands_00459280 | Wiederhorn, Andrew | Withheld | | | | 3/7/2020 | Attorney Client | Document subject of requested legal advice regarding shareholder loan. |
| FATBrands_00459288 | FATBrands_00459288 | Wiederhorn, Andrew | Withheld | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | Allen Z. Sussman - Loeb & Loeb LLP (asussman@loeb.com) (asussman@loeb.com) | | 3/7/2020 | Attorney Client;Work Product | Communication requesting the legal advice of counsel regarding a potential regulatory inquiry, litigation, or other action. |
| FATBrands_00459286 | FATBrands_00459287 | Wiederhorn, Andrew | Redacted | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | Allen Z. Sussman - Loeb & Loeb LLP (asussman@loeb.com) (asussman@loeb.com) | | 3/7/2020 | Attorney Client;Work Product | Communication requesting the legal advice of counsel regarding a potential regulatory inquiry, litigation, or other action. |
| FATBrands_00459281 | FATBrands_00459281 | Wiederhorn, Andrew | Withheld | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | BRikkers@foley.com (brikkers@foley.com) | Ron Roe (rroe@fatburger.com) | 3/7/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding shareholder loan. |
| FATBrands_00459282 | FATBrands_00459282 | Wiederhorn, Andrew | Withheld | | | | 3/7/2020 | Attorney Client | Document subject of requested legal advice regarding shareholder loan. |
| FATBrands_00459283 | FATBrands_00459283 | Wiederhorn, Andrew | Withheld | | | | 3/7/2020 | Attorney Client | Document subject of requested legal advice regarding shareholder loan. |
| FATBrands_00459284 | FATBrands_00459284 | Wiederhorn, Andrew | Withheld | | | | 3/7/2020 | Attorney Client | Document subject of requested legal advice regarding shareholder loan. |

| Bates Start | Bates Stop | Custodian | Production Status | Author | Addressee(s) | Other Recipient(s) | Date | Privilege Type | Privilege RE: |
|---|---|---|---|---|---|---|---|---|---|
| FATBrands_00459285 | FATBrands_00459285 | Wiederhorn, Andrew | Withheld | | | | 3/7/2020 | Attorney Client | Document subject of requested legal advice regarding shareholder loan. |
| FATBrands_00459300 | FATBrands_00459300 | Wiederhorn, Andrew | Withheld | (brikkers@foley.com) | Ron Roe (rroe@fatburger.com); Andy Wiederhorn (andy.wiederhorn@fccgi.com) | (rtanden@foley.com) | 3/8/2020 | Attorney Client | Communication regarding the legal advice of counsel regarding shareholder loan. |
| FATBrands_00459301 | FATBrands_00459301 | Wiederhorn, Andrew | Withheld | | | | 3/8/2020 | Attorney Client | Document reflecting the legal advice of counsel regarding shareholder loan. |
| FATBrands_00459302 | FATBrands_00459302 | Wiederhorn, Andrew | Withheld | | | | 3/8/2020 | Attorney Client | Document reflecting the legal advice of counsel regarding shareholder loan. |
| FATBrands_00403575 | FATBrands_00403575 | Hershinger, Rebecca | Withheld | Rebecca Hershinger (rhershinger@fatbrands.com) | Allen Z. Sussman - Loeb & Loeb LLP (asussman@loeb.com) (asussman@loeb.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | 3/10/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding dividend payment. |
| FATBrands_00403576 | FATBrands_00403576 | Hershinger, Rebecca | Withheld | | | | 3/10/2020 | Attorney Client | Document subject of requested legal advice regarding dividend payment. |
| FATBrands_00403577 | FATBrands_00403577 | Hershinger, Rebecca | Withheld | | | | 3/10/2020 | Attorney Client | Document subject of requested legal advice regarding dividend payment. |
| FATBrands_00403578 | FATBrands_00403578 | Hershinger, Rebecca | Withheld | | | | 3/10/2020 | Attorney Client | Document subject of requested legal advice regarding dividend payment. |
| FATBrands_00403548 | FATBrands_00403550 | Hershinger, Rebecca | Redacted | | | | 3/10/2020 | Attorney Client | Document regarding the legal advice of counsel regarding financing matters. |
| FATBrands_00403561 | FATBrands_00403561 | Hershinger, Rebecca | Withheld | | | | 3/10/2020 | Attorney Client | Document regarding the legal advice of counsel regarding potential litigation. |
| FATBrands_00403568 | FATBrands_00403569 | Hershinger, Rebecca | Redacted | | | | 3/10/2020 | Attorney Client | Document regarding the legal advice of counsel regarding potential litigation. |
| FATBrands_00459303 | FATBrands_00459303 | Wiederhorn, Andrew | Withheld | Rebecca Hershinger (rhershinger@fatbrands.com) | Allen Z. Sussman - Loeb & Loeb LLP (asussman@loeb.com) (asussman@loeb.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | 3/10/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding stock dividends. |
| FATBrands_00459304 | FATBrands_00459304 | Wiederhorn, Andrew | Withheld | | | | 3/10/2020 | Attorney Client | Document subject of requested legal advice regarding stock dividends. |
| FATBrands_00459305 | FATBrands_00459305 | Wiederhorn, Andrew | Withheld | | | | 3/10/2020 | Attorney Client | Document subject of requested legal advice regarding stock dividends. |
| FATBrands_00459306 | FATBrands_00459306 | Wiederhorn, Andrew | Withheld | | | | 3/10/2020 | Attorney Client | Document subject of requested legal advice regarding stock dividends. |
| FATBrands_00459307 | FATBrands_00459307 | Wiederhorn, Andrew | Withheld | Rebecca Hershinger (rhershinger@fatbrands.com) | Allen Z. Sussman - Loeb & Loeb LLP (asussman@loeb.com) (asussman@loeb.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | 3/11/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding regulatory matters. |
| FATBrands_00459315 | FATBrands_00459315 | Wiederhorn, Andrew | Withheld | | | | 3/11/2020 | Attorney Client | Document subject of requested legal advice regarding regulatory matters. |
| FATBrands_00403579 | FATBrands_00403579 | Hershinger, Rebecca | Withheld | Rebecca Hershinger (rhershinger@fatbrands.com) | Allen Z. Sussman - Loeb & Loeb LLP (asussman@loeb.com) (asussman@loeb.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | 3/11/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding dividend payment. |
| FATBrands_00403580 | FATBrands_00403580 | Hershinger, Rebecca | Withheld | | | | 3/11/2020 | Attorney Client | Document subject of requested legal advice regarding dividend payment. |
| FATBrands_00403581 | FATBrands_00403581 | Hershinger, Rebecca | Withheld | | | | 3/11/2020 | Attorney Client | Document subject of requested legal advice regarding dividend payment. |
| FATBrands_00459322 | FATBrands_00459325 | Wiederhorn, Andrew | Redacted | Allen Sussman (asussman@loeb.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | | 3/13/2020 | Attorney Client; Work Product | Communication reflecting the legal advice of counsel regarding in anticipation of a potential regulatory inquiry, litigation, or other action. |
| FATBrands_00459326 | FATBrands_00459328 | Wiederhorn, Andrew | Redacted | Allen Sussman (asussman@loeb.com) | (gzelenay@squarmilner.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | 3/13/2020 | Work Product | Communication regarding the legal advice of counsel regarding a potential regulatory inquiry, litigation, or other action. |
| FATBrands_00459316 | FATBrands_00459318 | Wiederhorn, Andrew | Redacted | Allen Sussman (asussman@loeb.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | | 3/13/2020 | Attorney Client; Work Product | Communication reflecting the legal advice of counsel regarding in anticipation of a potential regulatory inquiry, litigation, or other action. |
| FATBrands_00459329 | FATBrands_00459332 | Wiederhorn, Andrew | Redacted | Gregory Zelenay (gzelenay@squarmilner.com) | Allen Sussman (asussman@loeb.com) | Andy Wiederhorn (andy.wiederhorn@fccgi.com); Ernest Miranda (emiranda@squarmilner.com) | 3/13/2020 | Work Product | Communication regarding the legal advice of counsel regarding a potential regulatory inquiry, litigation, or other action. |
| FATBrands_00459319 | FATBrands_00459321 | Wiederhorn, Andrew | Redacted | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | Allen Sussman (asussman@loeb.com) | | 3/13/2020 | Attorney Client; Work Product | Communication regarding the legal advice of counsel regarding a potential regulatory inquiry, litigation, or other action. |
| FATBrands_00403582 | FATBrands_00403585 | Hershinger, Rebecca | Redacted | Gregory Zelenay (gzelenay@squarmilner.com) | Rebecca Hershinger (rhershinger@fatbrands.com) | | 3/19/2020 | Work Product | Communication regarding the legal advice of counsel regarding a potential regulatory inquiry, litigation, or other action. |
| FATBrands_00403586 | FATBrands_00403586 | Hershinger, Rebecca | Withheld | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | Allen Z. Sussman - Loeb & Loeb LLP (asussman@loeb.com) (asussman@loeb.com) | Rebecca Hershinger (rhershinger@fatbrands.com); Ron Roe (rroe@fatburger.com) | 3/23/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding related party questionnaire. |
| FATBrands_00459333 | FATBrands_00459333 | Wiederhorn, Andrew | Withheld | Andy Wiederhorn (andy.wiederhorn@fccgi.com) | Allen Z. Sussman - Loeb & Loeb LLP (asussman@loeb.com) (asussman@loeb.com) | Rebecca Hershinger (rhershinger@fatbrands.com) (rhershinger@fatbrands.com); Ron Roe (rroe@fatburger.com) | 3/23/2020 | Attorney Client | Communication requesting the legal advice of counsel regarding related party transactions. |
| FATBrands_00403617 | FATBrands_00403626 | Hershinger, Rebecca | Redacted | | | | 3/24/2020 | Work Product | Communication prepared in anticipation of litigation regarding actual litigation. |

**EXHIBIT F**

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry ___06/12/2023___

DON H. COLEMAN (COLEMAN), date of birth ████████████
████████ email address ████████ ████████ home address
████████████████████ was interviewed by FBI Special Agent (SA)
Nathan Cherney, FBI SA Kyle Schultz, Internal Revenue Service (IRS) Criminal
Investigation SA Janet Siu, Assistant United States Attorney (AUSA) Adam
Schleifer, Securities & Exchange Commission (SEC) attorney James Lyman, and
SEC attorney Matthew Montgomery. Prior to the interview, AUSA
Schleifer admonished COLEMAN of the following:

- The interview was voluntary;
- to tell the truth and that it was a crime to lie to the interviewers;
- the Government was not interested in any privileged conversations.

    Prior to the interview, SEC attorney Matt Montgomery admonished COLEMAN
of the following:

- There civil and criminal penalties for lying to the interviewers;
- information provided during the interview was subject to the SEC's
  routine uses including sharing information with other law enforcement
  agencies.

    After being advised of the identities of the interviewers and the nature
of the interview, COLEMAN provided the following information:

    COLEMAN attended undergraduate school at Stanford. COLEMAN earned his MBA
from Stanford in 1962. COLEMAN did not have any professional licenses. In
1976, COLEMAN joined CLARION, a subsidiary of a large Japanese electronics
company. COLEMAN was the Senior Vice President in charge of marketing,
sales, and engineering. COLEMAN became Chief Executive Officer (CEO) of
CLARION in 1983 and served in that role for two years. In 1985, COLEMAN
joined a growing entrepreneurial company, and spent five years there. After,
COLEMAN was a partner in a phone company that did business in foreign
companies. After, COLEMAN served as an active board member of WILSHIRE
FINANCIAL SERVICES GROUP (WFSG) and FOG CUTTER CAPITAL GROUP (FOG).

    COLEMAN met ANDREW WIEDERHORN (WIEDERHORN) when WIEDERHORN was about

Investigation on  05/26/2023  at  Los Angeles, California, United States (Other (Video Conference))

File # ████████████████████                      Date drafted  05/26/2023

by  CHERNEY NATHAN ALEXANDER, SCHULTZ KYLE CHRISTOPHER

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of (U) Interview of Don Coleman (5.26.2023) ,On 05/26/2023 , Page 2 of 5

eighteen years old. WIEDERHORN was the son of a family acquaintance. COLEMAN
did not see WIEDERHORN again until COLEMAN was at CLARION in Los Angeles. At
the time, WIEDERHORN was at school at the University of Southern California,
and COLEMAN saw WIEDERHORN once or twice.

After WIEDERHORN formed WFSG, WIEDERHORN bought FIRST BANK OF BEVERLY
HILLS (FBBH). WIEDERHORN asked COLEMAN to serve on the board of FBBH.
WIEDERHORN wanted an experienced outside business director, even though
COLEMAN was not a banker. Later, COLEMAN joined the WFSG board around 1983
to 1985.

WFSG grew to be a large company. WFSG bought and managed securitized
loans as its primary business. COLEMAN was on the compensation committee and
audit committee while on the WFSG board. COLEMAN set WIEDERHORN's
compensation levels while on the compensation committee. COLEMAN vaguely
remembered WFSG engaging in a potential acquisition of a WIEDERHORN private
entity. COLEMAN did not remember what WILSHIRE CREDIT CORPORATION (WCC) was.

WIEDERHORN went to prison for a tax issue and investor issue.
WIEDERHORN's conviction was confusing to COLEMAN because a law firm and
auditor vetted related procedures as correct. COLEMAN was interviewed by the
Government in connection with the investigation into WIEDERHORN. The
Government was interested in WIEDERHORN's personal tax issues. COLEMAN did
not remember the specifics of the interview. COLEMAN did not remember if the
Government was interested in WIEDERHORN's shareholder loans.

COLEMAN remembered FOG paid $2 million to WIEDERHORN, which was how much
restitution WIEDERHORN was ordered to pay. FOG decided to pay WIEDERHORN the
$2 million because WIEDERHORN was the principal shareholder of FOG and key
to FOG's success. While WIEDERHORN was in prison, the FOG board was
responsible for keeping the business moving, and part of that involved
compensating WIEDERHORN for the direction WIEDERHORN provided. WIEDERHORN
had a couple year term and the FOG board assumed WIEDERHORN would be
involved with FOG again. COLEMAN understood FOG was delisted because the
regulators took a poor view of FOG giving WIEDERHORN $2 million. COLEMAN was
upset because the delisting affected the stock value for shareholders.

COLEMAN was asked to serve on the FOG board after WIEDERHORN came back
from prison. COLEMAN was on the compensation committee and audit committee
for FOG. WIEDERHORN's compensation structure at FOG included a $400,000
annual base salary. COLEMAN did not remember if WIEDERHORN received bonuses.
COLEMAN did not remember WIEDERHORN ever receiving an advance on a bonus.
The compensation committee would have had to approve WIEDERHORN's bonuses
based on FOG's rules.

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of  (U)  Interview of Don Coleman (5.26.2023)      , On   05/26/2023   , Page   3 of 5

[In reference to Exhibit 1i, FATBrands_00491275 – FATBrands_00491278,
which was shown to COLEMAN and placed in the 1a section for reference].
COLEMAN did not remember a ceiling amount for WIEDERHORN's compensation.
COLEMAN remembered approving compensation of around $2 million but did not
recognize the larger $4.6 million amount. COLEMAN did not see the action of
WIEDERHORN taking money out of FOG. COLEMAN was not sure how money was doled
out to WIEDERHORN from FOG. COLEMAN did not remember the FOG board approving
bonus payments to WIEDERHORN.

Before learning of the current Government investigation, COLEMAN was not
aware of approximately $50 million in shareholder loans to WIEDERHORN from
FOG between 2010 and 2020. COLEMAN remembered approving a $2 million
shareholder loan that was later raised to around $4 million. WIEDERHORN
never came to the FOG board to request additional shareholder loans. COLEMAN
would have remembered if WIEDERHORN had come to the FOG board for approval
of shareholder loans. It would be important to COLEMAN as a board member to
know if WIEDERHORN had caused approximately $50 million in shareholder loans
to WIEDERHORN to be forgiven. COLEMAN never did a formal underwriting
analysis to determine if WIEDERHORN would be a good creditor for FOG. The
FOG directors assumed since WIEDERHORN owned the lion's share of FOG shares,
WIEDERHORN had the collateral to repay a shareholder loan of $2-4 million.
The shareholder loan was not formally collateralized. COLEMAN never did an
insolvency analysis to determine if the shareholder loan debt would be
recoverable from WIEDERHORN.

COLEMAN assumed WIEDERHORN was the one who brought the shareholder loan
proposal to the FOG board. COLEMAN believed WIEDERHORN asked for the
shareholder loan because WIEDERHORN needed compensation to fund WIEDERHORN's
lifestyle. The FOG board approved the original $2 million shareholder loan
proposal. COLEMAN believed the shareholder loan was compensation to
WIEDERHORN for services WIEDERHORN provided to FOG. COLEMAN did not remember
why it was called a shareholder loan instead of a bonus or salary. COLEMAN
believed the shareholder loan would be repaid because there were terms in
the agreement. The FOG board expected WIEDERHORN to repay the shareholder
loan. COLEMAN did not remember FOG receiving interest payments on the
shareholder loan. COLEMAN did not believe interest payments were discussed.
COLEMAN did not remember the FOG board extending bonuses to WIEDERHORN so
that WIEDERHORN could repay the shareholder loans. COLEMAN did not remember
if or how the shareholder loan was ever resolved.

If FOG wrote off approximately $25 million worth of shareholder loans to
WIEDERHORN, COLEMAN did not know if COLEMAN would have been willing to
approve another $25 million loan to WIEDERHORN because it was a lot of
money. COLEMAN, as a fiduciary to the FOG shareholders, did not believe it

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER                                    USAO_PROD_00026988

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of (U) Interview of Don Coleman (5.26.2023) , On 05/26/2023 , Page 4 of 5

would be financially responsible to approve an additional $25 million loan to WIEDERHORN in this scenario.

COLEMAN and the FOG board discussed FOG borrowing approximately $35 million from FAT BRANDS (FAT). This money was supposed to be FOG working capital. WILSHIRE REAL ESTATE INVESTMENT TRUST (WILSHIRE REIT) was formed after WFSG failed. The purpose of WILSHIRE REIT was to make investments. WILSHIRE REIT converted to FOG later. The purpose of FOG's business was to make investments. COLEMAN did not think the money FOG borrowed from FAT was to fund WIEDERHORN's lifestyle. If COLEMAN knew the funds FOG borrowed from FAT were to be used to fund WIEDERHORN's lifestyle, it would have affected COLEMAN's analysis of whether FOG should borrow the money. COLEMAN was aware FOG had outstanding liabilities from creditors. COLEMAN believed the money FOG borrowed from FAT would be used to repay creditors.

FOG was a holding company, predominantly owned by WIEDERHORN. Once FAT went public, there were not many operations going on at the FOG level. COLEMAN believed WIEDERHORN had substantive work at FOG to the extent WIEDERHORN's duties overlapped between FAT and FOG. FOG managed FAT after it went public. Between 2018 and 2020, COLEMAN believed WIEDERHORN received compensation, but was not sure if WIEDERHORN received the compensation from FOG or FAT. COLEMAN believed WIEDERHORN's compensation was related to WIEDERHORN's services as the CEO of FAT.

COLEMAN was not aware of an option FATBURGER NORTH AMERICA (FNA) held to purchase WIEDERHORN's house for around $10 million. COLEMAN was aware FOG initially paid for WIEDERHORN's housing. COLEMAN assumed FOG paid for WIEDERHORN's housing for a period while WIEDERHORN moved and was looking for a house. COLEMAN did not know if WIEDERHORN continued to have his housing paid for by FOG after that period.

COLEMAN did not know what the COLEMAN FOUNDATION was. WIEDERHORN owed money to BUD COLEMAN (BUD), COLEMAN's step uncle. BUD loaned money to WIEDERHORN, but COLEMAN did not know the specific details. COLEMAN thought WIEDERHORN owed BUD approximately $2 million. COLEMAN did not know when the loan originated. COLEMAN thought WIEDERHORN eventually repaid BUD, maybe in 2021. COLEMAN did not know where WIEDERHORN obtained the money to repay BUD. It would not surprise COLEMAN if WIEDERHORN took the money out of FOG to repay BUD. If WIEDERHORN took the money out of FOG to repay BUD, COLEMAN believed that would have been taxable compensation for WIEDERHORN's services provided to FOG. COLEMAN did not know if WIEDERHORN took money out of FOG as a loan to repay BUD. WIEDERHORN never paid COLEMAN in relation to the debt WIEDERHORN owed BUD.

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

████████████████████

Continuation of FD-302 of  (U) Interview of Don Coleman (5.26.2023)      , On  05/26/2023  , Page  5 of 5

From 2017 to 2020, WIEDERHORN never gave any money to COLEMAN. COLEMAN worked for years as a FOG director and was not paid for many services COLEMAN provided. As an example, FOG owned a subsidiary company in Carpinteria, California where COLEMAN served on the board. COLEMAN went to the meetings for years and was never paid for COLEMAN's services. COLEMAN thought money COLEMAN received from FOG in March 2020 might have been compensation for COLEMAN's past board services. COLEMAN eventually received some of the money COLEMAN was owed.

COLEMAN and the FOG board were never adamant the WIEDERHORN shareholder loan be cancelled. COLEMAN never told the FOG board that debts to WIEDERHORN should be cancelled. If WIEDERHORN told the tax authorities and tax preparers that the FOG board was adamant tens of millions of dollars of WIEDERHORN's shareholder debt be cancelled, it would be an inaccurate statement. It seemed odd to COLEMAN if WIEDERHORN suggested the FOG board was adamant about canceling WIEDERHORN's debt.

COLEMAN was aware FOG essentially sold FATBURGER to FAT. This was a complicated back and forth transaction and COLEMAN did not remember all the details. COLEMAN was not aware most of the money FOG received from the sale of FATBURGER to FAT went into WIEDERHORN's pocket. It frustrated COLEMAN to learn this because COLEMAN was a shareholder of FOG and felt COLEMAN was stuck with worthless shares.

COLEMAN last spoke to WIEDERHORN approximately three to four weeks ago. WIEDERHORN's daughter ████████████████████████ COLEMAN attended and spoke to WIEDERHORN, but not about the Government's investigation. Initially, WIEDERHORN informed COLEMAN about the FBI going to WIEDERHORN's house and the investigation. WIEDERHORN said the investigation was unfair and the FBI treated WIEDERHORN like a "mafioso." WIEDERHORN told COLEMAN WIEDERHORN was not guilty. WIEDERHORN told COLEMAN to cooperate with the authorities.

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

**EXHIBIT G**

| From: | Andy Wiederhorn [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=652F16DD445D460FBAA350DA0E964979-ANDY.WIEDER] |
| Sent: | 8/14/2018 6:34:34 PM |
| To: | Ken Kotler▮ ; Anthony IPad▮ |
| CC: | Don Berchtold▮ Don Coleman▮ Ken Anderson |
| | ; Allen Z. Sussman - Loeb & Loeb LLP ▮ |
| Subject: | RE: FCCG Board Meeting 9:00 a.m. Thursday August 16th at FAT Brands/Fog Cutter Office. |

I will prepare a short agenda.  FCCG is just a stock holding company (owns FAT) nothing else.  There isn't a budget yet, although Ron is working on preparing a Balance Sheet with Scott Stevenson.

Andrew A. Wiederhorn
President & Chief Executive Officer
FAT Brands Inc.
9720 Wilshire Blvd., Suite 500
Beverly Hills, CA 90212

**From:** K. Kenneth Kotler▮
**Sent:** Tuesday, August 14, 2018 11:32 AM
**To:** Anthony IPad▮
**Cc:** Andy Wiederhorn▮ ; Don Berchtold▮ Don Coleman
▮ Ken Anderson ▮ ; Allen Z. Sussman - Loeb & Loeb LLP

**Subject:** Re: FCCG Board Meeting 9:00 a.m. Thursday August 16th at FAT Brands/Fog Cutter Office.

AW-to supplement, would appreciate if you would distribute agenda for board meeting.  I assume based upon Anthony's request, you will have full 2018 budget. Looking forward to seeing everyone   Thanks.

Ken
Excuse typos-sent via IPhone

On Aug 13, 2018, at 12:02 AM, Anthony IPad <anthony_laptop@suplc.co.uk> wrote:

Dear Andy,
Just to check that you got this message before Thursday's meeting. You may have sent the information already. If it came encrypted, then I have been unable to retrieve from my Box account.
Otherwise I could pick up a hard copy Monday or Tuesday.
Look forward to seeing you and Jessica tomorrow.
Best,
Anthony

Dear Andy,
In the diary. As we discussed, it would be extremely helpful if we could have quarterly results against budget for the meeting and also a cash flow update.

FOIA CONFIDENTIAL TREATMENT REQUESTED     CONFIDENTIAL
CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FATBrands_00220591

USAO_PROD_00082736

Best,
Anthony

Sent from my iPad

On 3 Aug 2018, at 16:57, Andy Wiederhorn █████████████████ wrote:

_____

Andrew A. Wiederhorn

President & Chief Executive Officer

FAT Brands Inc.

9720 Wilshire Blvd., Suite 500

Beverly Hills, CA 90212

_____

████████████████████

e-mail: ████████████████████

<winmail.dat>

FOIA CONFIDENTIAL TREATMENT REQUESTED    CONFIDENTIAL
CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FATBrands_00220592

USAO_PROD_00082737

**EXHIBIT H**

- 1 of 17 -

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry ____03/23/2023____

JAMES CAMERON NEUHAUSER (NEUHAUSER), date of birth (DOB) ███████
phone number ██████████, email addresses ██████████ and
██████████, home address ██████████
██████, was interviewed at the United States Attorney's Office for the
Central District of California, located at 312 N Spring St, Los Angeles,
California 90012, by Federal Bureau of Investigation (FBI) Special Agent
(SA) Nathan Cherney, FBI SA Tristan Lozano, Assistant United States Attorney
(AUSA) Adam Schleifer, Internal Revenue Service Criminal Investigation (IRS-
CI) SA Megan Lucena, IRS-CI SA Janet-Siu, Securities & Exchange Commission
(SEC) attorney James Lyman, and SEC attorney Matt Montgomery. Also present
during the interview via phone was SEC accountant Carol Kim. Also present
during the interview was NEUHAUSER's counsel, Morgan Lewis attorneys Susan
Resley, Warren Rissier, Eric Sitarchuk, and Ryan Roth.

   Prior to the interview AUSA Adam Schleifer and SA Nathan Cherney
admonished NEUHAUSER of the following:

- The interview was voluntary;
- The SEC investigation was parallel and separate from the criminal
  investigation;
- To be truthful and complete in NEUHAUSER's answers during the interview
  because it was a crime to lie to federal agents and the protections
  afforded to NEUHAUSER under the proffer agreement would be void if
  NEUHAUSER was untruthful;
- The Government was not interested in any privileged communications.

   Prior to the interview SEC Attorney James Lyman admonished NEUHAUSER of
the following:

- NEUHAUSER's statements were covered via the SEC letter;
- It was important to be truthful during the interview;
- Information provided during the interview was subject to the SEC's
  routine use including sharing with law enforcement.

   Prior to the interview, NEUHAUSER confirmed NEUHAUSER reviewed the
proffer letter and signed it. After being advised of the identities of the

---

Investigation on  03/10/2023  at  Los Angeles, California, United States (In Person)

File # ██████████                                    Date drafted  03/10/2023

by  CHERNEY NATHAN ALEXANDER, LOZANO TRISTAN PIMENTEL

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

```
█████████████████
```

(U) Interview of James Neuhauser
Continuation of FD-302 of  (3.10.2023)                                                        , On  03/10/2023 , Page  2 of 17

interviewers and the nature of the interview, NEUHAUSER provided the
following information:

NEUHAUSER graduated from Brown University with a Bachelor's of Arts in
Economics. NEUHAUSER received his Masters of Business Administration (MBA)
from the University of Michigan. NEUHAUSER was a Chartered Financial Analyst
(CFA). NEUHAUSER worked for the Bank of New England for two years. From 1986
to 1993, NEUHAUSER worked for TRIDENT FINANCIAL CORP, a boutique investment
bank. From 1993 to 2016, NEUHAUSER worked for FBR. NEUHAUSER retired from
FBR in 2016. NEUHAUSER headed up the financial services group and investment
banking at FBR. From his time in banking, NEUHAUSER regularly reviewed SEC
filings and was familiar with the audit process. In 2017, NEUHAUSER
unretired to work for investment bank, STIFEL. NEUHAUSER left STIFEL in
summer 2022.

In 1994 or 1995, NEUHAUSER met ANDREW WIEDERHORN (WIEDERHORN). WIEDERHORN
was the Chief Financial Officer (CFO) of WILSHIRE FINANCIAL SERVICES (WFS),
which serviced mortgages. WFS owned and bought assets and morphed into
buying underperforming mortgages. WFS' business grew quite rapidly. FBR took
WFS public around 1995 or 1996. In 1997, FBR took WILSHIRE REIT public.
WILSHIRE REIT was managed by WFS. WILSHIRE REIT became what was now known as
FOG CUTTER CAPITAL GROUP (FCCG).

When FBR was involved with WFS, WIEDERHORN did not have shareholder loans
with WFS or WILSHIRE REIT. WIEDERHORN had a separate private company,
possibly called WILSHIRE SERVICING or something similar. WIEDERHORN had
shareholder loans with WILSHIRE SERVICING. NEUHAUSER learned about the
shareholder loans with WILSHIRE SERVICING from financial filings. NEUHAUSER
believed the IPO documents mentioned the shareholder loans. NEUHAUSER
believed the shareholder loans were for over $100 million. NEUHAUSER did not
know if WIEDERHORN ever repaid the shareholder loans. NEUHAUSER did not know
if a credit assessment was done for WIEDERHORN. There were no loans between
WFS and WILSHIRE SERVICING. WFS possibly merged with WILSHIRE SERVICING
before WFS was sold off. In the 2000s, NEUHAUSER remembered seeing in the
news that WIEDERHORN went to prison over a tax issue. NEUHAUSER found out
later WIEDERHORN went to prison for more than just a tax charge.

NEUHAUSER did not speak at length with WIEDERHORN about WIEDERHORN's
past. WIEDERHORN told NEUHAUSER WIEDERHORN pled guilty to two charges.
WIEDERHORN plead guilty for filing a false tax form and for giving a
gratuity. WIEDERHORN told NEUHAUSER WIEDERHORN's attorneys told WIEDERHORN
the Government would go after WIEDERHORN forever unless WIEDERHORN pled
guilty. WIEDERHORN did not tell NEUHAUSER the Government was investigating
WIEDERHORN for not paying taxes on shareholder loans that were written off.

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

(U) Interview of James Neuhauser

Continuation of FD-302 of  (3.10.2023)                              , On  03/10/2023 , Page  3 of 17

In 2016, WIEDERHORN called NEUHAUSER and asked if FBR could take
FATBURGER public. At the time, NEUHAUSER was no longer in investment banking
so NEUHAUSER referred WIEDERHORN to investment bankers at FBR. After,
WIEDERHORN periodically called NEUHAUSER to update NEUHAUSER on the ongoing
process. FBR was then sold to B. RILEY. B. RILEY knew of WIEDERHORN and
elected not to underwrite FATBURGER. NEUHAUSER was not kept in the loop on
the specific details of why the deal fell through around the end of 2016 or
early 2017. WIEDERHORN needed to get a high profile board member in the
restaurant industry. NEUHAUSER told WIEDERHORN if WIEDERHORN could find an
underwriter NEUHAUSER would join the board of directors. NEUHAUSER was
retired and looking for one or two things to do. NEUHAUSER was previously a
board member for a bank in the 1990s.

In March 2017, FAT BRANDS incorporated and NEUHAUSER joined the board.
FAT BRANDS' IPO occurred in October 2017. Between March 2017 and the IPO,
FCCG had not contributed anything to FAT BRANDS yet. FCCG had various loans
and legal issues including a dry cleaning environmental issue. NEUHAUSER did
not recall payroll or IRS issues with FCCG at the time of the IPO. The idea
behind the structure was for FAT BRANDS to have the franchising of numerous
brands and not have to answer to FCCG's liabilities. The ownership structure
after the IPO was FCCG owned 80% of FAT BRANDS, and the remaining 20% was
offered to the public via the IPO. FCCG could not go below 80% ownership or
the net operating losses (NOLs) would be lost or severely reduced. NEUHAUSER
understood FCCG had NOLs, but did not recall the dollar amount. NEUHAUSER
did not know if the NOLs were from write-offs of shareholder loans. ANDERSEN
TAX (ANDERSEN) performed a valuation of the NOLs which were valued around
$10 to $15 million.

FCCG contributed FATBURGER, BUFFALO'S FRANCHISE CONCEPTS (BFC), and the
rights to acquire PONDEROSA and BONANZA STEAKHOUSE to FAT BRANDS. In return,
FCCG received 8 million of common stock and a promissory note for $30
million. FAT BRANDS' gross proceeds from the IPO were $24 million and net of
fees was around $20 million. FAT BRANDS used approximately half of the IPO
proceeds to pay down the FCCG promissory note by approximately $10 million.
Immediately following the IPO, NEUHAUSER did not have direct insight into
the condition of operations at FCCG. NEUHAUSER did not think FCCG had
operations and understood FCCG to be a holding company for the ownership of
FAT BRANDS. NEUHAUSER did not believe FCCG had its own offices.

At the time of the IPO, NEUHAUSER understood there was potential for an
eventual merger between FAT BRANDS and FCCG. Once legacy issues at FCCG such
as the environmental issues were resolved, FAT BRANDS would look at
acquiring FCCG. The primary reason for FAT BRANDS to acquire FCCG would be
to obtain the NOLs. FCCG filed the consolidated tax return for FAT BRANDS.

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

(U) Interview of James Neuhauser

Continuation of FD-302 of  (3.10.2023)                                                   , On  03/10/2023  , Page   4 of 17

There was a tax sharing agreement between FAT BRANDS and FCCG. If FAT BRANDS
generated a tax obligation, FAT BRANDS would pay the amount of the tax
obligation to FCCG instead of the IRS.

NEUHAUSER received $60,000 and an annual grant of options for serving as
a board member. NEUHAUSER thought the initial grant of options was
approximately 10,000 options, but did not recall specifically. NEUHAUSER did
not have any ownership, compensation, or role at FCCG.

NEUHAUSER was the head of the audit committee. The audit committee was
responsible for hiring and interfacing with FAT BRANDS' external auditor.
NEUHAUSER was on the compensation committee. The compensation committee was
responsible for setting the compensation of FAT BRANDS' Chief Executive
Officer (CEO), WIEDERHORN.

WIEDERHORN's initial compensation at FAT BRANDS was a $400,000 base
salary. The compensation committee set the salary by looking at other public
company CEOs. FAT BRANDS had a much smaller market cap than the comparable
public companies. There was not a big negotiation with WIEDERHORN about
salary. NEUHAUSER did not recall any pushback from WIEDERHORN on the salary
figure. WIEDERHORN also received approximately 10,000 to 15,000 options
grants and there was a potential to receive bonuses. The compensation
committee did not approve any other forms of compensation for WIEDERHRON.
NEUHAUSER did not remember hearing anything or WIEDERHORN saying anything
about other forms of compensation WIEDERHORN would receive. NEUHAUSER did
not believe WIEDERHORN was allowed to withdraw funds from FAT BRANDS' bank
accounts for WIEDERHORN's personal use. NEUHAUSER was not aware WIEDERHORN
was withdrawing funds from FAT BRANDS' bank accounts for personal use. If
NEUHAUSER were aware WIEDERHORN could withdraw funds from FAT BRANDS' for
personal use, it would have affected how NEUHAUSER viewed WIEDERHORN's
compensation. If NEUHAUSER learned WIEDERHORN took $5 million or more from
FAT BRANDS every year, NEUHAUSER believed that was outside of what the
compensation committee approved for WIEDRHORN.

NEUHAUSER served on the board of directors for PHH CORP and a small bank.
In NEUHAUSER's commercial experience and over the course of NEUHAUSER's
career, NEUHAUSER generally believed people did not treat business bank
accounts as personal accounts. If a CEO treated the business bank accounts
as personal accounts, NEUHAUSER would be concerned.

NEUHAUSER was not aware of any compensation to WIEDERHORN in the form of
personal housing. NEUHAUSER was not aware of a house or option to own a
house in the name of FAT BRANDS or a FAT BRANDS' subsidiary. NEUHAUSER was
not aware of FAT BRANDS owning a home or an option to purchase a home.

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

(U) Interview of James Neuhauser

Continuation of FD-302 of (3.10.2023) _____ , On 03/10/2023 , Page 5 of 17

NEUHAUSER was not aware of WIEDERHORN living in a house owned by FAT BRANDS or a house that FAT BRANDS had an option to acquire. NEUHAUSER would have wanted to know if WIEDERHORN was hiding personal assets such as WIEDERHORN's home in the name of FAT BRANDS or a FAT BRANDS subsidiary. NEUHAUSER believed this would have been material to negotiating WIEDERHORN's compensation. If WIEDERHORN did this, it would seem improper and needed to be disclosed as a related party transaction. NEUHAUSER would have wanted to know if WIEDERHORN was hiding personal assets in the name of FAT BRANDS or a FAT BRANDS subsidiary from the IRS.

NEUHAUSER assumed if WIEDERHORN wired one million dollars from FAT BRANDS to WIEDERHORN, it would create a disclosure obligation, but did not know definitively. There should be controls so a person could not wire money to themselves from the company's accounts. Reviewing related party transactions was the board's responsibility. NEUHAUSER believed WIEDERHORN wiring money from FAT BRANDS to WIEDERHORN was a related party transaction.

NEUHAUSER did not have any awareness into other sources of income WIEDERHORN had outside of FAT BRANDS. NEUHAUSER was aware WIEDERHORN spent some time on FCCG issues including lawsuits and lenders. NEUHAUSER did not know if WIEDERHORN was compensated at FCCG for that work. NEUHAUSER had a general sense of WIEDERHORN's lifestyle.

NEUHAUSER had not specifically heard of section 162(m) of the Internal Revenue Code (IRC). NEUHAUSER was aware there were limits on the deductibility of cash compensation over $1 million to CEOs or executives of publicly traded companies. NEUHAUSER would have been aware of and considered the deductibility of executive compensation as a member of the compensation committee.

ALAN SUSSMAN (SUSSMAN) was disclosure counsel at Loeb & Loeb. SUSSMAN reviewed SEC filings for FAT BRANDS.

[In reference to Exhibit 1a, FAT BRANDS Offering Circular, dated October 20, 2017, PDF page 128, document page 108, section entitled, "Policies and Procedures for Related Party Transactions"]. NEUHAUSER recognized the offering circular. NEUHAUSER would have reviewed the offering circular in connection with the IPO. NEUHAUSER did not specifically recall the section entitled, "Policies and Procedures for Related Party Transactions." NEUHAUSER assumed Loeb & Loeb put this policy/disclosure together and it was accurate. NEUHAUSER understood that any related party transactions would need to be approved as outlined here. NEUHAUSER agreed with the statement that related person transactions presented a heightened risk of conflicts of interests and/or improper valuation or the perception thereof. NEUHAUSER was

USAO_PROD_00018892

FD-302a (Rev. 5-8-10)

(U) Interview of James Neuhauser

Continuation of FD-302 of (3.10.2023) , On 03/10/2023 , Page 6 of 17

not aware if NASDAQ had a policy requirement for related party transactions. NEUHAUSER thought there was a policy implemented for transactions on related persons. Every year, management and the board received a directors & officers (D&O) questionnaire for related party transactions. The D&O questionnaire helped discover if such related party transactions occurred. NEUHAUSER did not recall if FAT BRANDS implemented a written policy for transactions on related persons.

[In reference to Exhibit 1b, Audit Committee Charter, FATBrands_00249208 – FATBrands_00249213]. Regarding item D3, NEUHAUSER believed the audit committee was supposed to review reports prepared by management concerning all related party transactions for potential conflict of interest situations on an ongoing basis and approve all such transactions. NEUHAUSER did not recall receiving reports or anything prepared by management that would have informed NEUHAUSER of transfers of funds or benefits from FAT BRANDS to WIEDERHORN. NEUHAUSER believed it was management and WIEDERHORN's duty to bring related party transactions to NEUHAUSER's attention. NEUHAUSER remembered being asked to disclose any related party transactions involving NEUHAUSER. FAT BRANDS' compensation committee had to approve any compensation to WIEDERHORN. WIEDERHORN was not authorized to take whatever money or compensation WIEDERHORN wanted.

[In reference to Exhibit 1a, FAT BRANDS Offering Circular, dated October 20, 2017, PDF page 128, document page 108, section entitled, "Policies and Procedures for Related Party Transactions", continued]. NEUHAUSER believed any transactions between FAT BRANDS and WIEDERHORN or WIEDERHORN's children would be related party transactions. NEUHAUSER believed WIEDERHORN had direct or at least indirect interest in transactions involving FAT BRANDS and FCCG. NEUHAUSER believed any transactions between FAT BRANDS and FCCG would be a related party transactions and WIEDERHORN had an obligation to tell NEUHAUSER about transactions involving WIEDERHORN or WIEDERHORN's children. WIEDERHORN never told NEUHAUSER WIEDERHORN would take cash from FAT BRANDS and give it to WIEDERHORN's children. WIEDERHORN never told NEUHAUSER that WIEDERHORN's children were involved in transactions sending millions of dollars to FAT BRANDS. NEUHAUSER expected WIEDERHORN to tell NEUHAUSER about these related party transactions. NEUHAUSER believed related party transactions had to be disclosed. NEUHAUSER believed management including WIEDERHORN understood related party transactions had to be disclosed to the board. NEUHAUSER believed these disclosures were required whether there was a written policy or not.

[In reference to Exhibit 1a, FAT BRANDS Offering Circular, dated October 20, 2017, PDF page 128, document page 108, section entitled, "Policies and Procedures for Related Party Transactions", continued]. NEUHAUSER did not

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

(U) Interview of James Neuhauser

Continuation of FD-302 of  (3.10.2023)                                    , On  03/10/2023 , Page  7 of 17

know specifically what section 402 of Sarbanes-Oxley addressed at the time
of the Offering Circular. At the time of the Offering Circular, NEUHAUSER
understood publicly traded companies were not allowed to make loans to
officers. Personal loans to officers were prohibited because they could be
considered a form of compensation. NEUHAUSER did not remember distinguishing
between direct loans versus indirect loans such as through a third party.

[In reference to Exhibit 2, 2017 FAT BRANDS Form 10-K, Item 13, "Certain
Relationships and Related Party Transactions, and Director Independence,"
PDF page 52, document page 48]. NEUHAUSER did not recognize Item 13 of the
Form 10-K. NEUHAUSER did not specifically recall a policy being implemented
by resolution by the board. NEUHAUSER believed WIEDERHORN knew related
person transactions must be approved by a majority of the board of directors
and by a majority of the disinterested members of the board. NEUHAUSER
understood, "be on terms no less favorable to us than could be obtained from
unaffiliated third parties" to mean related person transactions could not be
done at nonmarket rates. Management did not inform the board of directors of
wires over $120,000 between FAT BRANDS and WIEDERHORN and WIEDERHORN's
children. NEUHAUSER did not recall what WIEDERHORN's children's salaries
were for 2017. 2017 was a partial year. NEUHAUSER was aware WIEDERHORN's
children were employees of FAT BRANDS. NEUHAUSER thought salaries of
$300,000 for THAYER WIEDERHORN (THAYER) and TAYLOR WIEDERHORN (TAYLOR), and
a salary of $250,000 for MASON WIEDERHORN (MASON) sounded familiar.
NEUHAUSER was aware at the time of the salaries, but did not recall
specifically when NEUHAUSER learned of the salaries. WIEDERHORN was
responsible for setting WIEDERHORN's childrens' salaries. NEUHAUSER expected
WIEDERHORN's children's salaries to fall under related person transactions.

[In reference to Exhibit 4, $11,906,000 Intercompany Promissory Note].
This note was a rollup of notes from FCCG and the franchised brands. This
note represented money FCCG owed to FAT BRANDS. NEUHAUSER understood this
money was owed to FAT BRANDS so the franchise brands would have capital. In
order for FAT BRANDS to operate in California, a certain amount of capital
was required. NEUHAUSER believed this promissory note was not a cash
transaction, but rather documented a payable sitting on the balance sheet
for capitalization. NEUHAUSER reviewed the promissory note. NEUHAUSER
believed the promissory note was a related party transaction. NEUHAUSER did
not remember how the amount or interest rate were calculated. NEUHAUSER
assumed it was the board of director's responsibility to ensure it was done
at fair terms since it was a related party transaction. NEUHAUSER believed
the money represented in the promissory note was supposed to be used for
business purposes. NEUHAUSER was not involved in the prior loans, but
reviewed and approved this document because it was part of the IPO

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

███████████████

      (U) Interview of James Neuhauser

Continuation of FD-302 of (3.10.2023)         , On  03/10/2023 , Page  8 of 17

transaction. NEUHAUSER did not do any work to ascertain how the funds were used. At the time, NEUHAUSER thought 10% was not necessarily an unreasonable interest rate. The promissory note was signed by WIEDERHORN.

[In reference to Exhibit 5, $30 million Promissory Note]. NEUHAUSER approved the promissory note as part of the IPO. 10% interest looked reasonable, but NEUHAUSER was unaware of how that rate was calculated or decided. NEUHAUSER did not know why the $11,906,000 note and the $30 million note were not netted against each other.

[In reference to Exhibit 6, an email dated May 12, 2018]. NEUHAUSER did not recall this email. NEUHAUSER did not recall anything about SAGARD. NEUHASUER did not believe the transaction with SAGARD went through. In general, WIEDERHORN was attempting to get third party loans to purchase other franchises. In general, the lenders did not want money lent to FAT BRANDS to go to FCCG. The lenders wanted the loan proceeds to go towards FAT BRANDS' business and not repaying other debt. NEUHAUSER did not recall WIEDERHORN ever telling NEUHAUSER the lenders were concerned about WIEDERHORN using loan proceeds for personal use through FCCG. NEUHAUSER would have wanted to know if the lenders expressed concern about WIEDERHORN using loan proceeds for personal use.

[In reference to Exhibit 6, an email dated May 12, 2018]. There was another lender, possibly FB LENDING, who required the remaining balance of the $30 million promissory note to be converted to convertible stock because the lender did not want the loan proceeds to be used for non-operating business. NEUHAUSER believed it was very typical for a lender to want the loan proceeds used for operations. The lender wanted the money to be used to generate returns and not go out elsewhere. NEUHAUSER believed if FAT BRANDS took out a third party loan and gave the proceeds to WIEDERHORN personally, it would be hard to generate a return on investment. NEUHAUSER would have wanted to know if WIEDERHORN was using loan proceeds to FAT BRANDS for personal use. FCCG had creditors on payment plans who were awaiting payment from FCCG. WIEDERHORN told the board FCCG needed funds to keep the creditors at FCCG happy. WIEDERHORN said WIEDERHORN needed $5 to $7 million for the creditors. If FAT BRANDS lent FCCG approximately $6.5 million in the second half of 2018, NEUHAUSER would have seen in the financial statements. NEUHAUSER did not know if approximately $4.5 million of that loan went to WIEDERHORN personally. NEUHAUSER believed WIEDERHORN's representation of why FCCG needed the money to be a material lie if WIEDERHORN used the proceeds for personal use.

[In reference to Exhibit 7, an email dated June 25, 2018]. Around this time, FAT BRANDS was continuing its strategy to find brands to acquire. One

USAO_PROD_00018895

FD-302a (Rev. 5-8-10)

[ ]

(U) Interview of James Neuhauser

Continuation of FD-302 of (3.10.2023)                                   , On  03/10/2023 , Page  9 of 17

of the lenders demanded money not flow to FCCG, which led to the conversion
of the remaining balance of the $30 million promissory note. NEUHAUSER did
not remember WIEDERHORN having any qualms with the conversion.

[In reference to Exhibit 8a, Action by Unanimous Written Consent]. The
purpose of the loan from LION FUND I and LION FUND II (collectively LION
FUND) was to refinance the FB LENDING loan. NEUHAUSER believed FAT BRANDS
refinanced the FB LENDING loan with LION FUND because the FB LENDING loan
was due. The interest rate on the loan from LION FUND was 20% because FAT
BRANDS was a small company and was unable to access other capital as FAT
BRANDS anticipated. NEUHAUSER understood the use of the LION FUND funds for
"general corporate purposes" meant the funds would be used for the day-to-
day running of FAT BRANDS' business. NEUHAUSER did not believe using the
proceeds of the LION FUND loan to pay WIEDERHORN's personal credit card
would constitute "general corporate purposes." NEUHASUER did not recall any
consideration given to the fact that the loan from LION FUND had a 20%
interest rate, but FAT BRANDS was loaning money to FCCG at a 10% interest
rate. NEUHAUSER believed there could have been legitimate reasons for FAT
BRANDS to lend money to FCCG, which could have benefited FAT BRANDS minority
shareholders. However, NEUHAUSER believed the disparity in interest rates
would not be fair to the FAT BRANDS non-FCCG shareholders if the money lent
to FCCG were going to WIEDERHORN personally.

NEUHAUSER was expecting the loans from FAT BRANDS to FCCG to be paid
back. In board meetings WIEDERHORN represented the loans would be paid back.
NEUHAUSER did not recall any of the loans from FAT BRANDS to FCCG being paid
back. WIEDERHORN claimed FCCG would repay FAT BRANDS by monetizing FAT
BRANDS stock and from cash received from the NOL utilization. NEUHAUSER,
WIEDERHORN, and the board did not want FCCG to make a large or distressed
sale of FAT BRANDS stock. NEUHAUSER, WIEDERHORN, and the board were okay
with FCCG selling FAT BRANDS stock over time though.

[In reference to Exhibit 9, an email dated May 11, 2019]. This email
looked familiar to NEUHAUSER. NEUHAUSER believed this exchange was primarily
over email. The board would have received the first quarter results from FAT
BRANDS prior to the filing. The intercompany account referred to money FCCG
borrowed from FAT BRANDS. NEUHAUSER thought WIEDERHORN removed the auditors
from the email chain because the email did not have anything to do with the
auditors. Nothing WIEDERHORN wrote in the email conveyed to NEUHAUSER or the
board that WIEDERHORN was using the money to lent to FCCG to give WIEDERHORN
money personally. The dividends to FCCG stopped and NEUHAUSER understood
WIEDERHORN to be saying the loan from FAT BRANDS to FCCG was implemented to
pay FCCG's obligations. WIEDERHORN was saying WIEDERHORN was using the loan
to FCCG to help FAT BRANDS because FCCG's creditors might sue FAT BRANDS. If

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

(U) Interview of James Neuhauser

Continuation of FD-302 of (3.10.2023)  , On 03/10/2023  , Page 10 of 17

WIEDERHORN was not paying creditors as WIEDERHORN represented, it would
upset NEUHAUSER. NEUHAUSER did not recall if WIEDERHORN was sour about the
$30 million promissory note being converted to equity. WIEDERHORN mentioned
the conversion as an excuse as to why FCCG needed cash. The terms of the
money lent from FAT BRANDS to FCCG was done at the same terms as the
original $11,906,000 note. At the time, NEUHAUSER did not think of the
additional proceeds lent to FCCG as an extension of the $11,906,000 note,
but rather entirely new advances to FCCG. NEUHAUSER believed the $11,906,000
note was supposed to be for business purposes.

GREG ZELENAY (ZELENAY) was the audit partner from BAKER TILLY. ZELENAY
called NEUHAUSER because NEUHAUSER was the head of the audit committee.
ZELENAY told NEUHAUSER FAT BRANDS needed to formalize the advances made from
FAT BRANDS to FCCG.

[In reference to Exhibit 10, FATBrands_00073197 - FATBrands_00073199].
Prior to April 2020, there was no document governing the additional proceeds
lent from FAT BRANDS to FCCG. The auditors asked for a formal system, which
led to the drafting of the intercompany revolving credit agreement. The new
agreement also called for control procedures to govern the borrowings. The
agreement for up to $35 million of borrowings, but the balance outstanding
was lower at the time.

[In reference to Exhibit 11, April 14, 2020 board minutes,
FATBrands_00000323 - FATBrands_00000325]. From 2017 to 2019, board meetings
were typically quarterly and in person. In early 2020, the board meetings
switched to weekly Zoom meetings. NEUHAUSER recognized the board minutes.
REBECCA HERSHINGER (HERSHINGER) took minutes. The minutes including the
attendees listed appeared accurate. At the time, COVID-19 was a concern and
FAT BRANDS was looking closely at cash management. Initially, sales were
down and there was concern about COVID-19's impact on FAT BRANDS' business.

[In reference to Exhibit 11, April 14, 2020 board minutes,
FATBrands_00000323 - FATBrands_00000325]. NEUHAUSER did not specifically
remember WIEDERHORN's representations at this board meeting versus the other
ensuing board meetings. WIEDERHORN was consistent in each meeting about the
intended uses of the funds lent to FCCG. There were rigorous discussions
about the intercompany revolving credit agreement including how much money
was needed and what the uses were. WIEDERHORN claimed FCCG needed
approximately $1-$2 million per quarter for FCCG's legacy issues. WIEDERHORN
never told the board FCCG needed money to give or lend money to WIEDERHORN
personally. The board approved the intercompany revolving agreement, which
satisfied the auditors. The board agreed to potentially approve
disbursements under the agreement later. NEUHAUSER and the board's

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

████████████

(U) Interview of James Neuhauser

Continuation of FD-302 of (3.10.2023) _____ , On 03/10/2023 , Page 11 of 17

expectations were FAT BRANDS would not advance more money to FCCG than what the board approved.

[In reference to Exhibit 12, the Intercompany Revolving Credit Agreement]. NEUHAUSER reviewed the agreement. NEUHAUSER remembered the intercompany lending agreement called for the board to approve additional borrowings in advance. NEUHAUSER would not have focused on language in the agreement requiring changes to be written.

[In reference to Exhibit 13, an email dated April 19, 2020, FATBrands_00233737 - FATBrands_00233770]. FAT BRANDS completed the securitization of BURGER BRANDS in early March 2020. FAT BRANDS had a little more cash than FAT BRANDS normally had on hand. FAT BRANDS was worried about the viability of its business during COVID-19 closures. Ultimately, FAT BRANDS recovered quickly because of food delivery and pickup. Around April 2020, there was a lot of uncertainty and concern about FAT BRANDS meeting its obligations. The purpose of the 12-month cash flow analysis was to see the availability of cash going forward including cash going to FCCG. The advance or dividends line item showed $1 million per quarter projected as going to FCCG on a consistent basis. It was significant to WIEDERHORN that FCCG received the advances. This document tried to show there was cash available even after paying the advances to FCCG. Even in the worst-case scenario, money still went from FAT BRANDS to FCCG and there was money left over.

[In reference to Exhibit 14, April 21, 2020 board minutes, FATBrands_00000336 - FATBrands_00000338]. The minutes were consistent with NEUHAUSER's recollection of the attendees. There were specific discussions about how much cash FCCG needed, who it was going to, and how it would be paid. WIEDERHORN told the board FCCG needed the money to pay FCCG's creditors. WIEDERHORN did not tell the board the funds to FCCG were for WIEDERHORN personally. NEUHAUSER recalled WIEDERHORN said WIEDERHORN needed $50,000 immediately for business expenses that needed to be paid. If any of the $50,000 went to WIEDERHORN personally, it would have been important information for NEUHAUSER to know prior to approving the advance. It would upset NEUHAUSER if WIEDERHORN used any of the $50,000 for WIEDERHORN personally. Neither RON ROE (ROE) nor HERSHINGER told the board what they thought the funds would be used for.

[In reference to Exhibit 15, April 28, 2020 minutes, FATBrands_00000326 - FATBrands_00000328]. NEUHAUSER believed the attendees listed were accurate. WIEDERHORN made the same representations WIEDERHORN made previously as to why FCCG needed to borrow money from FAT BRANDS. WIEDERHORN claimed the funds were to pay FCCG creditors. WIEDERHORN did not tell the board

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

████████████

(U) Interview of James Neuhauser

Continuation of FD-302 of (3.10.2023) , On 03/10/2023 , Page 12 of 17

WIEDERHORN would use the funds for WIEDERHORN personally. Neither ROE nor HERSHINGER spoke up about why FCCG needed the funds. NEUHAUSER did not recall checking on how the previously approved $50,000 was spent. WIEDERHORN requested and the board approved up to an additional $1 million of borrowing by FCCG for Q2 2020. NEUHAUSER's expectation was FCCG could only borrow up to $1 million for Q2 2020 unless WIEDERHORN sought additional approvals. NEUHAUSER did not recall WIEDERHORN coming back to the board for approval of additional advances for Q2 2020. If WIEDERHORN sought additional advances for Q2 2020, it would be in the minutes. It would upset NEUHAUSER if NEUHAUSER found out the funds lent to FCCG went to WIEDERHORN personally. WIEDERHORN should have told NEUHAUSER and NEUHAUSER had a right to know how the funds were used.

[In reference to Exhibit 16, an email dated April 28, 2020, FATBrands_00407188 - FATBrands_00407190]. Looking back, NEUHAUSER believed WIEDERHORN did not keep in mind the best interest of all FAT and FCCG shareholders. NEUHAUSER expected WIEDERHORN to list FCCG liability payments accurately. It would frustrate NEUHAUSER to learn WIEDERHORN was either not making payments at all or misrepresenting the amount WIEDERHORN was making such as the payments to the IRS and TALL PINES. NEUHAUSER was aware FCCG had legal action and assumed SG&A covered legal expenses. NEUHAUSER did not believe or interpret SG&A and compensation to mean WIEDERHORN was taking money from FCCG. NEUHAUSER remembered reviewing the amount of each monthly liability amount WIEDERHORN listed. On a quarterly basis, the monthly payments totaled close to $1 million. Because WIEDERHORN did not list an amount for SG&A including compensation, NEUHAUSER assumed the amount of payments for SG&A and compensation to be the remainder of the $1 million, which was small. This was the first time WIEDERHORN ever mentioned compensation at FCCG. NEUHAUSER did not recall WIEDERHORN mentioning compensation for WIEDERHORN at FCCG. To the extent WIEDERHORN had any compensation at FCCG, NEUHAUSER assumed it would be a modest amount, meaning well under the amount of compensation WIEDERHORN received at FAT BRANDS. NEUHAUSER believed any compensation for WIEDERHORN at FCCG would be modest because FCCG was just a holding company. NEUHAUSER did not believe anyone raised questions about the validity of the amounts listed for the debts.

[In reference to Exhibit 17, an email dated August 21, 2020, FATBrands_00025509 - FATBrands_000025510]. If ROE knew FCCG was not paying liabilities as WIEDERHORN represented, NEUHAUSER expected ROE would tell the board. NEUHAUSER did not recall ROE or anyone saying FCCG was not paying the lenders as WIEDERHORN represented. NEUHAUSER would have wanted to know if there was an indication the money was not being used as WIEDERHORN claimed.

[In reference to Exhibit 18, an email dated May 27, 2020,

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

(U) Interview of James Neuhauser
Continuation of FD-302 of (3.10.2023) _____ , On 03/10/2023 , Page 13 of 17

FATBrands_00376230]. The auditors wanted an explanation as to why the receivable from FCCG was valuable as an asset. The auditors wanted assurance FCCG could repay FAT BRANDS. NEUHAUSER would have expected the disclosure of a loan from WIEDERHORN to FCCG to be a way to potentially pay back FCCG if NEUHAUSER knew it existed. The expectation was the FCCG loan could be repaid back from the $16.5 million NOL and from sale of stock. The FAT BRANDS stock held by FCCG was worth $94 million at the IPO. As the stock price went down, there was more concern about how FCCG could repay FAT BRANDS and whether a creditor could sell the stock and blow FAT BRANDS' share price. FAT BRANDS had less and less ability to complete a deal as the stock price went down.

Because of COVID-19, FAT BRANDS could acquire franchises like JOHNNY ROCKETS at a lower price. One reason for the merger was so the intercompany loans could be resolved. FAT BRANDS could not access the capital markets with the equity structure and intercompany loans in place. NEUHAUSER looked at another way of FCCG repaying FAT BRANDS. NEUHAUSER looked at netting the loans and liabilities to FCCG and giving series B preferred stock to the minority shareholders. Ultimately, FAT BRANDS issued a stock dividend to the minority shareholders.

[In reference to Exhibit 19, July 13, 2020 board minutes, FATBrands_00000536 - FATBrands_00000538]. SILVIA KESSEL (KESSEL) and MARC HOLTZMAN (HOLTZMAN) resigned from FAT BRANDS. HOLTZMAN told NEUHAUSER HOLTZMAN resigned because HOLTZMAN felt overwhelmed by the amount of work. FAT BRANDS was having weekly meetings and HOLTZMAN was in New Zealand. HOLTZMAN had become the chairman of a bank in Africa. KESSEL had issues with KESSEL's mother and dealing with COVID-19. HOLTZMAN and KESSEL never said they quit because of a disagreement with WIEDERHORN. At the board meeting, the board approved another $1 million for FCCG for Q3 2020. WIEDERORN made the same representations to the board about why FCCG needed additional funds. WIEDEHORN claimed the funds were needed for creditors and did not tell the board the funds were for WIEDERHORN personally. NEUHAUSER understood WIEDERHORN was not allowed to borrow anything beyond the $1 million without board approval. Sometime around Q3 2020, WIEDERHORN came back to the board and asked for additional money for FCCG. WIEDERHORN was consistent in his representations regarding the intended use of the funds. WIEDERHORN asked the board if WIEDERHORN needed to keep coming back to the board for approval of the funds to FCCG. The board agreed to let FCCG borrow whatever amount WIEDERHORN wanted up to the maximum allowable amount under the intercompany revolving credit agreement without approval going forward. While the intercompany lending agreement required written approval, approval was not granted in writing. NEUHAUSER would have expected SUSSMAN to have reminded the board to stick to the terms outlined in the intercompany

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

(U) Interview of James Neuhauser
Continuation of FD-302 of (3.10.2023)                          , On 03/10/2023 , Page 14 of 17

revolving agreement, but SUSSMAN did not. NEUHAUSER believed SUSSMAN worked
for FAT BRANDS. NEUHAUSER did not know if SUSSMAN worked for FCCG or
WIEDERHORN personally.

   Prior to the September 2020, NEUHAUSER was unaware of the shareholder
loan between FCCG and WIEDERHORN. If NEUHAUSER had learned about the
shareholder loan earlier, it would have raised questions for NEUHAUSER and
there would have been a discussion. In September 2020, NEUHAUSER received an
email with FCCG financial statements. SQUIRE JUNGER (JUNGER) was not
included in the September 2020 email. This email was when NEUHAUSER first
learned FCCG lent money to WIEDERHORN via a shareholder loan. NEUHAUSER was
surprised when NEUHAUSER learned of the shareholder loan from FCCG to
WIEDERHORN. NEUHAUSER was surprised by the amount of the shareholder loan,
around $16 million. NEUHAUSER remembered wondering whether the shareholder
loan was compensation. NEUHAUSER did not know where all the money for the
shareholder loan came from. NEUHAUSER thought some of the money for the
shareholder loan could have come from the $30 million promissory note.
NEUHAUSER was disappointed to learn of the shareholder loan. WIEDERHORN's
use of money lent from FAT to FCCG was not what WIEDERHORN told NEUHAUSER
and the board it would be used for. After learning of the shareholder loan,
there was a trust deficit between WIEDERHORN and NEUHAUSER.

   When NEUHAUSER learned of the shareholder loan, NEUHAUSER was focused on
the merger to deal with the loan between FCCG and FAT. NEUHAUSER was focused
on protecting the non-FCCG shareholders in the merger. FAT BRANDS and FCCG
had accountants and people looking at the various issues. The merger was
looked at by experts and nobody flagged issues. Dealing with the shareholder
loan between FCCG and WIEDERHORN was not directly on NEUHAUSER's radar.
NEUHAUSER did not ask WIEDERHORN about the shareholder loan after learning
of it. NEUHAUSER did not have discussions about WIEDERHORN's compensation
and loans between December 2020 and December 2021.

   [In reference to Exhibit 20, an email dated October 18, 2020,
FATBrands_00146646 - FATBrands_00146668]. The email and attachment looked
familiar to NEUHAUSER. NEUHAUSER reviewed the FCCG financial statements in
pretty good detail. FCCG was a holding entity that did not really have any
operations. NEUHAUSER was not aware of FCCG getting cash from anywhere else
besides FAT BRANDS.

   A $25 million write-off the shareholder loan did not sound familiar to
NEUHAUSER. The shareholder loan had to be written off or paid back prior to
the merger or else it would violate section 402 of the Sarbanes-Oxley act.
NEUHAUSER did not have an understanding of how the shareholder loan would be
eliminated. If NEUHAUSER had known the NOLs FAT BRANDS acquired from FCCG

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

■■■■■■■■■■

(U) Interview of James Neuhauser

Continuation of FD-302 of (3.10.2023)                          , On  03/10/2023 , Page  15 of 17

might be worthless due to the illegal tax treatment of the write-off of the
shareholder loan, NEUHAUSER would have adjusted the terms of the merger to
make the non-FCCG shareholders whole via a larger stock dividend. It would
have been important for NEUHAUSER and shareholders to know the shareholder
loan to WIEDERHORN might arguably be indirect executive compensation, which
might mean the NOLs were of reduced value. Had someone come to NEUHAUSER and
notified NEUHAUSER there was an issue with the NOLs, NEUHAUSER would have
compensated the non-FCCG shareholders appropriately. The net present value
of the NOLs were written down from $16.5 million to $9.5 million. The write-
off would have had an NOL of something like $2 million, and the minority
shareholders would have had a small percentage of that.

With the benefit of hindsight, NEUHAUSER would not have approved the
funds lent from FAT BRANDS to FCCG if NEUHAUSER knew the money was going to
WIEDERHORN. In 2018, if FAT BRANDS had revenue of $18 million and $9 million
went to WIEDERHORN via the shareholder loan, an investor's decision to
invest might have been impacted. As an investor in FAT BRANDS himself,
NEUHAUSER's decision to invest might have been affected had NEUHAUSER known
WIEDERHORN was putting 50% of FAT BRANDS revenue into WIEDERHORN's pocket.

NEUHAUSER spoke fairly frequently with JUNGER. NEUHAUSER spoke less
frequently with ED RENSI (RENSI). Sometime probably after the merger and
prior to learning of the Government's investigation, NEUHAUSER spoke to
JUNGER. JUNGER expressed disbelief about WIEDERHORN taking money out of FAT
BRANDS via the FCCG shareholder loan.

After the merger, FAT BRANDS hired a more experienced CFO. FAT BRANDS
built out a broader finance group. Prior to the merger, not all the policies
were being followed. Now there were more controls in place, and FAT BRANDS
was big enough to implement them.

After learning of the shareholder loan, NEUHAUSER did not do anything to
discover who else knew money was going from FAT BRANDS to FCCG to
WIEDERHORN. NEUHAUSER did not call or talk to anyone after discovering the
$16 million WIEDERHORN took out from FCCG. NEUHAUSER talked to CABRILLO
ADVISORS or others only about not having the shareholder loan upon
completion of the merger. Neither ZELENAY or anyone from SQUAR MILNER told
NEUHAUSER WIEDERHORN was taking money out via the shareholder loan.
NEUHAUSER was surprised ZELENAY did not tell NEUHAUSER about the shareholder
loan. NEUHAUSER would have expected SUSSMAN to tell NEUHAUSER WIEDERHORN was
taking money out of the company via a shareholder loan if SUSSMAN knew that.
NEUHAUSER thought SUSSMAN should have said there was an issue and brought it
to the board's attention.

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

(U) Interview of James Neuhauser
Continuation of FD-302 of (3.10.2023) , On 03/10/2023 , Page 16 of 17

Up until the merger, FAT BRANDS did not have an employment agreement with WIEDERHORN. As FAT BRANDS got bigger, NEUHAUSER expected WIEDERHORN's compensation to increase. FAT BRANDS' revenue increased to $400 million per year. FAT BRANDS used ICR's services to get data for setting the CEO compensation. ICR and one other expert maybe a law firm, helped the compensation committee put together a raise for WIEDERHORN. NEUHAUSER did not recall if WIEDERHORN asked for a raise.

FAT BRANDS had shareholder derivative lawsuits. NEUHAUSER was unaware of any shareholders being unhappy with WIEDERHORN's shareholder loans. One lawsuit was on certain aspects of corporate governance involving race and diversity. Management and the board were looking at changes to show better corporate governance. The board moved to a one-year non-staggered board. Prior, FAT BRANDS had a staggered board which meant a board member could only be fired when his or her term came up and could not be fired midstream. For a non-staggered term, the controlling shareholder could remove a board member at any time. In December 2022, FAT BRANDS switched to the non-staggered board at one-year terms. The day after, WIEDERHORN removed JUNGER as a board member. WIEDERHORN called NEUHAUSER and told NEUHAUSER WIEDERHORN removed JUNGER because JUNGER only received a 24% affirmative vote. WIEDERHORN told NEUHAUSER the proxy advisors recommended voting against JUNGER and LYNN COLLIER because there was not enough diversity on the board. WIEDERHORN said WIEDERHORN was removing JUGNER to put someone who qualified. NEUHAUSER did not talk with JUNGER about JUNGER's removal.

NEUHAUSER thought HERSHINGER was fine as a CFO for the size FAT BRANDS was at the time. HERSHINGER had good qualifications. HERSHINGER was not a delegator. As FAT BRANDS got bigger, HERSHINGER still tried to do all the work. The board received lists of problems and they told HERSHINGER to hire more people. Eventually, FAT BRANDS came within an hour of not filing on time and they decided to go with someone stronger. NEUHAUSER would have expected HERSHINGER to have been aware of wires to WIEDERHORN from FAT BRANDS or FCCG. NEUHAUSER would have expected HERSHINGER to inform the board of wires to WIEDERHORN if HERSHINGER were aware of them.

ROE was an analyst and not qualified to be CFO of FAT BRANDS. NEUHAUSER would have expected in ROE to have informed the board of wires to WIEDERHORN from FAT and FCCG.

In July 2022, NEUHAUSER became the Executive Chairman of FAT BRANDS. NEUHAUSER received presentations and updates throughout 2022 about the investigation. After the presentation, NEUHAUSER met with WIEDERHORN in January 2023. NEUHAUSER told WIEDERHORN NEUHAUSER was not speaking for the board, but NEUHAUSER thought WIEDERHORN should resign at some point.

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER

FD-302a (Rev. 5-8-10)

(U) Interview of James Neuhauser

Continuation of FD-302 of (3.10.2023) _____ , On 03/10/2023 , Page 17 of 17

NEUHAUSER thought WIEDERHORN staying on at FAT BRANDS would cause real issues for FAT BRANDS. WIEDERHORN argued his case with NEUHAUSER about why WIEDERHORN should stay on. WIEDERHORN pushed back and asked why WIEDERHORN's removal had to be done so quickly. WIEDERHORN said they should wait until something did or did not happen. WIEDERHORN and NEUHAUSER agreed to talk more later. NEUHAUSER met with WIEDERHORN on February 7 or February 8, 2023. NEUHAUSSER told WIEDERHORN NEUHAUSER did not think WIEDERHORN had a lot of time before the board took action against WIEDERHORN.

NEUHAUSER was concerned WIEDERHORN could remove everyone from the board, but NEUHAUSER did not care. WIEDERHORN pushed back very strongly about the resignation discussion. WIEDERHORN felt it was not fair. WIEDERHORN thought the shares of FAT BRANDS could become worth $50 per share by the end of it all. On February 15 or February 16, 2023. WIEDERHORN told NEUHAUSER it would be too bad if NEUHAUSER lost all of NEUHAUSER's restricted stock as a result of being remove from the board.

WIEDERHORN made his resignation on March 3, 2023, which was publicly announced March 6, 2023, and effective in May 2023. After May 2023, WIEDERHORN would stay on as a consultant. WIEDERHORN would remain on the board because the board did not have the power to remove WIEDERHORN.

CONFIDENTIAL INFORMATION--
CONTENTS SUBJECT TO PROTECTIVE
ORDER